**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:     (818) 532-6499
E-mail: jpafiti@pomlaw.com
*- additional counsel on signature page -*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INCHEN HUANG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DEPOMED, INC., ARTHUR JOSEPH HIGGINS, JAMES A. SCHOENECK, and AUGUST J. MORETTI,<br><br>Defendants | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Inchen Huang ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Depomed, Inc. ("Depomed" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Depomed securities between February 26, 2015 and August 7, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Depomed, a specialty pharmaceutical company, engages in the development, sale, and licensing of products for pain and other central nervous system conditions in the United States.

3.     Founded in 1995, the Company is headquartered in Newark, California.  Depomed's stock trades on the NASDAQ under the ticker symbol "DEPO."

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Depomed engaged in questionable practices in connection with the sales and marketing of the Company's opioid products; (ii) the foregoing conduct, when it became known, would likely subject the Company to heightened legal and regulatory scrutiny; and (iii) as a result, Depomed's public statements were materially false and misleading at all relevant times.

5.     On August 7, 2017, post-market, Depomed disclosed that the Company "recently received a request for information from the ranking minority member of the United States Senate Committee on Homeland Security and Governmental Affairs related to the promotion of opioids" and that Depomed had also received "subpoenas related to opioid sales and marketing from the Office of the Attorney General of Maryland and the United States Department of Justice."

6.     On this news, Depomed's share price fell $3.09, or 33.42%, to close at $6.15 on August 8, 2017.

### JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business and operate facilities in this district, and a significant portion of the Defendants' actions, and the subsequent damages, took place within this Judicial District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

11.     Plaintiff, as set forth in the accompanying Certification, purchased Depomed securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

12.     Defendant Depomed is incorporated in Delaware and its principal executive offices are located at 7999 Gateway Boulevard, Suite 300, Newark, California 94560.  Depomed's securities are traded on the NASDAQ under the ticker symbol "DEPO."

13.     Defendant Arthur Joseph Higgins ("Higgins") has served as the Company's Chief Executive Officer ("CEO") and President since March 2017.

3

14.     Defendant James A. Schoeneck ("Schoeneck") served as the Company's CEO and President from April 2011 until March 2017.

15.     Defendant August J. Moretti ("Moretti") has served at all relevant times as the Company's Chief Financial Officer ("CFO") and Senior Vice President.

16.     Defendants Higgins and Moretti are sometimes collectively referred to herein as the "Individual Defendants."

17.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Depomed, a specialty pharmaceutical company, engages in the development, sale, and licensing of products for pain and other central nervous system conditions in the United States.

19.     Among other drugs, Depomed's portfolio includes the opioids Nucynta (tapentadol) and Lazanda (fentanyl).

### Materially False and Misleading Statements Issued During the Class Period

20.     The Class Period begins on February 26, 2015, when Depomed filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").  For the quarter, Depomed reported net income of $94.62 million, or $1.23 per diluted share, on revenue of $194.6 million, compared to net income of $41.8 million, or $0.72 per diluted share, on revenue of $40.61 million for the same period in the prior year.  For 2014, Depomed reported net income of $131.76 million, or $2.05 per diluted share, on revenue of $390.36 million, compared to net income of $43.31 million, or $0.75 per diluted share, on revenue of $134.21 million for 2013.

21.     In the 2014 10-K, Depomed stated, in relevant part:

4

**MARKETING AND SALES**

We have developed capabilities in various aspects of our commercial organization through our commercialization of Gralise®, CAMBIA®, Zipsor® and Lazanda®, including sales, marketing, manufacturing, quality assurance, wholesale distribution, medical affairs, managed market contracting, government price reporting, compliance, maintenance of the product NDA and review, and submission of promotional materials. Members of our commercial organization are also engaged in the commercial and marketing assessments of other potential product candidates.

Our sales organization includes 188 full-time sales representatives. If we consummate the NUCYNTA® Acquisition, we expect to significantly increase the number of sales representatives. Our sales force primarily calls on pain specialists, neurologists and primary care physicians throughout most of the United States. Our marketing organization is comprised of professionals who have developed a variety of marketing techniques and programs to promote our products, including promotional materials, speaker programs, industry publications, advertising and other media.

. . .

***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

***Pharmaceutical marketing is subject to substantial regulation in the United States and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with Gralise®, Zipsor®, Lazanda® and CAMBIA®, as well as marketing activities related to any other products which we may acquire, such as NUCYNTA® , or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of

pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

. . .

***Changes in laws and regulations may adversely affect our business***

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For example, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, United States Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

22.     The 2014 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Schoeneck and Moretti, stating, in relevant part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

23.     On May 11, 2015, Depomed filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). For the quarter, Depomed reported a net loss of $11.63 million, or $0.20 per diluted share, on revenue of $32.2 million, compared to net income of $17.94 million, or $0.30 per diluted share, on revenue of $76.54 million for the same period in the prior year.

24.     In the Q1 2015 10-Q, Depomed stated, in relevant part:

***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA® ER, NUCYNTA®, Gralise®, CAMBIA®, Zipsor® and Lazanda®, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims

laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

. . .

**Changes in laws and regulations may adversely affect our business.**

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For example, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

25. The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Schoeneck and Moretti, stating, in relevant part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

26. On August 3, 2015, Depomed filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). For the quarter, Depomed reported a net loss of $21.65 million, or $0.36 per diluted

share, on revenue of $94.5 million, compared to net income of $12.75 million, or $0.21 per diluted

share, on revenue of $67.73 million for the same period in the prior year.

27.    In the Q2 2015 10-Q, Depomed stated, in part:

***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA® ER, NUCYNTA®, Gralise®, CAMBIA®, Zipsor® and Lazanda®, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such

statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

. . .

**_Changes in laws and regulations may adversely affect our business._**

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For example, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

28.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Schoeneck and Moretti, stating, in relevant part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

29.     On November 9, 2015, Depomed filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, Depomed reported a net loss of $11.79 million, or $0.20 per diluted share, on revenue of $104.86 million, compared to net income of $6.45 million, or $0.11 per diluted share, on revenue of $51.49 million for the same period in the prior year.

30.     In the Q3 2015 10-Q, Depomed stated, in relevant part:

**_We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs._**

10

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA® ER, NUCYNTA®, Gralise®, CAMBIA®, Zipsor® and Lazanda®, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

. . .

11

*Changes in laws and regulations may adversely affect our business.*

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. As an example, we were named as a defendant in a case brought by the City of Chicago against a number of Pharmaceutical Companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

31.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Schoeneck and Moretti, stating, in relevant part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

32.     On February 26, 2016, Depomed filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").  For the quarter, Depomed reported a net loss of $30.67 million, or $0.51 per diluted share, on revenue of $111.17 million, compared to net income of $94.62 million, or $1.23 per diluted share, on revenue of $194.6 million for the same period in the prior year.  For 2015, Depomed reported a net loss of $75.74 million, or $1.26 per diluted share, on revenue of $342.74 million, compared to net income of $131.76 million, or $2.05 per diluted share, on revenue of $390.36 million for 2014.

33.     In the 2015 10-K, Depomed stated, in relevant part:

**MARKETING AND SALES**

12

We have developed capabilities in various aspects relating to the commercialization of our marketed products, including sales, marketing, manufacturing, quality assurance, wholesale distribution, managed market contracting, government price reporting, medical affairs, compliance, and regulatory. Members of our commercial organization are also engaged in the commercial and marketing assessments of other potential product candidates.

Our sales organization includes approximately 300 full-time sales representatives. Our sales force primarily calls on pain specialists, neurologists and primary care physicians throughout most of the United States. Our marketing organization is comprised of professionals who have developed a variety of marketing techniques and programs to promote our products, including promotional materials, speaker programs, industry publications, advertising and other media.

. . .

***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA® ER, NUCYNTA®, Gralise®, CAMBIA®, Zipsor® and Lazanda®, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is

13

subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

. . .

***Changes in laws and regulations may adversely affect our business.***

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. As an example, we were named as a defendant in a case brought by the City of Chicago against a number of Pharmaceutical Companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. This case against the Company was recently dismissed. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

34.     The 2015 10-K contained signed certifications pursuant to SOX by Defendants Schoeneck and Moretti, stating, in relevant part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

35.     On May 6, 2016, Depomed filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"). For the quarter, Depomed reported a net loss of $20.92 million, or $0.34 per diluted share, on revenue of $104.78 million, compared to a net loss of $11.63 million, or $0.20 per diluted share, on revenue of $32.2 million for the same period in the prior year.

36.     In the Q1 2016 10-Q, Depomed stated, in part:

**We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.**

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

**Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.**

All marketing activities associated with NUCYNTA® ER, NUCYNTA®, Gralise®, CAMBIA®, Zipsor® and Lazanda®, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition,

federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

. . .

**_Changes in laws and regulations may adversely affect our business._**

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. As an example, we were named as a defendant in a case brought by the City of Chicago against a number of Pharmaceutical Companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. This case against the Company was dismissed. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. Further the FDA has recently announced that it will require "black-box" warnings on immediate release opioids highlighting the risk of misuse, abuse, addiction, overdose and death. These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

37. The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Schoeneck and Moretti, stating, in relevant part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

16

38.     On August 3, 2016, Depomed filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").   For the quarter, Depomed reported a net loss of $10.54 million, or $0.17 per diluted share, on revenue of $116.68 million, compared to a net loss of $21.65 million, or $0.36 per diluted share, on revenue of $94.5 million for the same period in the prior year.

39.     In the Q2 2016 10-Q, Depomed stated, in part:

**We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.**

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

**Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.**

All marketing activities associated with NUCYNTA ER, NUCYNTA, Gralise, CAMBIA, Zipsor and Lazanda, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims

17

laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

. . .

### Changes in laws and regulations may adversely affect our business.

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. The Centers for Disease Control (CDC) recently issued national, non-binding guidelines on the prescribing of opioids. In addition states, including the Commonwealth of Massachusetts and the State of New York, have either recently enacted or have pending legislation designed to limit the duration and quantity of initial prescriptions of immediate release form of opiates. We were named as a defendant in a case brought by the City of Chicago against a number of pharmaceutical companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. This case against the Company was dismissed. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. Further, the FDA has recently announced that it will require "black-box" warnings on immediate release opioids highlighting the risk of misuse, abuse, addiction, overdose and death. These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

40.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Schoeneck and Moretti, stating, in relevant part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

41.     On November 7, 2016, Depomed filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter, Depomed reported a net loss of $12.89 million, or $0.21 per diluted share, on revenue of $110.52 million, compared to a net loss of $11.79 million, or $0.20 per diluted share, on revenue of $104.86 million for the same period in the prior year.

42.     In the Q3 2016 10-Q, Depomed stated, in relevant part:

***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA ER, NUCYNTA, Gralise, CAMBIA, Zipsor and Lazanda, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and

advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

***Changes in laws and regulations applicable to the pharmaceutical industry, including the opioid market, may adversely affect our business, financial condition and results of operations.***

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. The Centers for Disease Control (CDC) recently issued national, non-binding guidelines on the prescribing of opioids. In addition states, including the Commonwealth of Massachusetts and the State of New York, have either recently enacted or have pending legislation designed to among other things, limit the duration and quantity of initial prescriptions of immediate release form of opiates and mandate the use by prescribers of prescription drug databases. These and other initiatives may result in the reduced prescribing and use of opioids, including NUCYNTA and NUCYNTA ER, which could adversely affect our business, financial condition and results of operations. We were named as a defendant in a case brought by the City of Chicago against a number of pharmaceutical companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. This case against the Company was dismissed. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. Further, the FDA has recently announced that it will

require "black-box" warnings on immediate release opioids highlighting the risk of misuse, abuse, addiction, overdose and death. These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

43.     The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Schoeneck and Moretti, stating, in relevant part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

44.     On February 24, 2017, Depomed filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K").  For the quarter, Depomed reported a net loss of $44.37 million, or $0.72 per diluted share, on revenue of $123.91 million, compared to a net loss of $30.67 million, or $0.51 per diluted share, on revenue of $111.17 million for the same period in the prior year.  For 2016, Depomed reported a net loss of $88.72 million, or $1.45 per diluted share, on revenue of $455.9 million, compared to a net loss of $75.74 million, or $1.26 per diluted share, on revenue of $342.74 million for 2015.

45.     In the 2016 10-K, Depomed stated, in part:

**MARKETING AND SALES**

We have developed capabilities in various aspects relating to the commercialization of our marketed products, including sales, marketing, manufacturing, quality assurance, wholesale distribution, managed market contracting, government price reporting, medical affairs, compliance, and regulatory. Members of our commercial organization are also engaged in the commercial and marketing assessments of other potential product candidates.

Our sales organization includes approximately 300 full time sales representatives. Our sales force primarily calls on pain specialists, neurologists and primary care physicians throughout most of the United States. Our marketing organization is comprised of professionals who have developed a variety of marketing techniques and programs to promote our products, including promotional materials, speaker programs, industry publications, advertising and other media.

. . .

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business .***

All marketing activities associated with NUCYNTA ER, NUCYNTA, Gralise, CAMBIA, Zipsor and Lazanda, as well as marketing activities related to any other products that we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. Such liabilities would harm our business, financial condition and results of operations as well as divert management's attention from our business operations and damage our reputation.

. . .

22

***Changes in laws and regulations applicable to the pharmaceutical industry, including the opioid market, may adversely affect our business, financial condition and results of operations.***

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. The Centers for Disease Control (CDC) recently issued national, non-binding guidelines on the prescribing of opioids. In addition states, including the Commonwealth of Massachusetts and the State of New York, have either recently enacted or have pending legislation designed to among other things, limit the duration and quantity of initial prescriptions of immediate release form of opiates and mandate the use by prescribers of prescription drug databases. These and other initiatives may result in the reduced prescribing and use of opioids, including NUCYNTA and NUCYNTA ER, which could adversely affect our business, financial condition and results of operations. We were named as a defendant in a case brought by the City of Chicago against a number of pharmaceutical companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. This case against the Company was dismissed. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. Further, the FDA is requiring "black-box" warnings on immediate release opioids highlighting the risk of misuse, abuse, addiction, overdose and death. In addition, during the 2016 presidential campaign, President Trump called for the DEA to restrict the amount of opioids that can be manufactured in the U.S. These and other changes, and potential changes in laws and regulations, including those that have the effect of reducing the overall market for opioids or reducing the prescribing of opioids, could adversely affect our business, financial condition and results of operations.

46.     The 2016 10-K contained signed certifications pursuant to SOX by Defendants Schoeneck and Moretti, stating, in relevant part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

47.     On May 10, 2017, Depomed filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q").  For the quarter, Depomed reported a net loss of $26.74 million, or $0.28 per diluted

share, on revenue of $90.45 million, compared to a net loss of $20.92 million, or $0.34 per diluted share, on revenue of $104.78 million for the same period in the prior year.

48.     In the Q1 2017 10-Q, Depomed stated, in relevant part:

***Changes in laws and regulations applicable to and investigations of, the pharmaceutical industry, including the opioid market, may adversely affect our business, financial condition and results of operations.***

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. The Centers for Disease Control (CDC) recently issued national, non-binding guidelines on the prescribing of opioids, providing recommended considerations for primary care providers when prescribing opioids, including specific considerations and cautionary information about opioid dosage increases and morphine milligram equivalents (MME).   Certain third-party payers are, or are considering, adopting these CDC guidelines. In July 2017, the Pharmaceutical Care Management Association, a trade association representing pharmacy benefit managers, wrote a letter to the commissioner of FDA in which it expressed support for, among other things, the CDC guidelines and a seven-day limit on the supply of opioids for acute pain. In addition, states, including the Commonwealth of Massachusetts and the States of New York, Ohio and New Jersey, have either recently enacted or have pending legislation or regulations designed to among other things, limit the duration and quantity of initial prescriptions of immediate release form of opiates and mandate the use by prescribers of prescription drug databases. Also, at the state and local level, a number of states and major cities have brought separate lawsuits against various pharmaceutical companies marketing and selling opioid pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers.   In addition, the attorneys general from several states have announced the launch of a joint investigation into the marketing and sales practices of drug companies that market opioid pain medications. These and other similar initiatives and actions, whether taken by governmental authorities or other industry stakeholders, may result in the reduced prescribing and use of opioids, including NUCYNTA and NUCYNTA ER, which could adversely affect our business, financial condition and results of operations.

49.     The Q1 2017 10-Q contained signed certifications pursuant to SOX by Defendants Higgins and Moretti, stating, in relevant part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

50.     The statements referenced in ¶¶ 20-49 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the

24

Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Depomed engaged in questionable practices in connection with the sales and marketing of the Company's opioid products; (ii) the foregoing conduct, when it became known, would likely subject the Company to heightened legal and regulatory scrutiny; and (iii) as a result, Depomed's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

51.     On August 7, 2017, post-market, Depomed filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2017 (the "Q2 2017 10-Q").  In the Q1 2017 10-Q, Depomed stated, in relevant part:

### *Opioid-Related Request and Subpoenas*

The Company and a number of other pharmaceutical companies recently received a request for information from the ranking minority member of the United States Senate Committee on Homeland Security and Governmental Affairs related to the promotion of opioids.  The Company has voluntarily furnished information responsive to such request.

The Company and a number of other pharmaceutical companies recently received subpoenas related to opioid sales and marketing from the Office of the Attorney General of Maryland and the United States Department of Justice. The Company is currently cooperating with the State of Maryland and the Department of Justice in their respective investigations.

52.     On this news, Depomed's share price fell $3.09, or 33.42%, to close at $6.15 on August 8, 2017.

53.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

25

54.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Depomed securities publicly traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

55.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Depomed securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

57.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

- whether the prices of Depomed securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

60.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

27

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Depomed securities are traded in efficient markets;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Depomed securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

61.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

62.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

28

64.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

65.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Depomed securities during the Class Period.

67.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their

control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

68. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

69. As a result of the foregoing, the market price of Depomed securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Depomed securities during the Class Period in purchasing Depomed securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

70. Had Plaintiff and the other members of the Class been aware that the market price of Depomed securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Depomed securities at the artificially inflated prices that they did, or at all.

71. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

72. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and

the other members of the Class for substantial damages which they suffered in connection with their purchases of Depomed securities during the Class Period.

## COUNT II

**(Violation of Section 20(a) of The Exchange Act Against The Individual Defendants)**

73.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

75.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

76.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Depomed securities.

77.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each

of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

78.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: August 18, 2017

Respectfully submitted,

**POMERANTZ LLP**

By: *s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*