**LEVI & KORSINSKY, LLP**
Adam C. McCall (SBN 302130)
Email: amccall@zlk.com
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Attorneys for Lead Plaintiff*
*The Depomed Investor Group and the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INCHEN HUANG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DEPOMED, INC., ARTHUR JOSEPH HIGGINS, JAMES A. SCHOENECK, and AUGUST J. MORETTI,<br><br>Defendants. | Case No. 3:17-cv-04830-JST<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>Demand for Jury Trial</u><br><br>Judge: Hon. Jon S. Tigar |

Lead Plaintiffs Aurelio Scarpatetti, Manuele Scarpatetti, Duy Vu, and Mark Madrack, (collectively, the “Depomed Investor Group” or “Plaintiffs”), by and through undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs’ information and belief is based upon, among other things, the investigation made by and through Plaintiffs’ attorneys, which includes without limitation: (a) review and analysis of regulatory filings made by Depomed, Inc. (“Depomed”) with the United States Securities and Exchange Commission (“SEC”); (b) review and analysis of press releases and media reports issued by and disseminated by Depomed; and (c) review of other publicly available information concerning Depomed.

Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CLAIM

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Depomed between July 29, 2015 and August 7, 2017, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Plaintiff alleges that defendants Depomed, Arthur Joseph Higgins ("Higgins"), James A. Schoeneck ("Schoeneck"), and August J. Moretti ("Moretti") (collectively, "Defendants") violated the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78a, *et seq.* Plaintiffs seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

2. Depomed, a specialty pharmaceutical company, engages in the development, sale, and licensing of products, including opioids, for pain and other central nervous system conditions in the United States.

3. Opioids are effective treatments for short-term postsurgical and trauma-related pain, and for palliative (end-of-life) care. However, they are also addictive and subject to abuse, particularly when used long-term for chronic non-cancer pain (pain lasting three months or longer, hereinafter referred to as "chronic pain"), and should not be used except as a last-resort. Defendants knew—and had known for years—that with prolonged use, the effectiveness of opioids wanes, requiring increases in doses and markedly increasing the risk of significant side effects and addiction.

4. Defendants' flagship product throughout the Class Period was the NUCYNTA (tapentadol) franchise. NUCYNTA comes in two forms, NUCYNTA IR, and NUCYNTA ER (collectively "NUCYNTA"). NUCYNTA IR and ER are Schedule II opioids that contain tapentadol. NUCYNTA IR was first approved in 2008 and indicated for the "relief of moderate to severe acute pain in patients 18 years of age or older." NUCYNTA ER was first approved in 2011 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid

treatment and for which alternative treatment options are inadequate." Prior to April 2014, NUCYNTA ER was indicated for the "management of moderate to severe chronic pain in adults [and] neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults." The DPN indication was added in August 2012.

5. The U.S. Food and Drug Administration ("FDA")-approved labels for both NUCYNTA IR and NUCYNTA ER describe the tapentadol molecule as "a substance with a high potential for abuse similar to other opioids including fentanyl, hydrocodone, hydromorphone, methadone, morphine, oxycodone, and oxymorphone." Due to the highly addictive nature of opioids, including tapentadol, companies that manufacture opioids are facing investigations by states' attorneys general and Congressional and Senate investigations.

6. On March 28, 2017, U.S. Senator Claire McCaskill, the top-ranking Democrat on the Senate Homeland Security and Government Affairs Committee (the "Senate Committee"), announced that she was opening an investigation into the marketing and sales practices of the nation's top five manufacturers of prescription opioid products, including Depomed (the "Senate Investigation"). According to a statement by Senator McCaskill, "[the] investigation is about finding out whether the same practices that led to this [opioid] epidemic still continue today, and if decisions are being made that harm the public health."

7. In letters to the manufacturers, Senator McCaskill further stated that "[t]his epidemic is the direct result of a calculated sales and marketing strategy major opioid manufacturers have allegedly pursued over the past 20 years to expand their market share and increase dependency on powerful—and often deadly—painkillers . . .. To achieve this goal, manufactures have reportedly sought, among other techniques, to downplay the risk of addiction to their products and encourage physicians to prescribe opioids for all cases of pain and in high doses." The opioid epidemic has become so severe that on October 26, 2017, President Donald Trump declared the opioid epidemic a national public health emergency.

8. The sale, marketing, and use of pharmaceutical drugs are also heavily regulated by FDA. FDA-promulgated labeling rules are designed to make information in prescription drug labeling easier for health care practitioners to access, read, and use when making prescribing

decisions. This is because drugs intended to help cure diseases or other medical conditions can have injurious or even deadly consequences when used inappropriately or by the wrong patient. Thus, it is illegal to market or promote drugs for any other purpose than the uses approved by the FDA, also known as an "off-label" use. However, the short-term profitability and boost in sales for potential off-label uses of drugs has proved too much for the executives and directors of pharmaceutical companies to resist. Thus, off-label marketing of drugs has firmly secured a place in the business models of major pharmaceutical companies, forcing government agencies to combat this dangerous epidemic by vigorously prosecuting and imposing criminal and civil penalties on members of the pharmaceutical industry that violate these laws.

9. Drug companies that violate the Federal Food, Drug, and Cosmetic Act (“FDCA”) prohibition against off-label are also subject to criminal prosecution and, if convicted, face exclusion or “debarment” from Federal healthcare programs. Such federal debarment would result in catastrophic damage to Depomed and its shareholders because Medicaid and Medicare would no longer cover the costs of any Depomed drug and most patients would therefore find an alternative drug sold by a competitor or would forego treatment altogether.

10. Despite these headwinds, Depomed continually informed investors that the opioid market was having no adverse effect on Depomed’s business. NUCYNTA's annual sales increased in the U.S. from $189.9 million in 2015 to approximately $281.3 million in 2016, becoming Depomed’s best selling product. This marked a 48% year-over-year growth in sales of NUCYNTA in just one year. NUCYNTA's sales during this period were greater than the sales of Depomed’s other products (Gralise®, CAMBIA®, Zipsor®, and Lazanda) combined, consisting of 62% of Depomed's total revenue. Depomed’s sales of NUCYNTA was increasing year over year while the rest of the opioid market was decreasing and Depomed attributed the increase in sales to its market strategy.

11. The market strategy causing the astronomical growth in sales, however, was fueled by Depomed's illegal practices in connection with its off-label marketing of NUCYNTA. In particular, Depomed promoted the use of opioids for all manner of pain management while downplaying the drugs' addictive nature, often promoting the drug as a safer alternative to other

opioids, despite this not being on the FDA label. Further, Depomed promoted an increase in dosage while focusing on family physicians and internal medicine doctors who were less knowledgeable about the dangers of opioids. In February 2017, Depomed's former CEO increased its sales force for the specific purpose of targeting primary care physicians. These illegal, off-label marketing schemes, further exacerbated the ongoing opioid dependency epidemic in the U.S. that has resulted in the death of at least 30,000 people in 2015 alone according to the Centers for Disease Control and Prevention ("CDC").

12. Between July 29, 2015 and August 7, 2017, Defendants made numerous public statements that concealed the true nature of Depomed's illicit conduct. Depomed encouraged its sales representatives to market NUCYNTA off-label as a safer, less abusive, less addictive opioid that did not create the same euphoric feeling as other opioids, even though this was not on the FDA-approved label. Depomed's management however, withheld from investors this marketing strategy, thus hiding from investors the real reason that Depomed was not experiencing the same headwinds as other companies. These statements concealed from investors the risk of exposure that Depomed faced in connection with its off-label marketing practices, the worsening opioid market environment, and the fact that NUCYNTA was far more dangerous than Defendants claimed.

13. These risks ultimately came to be realized and, through no fault of their own, Depomed's investors suffered significant losses. Beginning on November 7, 2016, and continuing through to August 7, 2017, several occurrences (including disclosures from Depomed) alerted investors that Defendants' past statements were misleading.

14. In response to Senator McCaskill's statements, investors began to realize that Depomed's business and operations were substantially and materially more risky than previously represented. The investigation spurred serious concern and suspicion among Depomed investors and, as a result, investors began to sell their stock. As news of the investigation seeped into the market, Depomed's stock fell by nearly 16%, or a loss of $2.35 per share by March 31, 2017. Depomed's stock closed at $12.55 per share on March 31, 2017, compared to $14.90 per share on March 27, 2017, erasing more than $145.9 million in market capitalization.

15. Investors grew more suspicious on August 7, 2017, when Depomed confirmed in its Quarterly Report on Form 10-Q that it had received a request for information from the Senate Committee. Depomed further disclosed that it had received subpoenas related to its opioid sales and marketing from the Office of the Attorney General of Maryland and the U.S. Department of Justice. Reporting on its third fiscal quarter financial results in the same report on August 7, 2017, Depomed further revealed that its adjusted earnings amounted to just $5 million compared to $19.8 million for the same quarter the year before, and slashed its forecast for the full fiscal year 2017, predicting $10 million to $15 million, or 3.5%, less in revenue than previously reported and cutting its adjusted pretax operating profit projection by approximately 10%. Depomed was forced to admit that the increased regulatory oversight over the opioid markets and associated legal expenses affected its revenues and earnings projections.

16. Depomed’s statements on August 7, 2017 further revealed to investors that Defendants had concealed serious risks associated with its business practices and, in particular, NUCYNTA. It was these risks that led to the Senate Investigation, the DOJ subpoena, and ultimately its decision to lower guidance, among other things.

17. Analysts and investors were taken aback in response to the news. For example, a Janney analyst report states that “After struggling for months to stem the negative prescription trends across its product portfolio, the revised guidance seems to be an admission the challenges facing its business are far greater to overcome than fixing the sales force realignment implemented by the prior CEO” . . . “but management seems to be conceding that headwinds against prescribing opioids are making a return to growth for NUCYNTA IR and ER uncertain at best.”

18. In the wake of the August 7, 2017 disclosure, Depomed's stock plummeted more than 33%, or $3.08 per share on August 8, 2017, to close at $6.15 compared to the previous trading day's closing of $9.23, erasing more than $194.3 million in market capitalization. Overall, Depomed's stock price has fallen over 80%, from a high of $33.28 per share shortly after the acquisition of NUCYNTA, to a low of $6.15 per share on August 8, 2017, after revealing ongoing investigations, a loss of $27.14 per share. Market capitalization fell more than $1.6 billion in little over two years.

## JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. §78aa.

21. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District.

22. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

23. Plaintiffs Aurelio Scarpatetti, Manuele Scarpatetti, Duy Vu, and Mark Madrack purchased Depomed common stock at artificially inflated prices during the Class Period and were damaged upon the revelation of the Defendants' fraud. Plaintiffs' certifications evidencing their transactions are attached to their motion for appointment as Lead Plaintiff and are incorporated by reference.

24. Defendant Depomed was incorporated in the State of California on August 7, 1995 and its principal executive offices are located at 7999 Gateway Boulevard, Suite 300, Newark, California 94560. Depomed's common stock is traded on the NASDAQ under the ticker symbol "DEPO."

25. Defendant Schoeneck served as a director of Depomed from December 2007 through March 28, 2017, and as its President and CEO from April 2011 until his resignation on March 28, 2017. From 2005 until he joined Depomed, Schoeneck was CEO of BrainCells, Inc. ("BrainCells"), a privately-held biopharmaceutical company. Prior to joining BrainCells, he served as CEO of ActivX BioSciences, Inc., a development stage biotechnology company. Schoeneck served as

President and Chief Executive Officer of Prometheus Laboratories Inc. ("Prometheus") for three years. Prior to joining Prometheus, Schoeneck spent three years at Centocor, Inc. ("Centocor"), where he led the development of Centocor's commercial capabilities. His group launched Remicade®, which has become one of the world's largest pharmaceutical products. Earlier in his career, he spent 13 years at Rhone-Poulenc Rorer, Inc. (now Sanofi S.A.) serving in various sales and marketing positions of increasing responsibility. According to the 2016 Proxy, the Board considered "Mr. Schoeneck's experience and expertise within the following areas relevant to Depomed and its business in concluding that he should serve on the Board: Corporate Strategy; Corporate Management; Commercial Strategy; Pharmaceutical Product Launch; Strategic Transactions; and Corporate Leadership."

26. Defendant Higgins has served as a director and as President and Chief Executive Officer ("CEO") of Depomed since March 28, 2017. From 2010 until his appointment at Depomed, Higgins served as a Senior Advisor to Blackstone Healthcare Partners, the healthcare team of The Blackstone Group, where he focused on product-based healthcare acquisitions. Prior to 2010, Higgins held various high-ranking positions in several different pharmaceutical companies, including joining Bayer HealthCare AG in 2004, where he served as Chair of the Board Management of Bayer HealthCare AG, a developer and manufacturer of human and animal health care products, and Chairman of the Bayer HealthCare Executive Committee. From 2001 to 2004, Higgins served as Chairman, President and CEO of Enzon Pharmaceuticals. Prior to joining Enzon, Higgins spent 14 years at Abbott Laboratories. He also has served as a past Board member of the Pharmaceutical Research Manufacturers of America (PhRMA), of the Council of the International Federation of Pharmaceutical Manufacturers and Association (IFPMA), and President of the European Federation of Pharmaceutical Industries and Associations (EFPIA).

27. Defendant Moretti is Depomed's Senior Vice President and Chief Financial Officer and has been since January 2012. From 2004 to December 2011, Mr. Moretti served as Chief Financial Officer and Senior Vice President of Alexza Pharmaceuticals, Inc., a publicly-held pharmaceutical company. From 2001 to 2004, Mr. Moretti served as Chief Financial Officer of Alavita, Inc. (formerly Surromed, Inc.). Prior to Alavita, Mr. Moretti was a partner of Heller

Ehrman LLP, an international law firm. Mr. Moretti holds a B.A. from Princeton University and a J.D. from Harvard Law School.

28. Defendants in paragraphs 25-27 are collectively referred to herein as the "Individual Defendants."

29. Each of the Individual Defendants:

(a) directly participated in the management of Depomed;

(b) was directly involved in the day-to-day operations of Depomed at the highest levels;

(c) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d) was directly or indirectly involved in the oversight or implementation of Depomed's internal controls;

(e) was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning Depomed; and/or

(f) approved or ratified these statements in violation of the federal securities laws.

30. Because of the Individual Defendants' positions within Depomed, they had access to undisclosed information about the opioid epidemic and Depomed's off-label marketing via access to internal corporate documents (including Depomed's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

31. As officers of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the opioid epidemic and Depomed's off-label marketing, including progress and issues concerning the development of the opioid epidemic, and Depomed's present and future business prospects, and to correct any previously-

issued statements that had become materially misleading or untrue, so that the market price of Depomed's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

32. The Individual Defendants, because of their positions with Depomed, possessed the power and authority to control the contents of Depomed's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of Depomed's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

33. Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Depomed common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public concerning Depomed's response to the opioid crisis and promotion of off-label marking. This scheme caused Plaintiff and other shareholders to purchase Depomed common stock at artificially inflated prices.

## FACTUAL BACKGROUND

### *A. Depomed's Background*

34. Depomed, a specialty pharmaceutical company, engages in the development, sale, and licensing of products for pain and other central nervous system conditions in the United States.

35. On April 2, 2015, Depomed acquired from Janssen and its affiliates the U.S. rights to the NUCYNTA franchise of pharmaceutical products for $1.05 billion in cash. The NUCYNTA franchise is an opioid that includes NUCYNTA ER (tapentadol) extended release tablets indicated

for the management of pain, including neuropathic pain associated with diabetic peripheral neuropathy (DPN), severe enough to require daily, around-the-clock, long-term opioid treatment, NUCYNTA IR (tapentadol), an immediate release version of tapentadol, for management of moderate to severe acute pain in adults, and NUCYNTA (tapentadol) oral solution, an approved oral form of tapentadol that has not been commercialized.

36. Immediately after acquiring NUCYNTA, NUCYNTA became Depomed's flagship product. By the end of the Class Period, NUCYNTA represented well over 60% of Depomed's revenues. NUCYNTA's annual sales quickly increased in the U.S. from $189.9 million in 2015 to approximately $281.3 million in 2016. This marked a 48% year-over-year growth in sales of NUCYNTA in just one year. NUCYNTA's sales during this period were greater than the sales of Depomed's other products (Gralise®, CAMBIA®, Zipsor®, and Lazanda) combined, consisting of 62% of Depomed's total revenue.

37. The Controlled Substances Act ("CSA") places all substances which were in some manner regulated under existing Federal law into one of five schedules. This placement is based upon the substance's medical use, potential for abuse, and safety or dependence liability. Before placing a drug into schedule, the Drug Enforcement Agency (DEA) receives scientific and medical evaluation from the Department of Health and Human Services (HHS). The DEA then evaluates all available data and makes a final decision whether to propose that a drug should be controlled and into which schedule it should be placed.

38. NUCYNTA ER is an opioid that contains tapentadol, a Schedule II controlled substance. Schedule II drugs, substances, or chemicals are defined as drugs with a high potential for abuse, with use potentially leading to severe psychological or physical dependence. These drugs are also considered dangerous.

39. As an opioid, NUCYNTA ER exposes users to the risks of addiction, abuse, and misuse. NUCYNTA ER is at an even greater risk for overdose and death due to the larger amount of tapentadol present because extended-release products such as NUCYNTA ER deliver the opioid over an extended period of time.

***B. The Opioid Epidemic***

40. The pain-relieving properties of opium have been recognized for millennia. So has the magnitude of its potential for abuse and addiction. Opioids, after all, are closely related to illegal drugs like opium and heroin. During the Civil War, opioids, then known as "tinctures of laudanum," gained popularity among doctors and pharmacists for their ability to reduce anxiety and relieve pain—particularly on the battlefield—and were popularly used in a wide variety of commercial products ranging from pain elixirs to cough suppressants to beverages. By 1900, an estimated 300,000 people were addicted to opioids in the United States, and many doctors prescribed opioids solely to avoid patients' withdrawal. Both the numbers of opioid addicts and the difficulty in weaning patients from opioids made clear their highly addictive nature.

41. Due to concerns about their addictive properties, opioids have been regulated at the federal level as controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970. The labels for scheduled opioid drugs carry black box warnings of potential addiction and "[s]erious, life-threatening, or fatal respiratory depression," the result of an excessive dose.

42. Most patients with more than a few weeks of opioid therapy will experience withdrawal symptoms if opioids are discontinued (commonly referred to as "dependence"). Once dependent, a patient experiences deeply unpleasant symptoms when his or her current dose of opioids loses effect and is not promptly replaced with a new dose. Among the symptoms reported in connection with opioid withdrawal are: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long opioids were used.

43. Dr. Andrew Kolodny, Chief Medical Officer for Phoenix House, a national addiction treatment program, has explained the effect of opioids as akin to "hijack[ing] the brain's reward system," which in turn convinces a user that "the drug is needed to stay alive." A patient's fear of the unpleasant effects of discontinuing opioids combined with the negative reinforcement during a period of actual withdrawal can drive a patient to seek further opioid treatment—even where ineffective or detrimental to quality of life—simply to avoid the deeply unpleasant effects of withdrawal.

44. When under the continuous influence of opioids over a period of time, patients grow tolerant to their analgesic effects. As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same levels of pain reduction he or she has become accustomed to—up to and including doses that are considered to be "frighteningly high." At higher doses, the effects of withdrawal are more substantial, thus leaving a patient at a much higher risk of addiction. The FDA has acknowledged that available data suggest a relationship between increased doses and the risk of adverse effects.

45. Patients receiving high doses of opioids as part of long-term opioid therapy are three to nine times more likely to suffer overdose from opioid-related causes than those on low doses. As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower rate than tolerance to analgesic effects. Accordingly, the practice of continuously escalating doses to match pain tolerance can, in fact, lead to overdose even where opioids are taken as recommended.

46. Further, "a potential side effect from chronic use [of opioids] can be abuse and addiction . . . . [i]n fact, correct use and abuse of these agents are not polar opposites—they are complex, inter-related phenomena." It is very difficult to tell whether a patient is physically dependent, psychologically dependent, or addicted. Drug-seeking behaviors, which are signs of addiction, will exist and emerge when opioids are suddenly not available, the dose is no longer effective, or tapering of a dose is undertaken too quickly.

47. Studies have shown that between 30% and 40% of long-term users of opioids experience problems with opioid use disorders.

48. Opioids vary by duration. Long-acting opioids, like NUCYNTA ER, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours. While it was once thought that long-acting opioids would not be as susceptible to abuse and addiction as short-acting ones, this view has been discredited. All labels of Schedule II long-acting opioids are required to state that the drug "exposes users to risks of addiction, abuse, and misuse, which can lead to overdose and death." The FDA has required extended release and long-

acting opioids to adopt "Risk Evaluation Mitigation Strateg[ies]" on the basis that they present "a serious public health crisis of addiction, overdose, and death."

***C. Benefits Offered by Long-Term Opioid Use Are Unproven and Contradicted.***

49. Despite the fact that opioids now are routinely prescribed, there never has been evidence of their safety and efficacy for long-term use. Defendants always have been aware of these gaps in knowledge. While promoting opioids to treat chronic pain, Defendants have failed to disclose the lack of evidence to support their use long-term and have failed to disclose the contradictory evidence that chronic opioid therapy actually makes patients sicker.

50. Evidence exists to show that opioid drugs are not effective to treat chronic pain, and may worsen patients' health. A 2006 study-of-studies titled "*Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects*" found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments. Most notably, it stated: "For functional outcomes, the other analgesics were significantly more effective than were opioids." Another review of evidence relating to the use of opioids for chronic pain, titled "*Are Opioids Effective in the Long-Term Treatment of Musculoskeletal Pain*?," found that up to 22.9% of patients in opioid trials dropped out before the study began because of the intolerable effects of opioids and that the evidence of pain relief over time was weak.

51. Increasing duration of opioid use is strongly associated with an increasing prevalence of mental health conditions (depression, anxiety, post-traumatic stress disorder, or substance abuse), increased psychological distress, and greater health care utilization.

52. As a pain specialist noted in an article titled, "*Are We Making Pain Patients Worse?*", "[O]pioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."

53. This is true both generally and for specific pain-related conditions. Studies of the use of opioids long-term for chronic lower back pain have been unable to demonstrate an improvement in patients' function. Instead, research consistently shows that long-term opioid therapy for patients

who have lower back injuries does not cause patients to return to work or physical activity. This is due partly to addiction and other side effects.

54. The lack of evidence for the efficacy of opioid use long-term has been well documented nationally in the context of workers' compensation claims, where some of the most detailed data exists. Claims involving workers who take opioids are almost four times as likely to reach costs of over $100,000 than claims without opioids, as these patients suffer greater side effects and are slower to return to work. Even adjusting for injury severity and self-reported pain score, receiving an opioid for more than seven days and receiving more than one opioid prescription increased the risk that the patient would be on work disability one year later. A prescription for opioids as the first treatment for a workplace injury doubled the average length of the claim.

### *D. Government Investigations and State of Emergency*

55. In response to the opioid epidemic, a number of states have filed lawsuits against opioid manufacturers. Between July 2016 and July 2017, at least 25 states, cities and counties have filed civil cases against manufacturers, distributors and large drugstore chains that make up the $13 billion-a-year opioid industry.

56. In May 2014, Santa Clara and Orange Counties in California filed a complaint in state court in Orange County, California against numerous pharmaceutical manufacturers, including Janssen, alleging claims related to opioid marketing practices, including false advertising, unfair competition, and public nuisance.

57. On August 26, 2015, the City of Chicago named Depomed as a defendant in a Second Amended Complaint (the "City of Chicago Complaint") filed in *City of Chicago v. Purdue Pharma L.P. et al.*, a federal case in the United States District Court, Northern District of Illinois (following removal from Cook County Circuit Court) against a number of pharmaceutical companies marketing and selling opioid pain medications. The original complaint in the action named as a defendant Janssen Pharma and its related companies. Janssen, at the time the original complaint was filed, marketed and sold NUCYNTA® and NUCYNTA® ER, the U.S. rights to which were sold to Depomed in a transaction that closed in April 2015. Depomed was dismissed without prejudice from the lawsuit on November 9, 2015, but the litigation is still on-going against the other defendants.

58. In addition to lawsuits, companies that manufacture opioids are also facing investigations by states' attorneys general and Congressional and Senate investigations. As discussed in more detail below, on March 28, 2017, Senator McCaskill announced that she was commencing the Senate Investigation into the marketing and sales practices of the nation's top five manufacturers of prescription opioid products, including Depomed. According to a statement by Senator McCaskill, "[the] investigation is about finding out whether the same practices that led to this [opioid] epidemic still continue today, and if decisions are being made that harm the public health." In letters to the manufacturers, Senator McCaskill further stated that "[t]his epidemic is the direct result of a calculated sales and marketing strategy major opioid manufacturers have allegedly pursued over the past 20 years to expand their market share and increase dependency on powerful—and often deadly—painkillers…[t]o achieve this goal, manufactures have reportedly sought, among other techniques, to downplay the risk of addiction to their products and encourage physicians to prescribe opioids for all cases of pain and in high doses."

59. The opioid epidemic has become so severe that on October 26, 2017, President Donald Trump declared the opioid epidemic a national public health emergency.

***E. Guidelines and Regulations for Prescribing Opioids***

60. In an attempt to curb the opioid epidemic, on March 18, 2016, the CDC issued guidelines for prescribing opioids for chronic pain. The guideline provided recommendations for primary care clinicians prescribing opioids for chronic pain outside of active cancer treatment, palliative care, and end-of-life care. The guidelines address 1) when to initiate or continue opioids for chronic pain; 2) opioid selection, dosage, duration, follow-up, and discontinuation; and 3) assessing risk and addressing harms of opioid use. CDC developed the guideline using the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) framework, and recommendations were made on the basis of a systematic review of the scientific evidence while considering benefits and harms, values and preferences, and resource allocation. CDC obtained input from experts, stakeholders, the public, peer reviewers, and a federally chartered advisory committee.

61. The categorization of the recommendations was based on the assessment that a) No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic

pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤6 weeks in duration); b) Extensive evidence shows the possible harms of opioids (including opioid use disorder, overdose, and motor vehicle injury); and c) Extensive evidence suggests some benefits of nonpharmacologic and nonopioid pharmacologic treatments compared with long-term opioid therapy, with less harm.

62. The guidelines are as follows:

> (1) Nonpharmacologic therapy and nonopioid pharmacologic therapy are preferred for chronic pain. Clinicians should consider opioid therapy only if expected benefits for both pain and function are anticipated to outweigh risks to the patient. If opioids are used, they should be combined with nonpharmacologic therapy and nonopioid pharmacologic therapy, as appropriate (recommendation category: A, evidence type: 3);
>
> (2) Before starting opioid therapy for chronic pain, clinicians should establish treatment goals with all patients, including realistic goals for pain and function, and should consider how opioid therapy will be discontinued if benefits do not outweigh risks. Clinicians should continue opioid therapy only if there is clinically meaningful improvement in pain and function that outweighs risks to patient safety (recommendation category: A, evidence type: 4);
>
> (3) Before starting and periodically during opioid therapy, clinicians should discuss with patients known risks and realistic benefits of opioid therapy and patient and clinician responsibilities for managing therapy (recommendation category: A, evidence type: 3);
>
> (4) When starting opioid therapy for chronic pain, clinicians should prescribe immediate-release opioids instead of extended-release/long-acting (ER/LA) opioids (recommendation category: A, evidence type: 4);
>
> (5) When opioids are started, clinicians should prescribe the lowest effective dosage. Clinicians should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to ≥50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to ≥90 MME/day or carefully justify a decision to titrate dosage to ≥90 MME/day (recommendation category: A, evidence type: 3);
>
> (6) Long-term opioid use often begins with treatment of acute pain. When opioids are used for acute pain, clinicians should prescribe the lowest effective dose of immediate-release opioids and should prescribe no greater quantity than needed for the expected duration of pain severe enough to require opioids. Three days or less will often be sufficient; more than seven days will rarely be needed (recommendation category: A, evidence type: 4);
>
> (7) Clinicians should evaluate benefits and harms with patients within 1 to 4 weeks of starting opioid therapy for chronic pain or of dose escalation. Clinicians should evaluate benefits and harms of continued therapy with

patients every 3 months or more frequently. If benefits do not outweigh harms of continued opioid therapy, clinicians should optimize other therapies and work with patients to taper opioids to lower dosages or to taper and discontinue opioids (recommendation category: A, evidence type: 4);

(8) Before starting and periodically during continuation of opioid therapy, clinicians should evaluate risk factors for opioid-related harms. Clinicians should incorporate into the management plan strategies to mitigate risk, including considering offering naloxone when factors that increase risk for opioid overdose, such as history of overdose, history of substance use disorder, higher opioid dosages (≥50 MME/day), or concurrent benzodiazepine use, are present (recommendation category: A, evidence type: 4);

(9) Clinicians should review the patient's history of controlled substance prescriptions using state prescription drug monitoring program (PDMP) data to determine whether the patient is receiving opioid dosages or dangerous combinations that put him or her at high risk for overdose. Clinicians should review PDMP data when starting opioid therapy for chronic pain and periodically during opioid therapy for chronic pain, ranging from every prescription to every 3 months (recommendation category: A, evidence type: 4); and

(10) When prescribing opioids for chronic pain, clinicians should use urine drug testing before starting opioid therapy and consider urine drug testing at least annually to assess for prescribed medications as well as other controlled prescription drugs and illicit drugs (recommendation category: B, evidence type: 4).

63. The guidelines are intended to improve communication between clinicians and patients about the risks and benefits of opioid therapy for chronic pain, improve the safety and effectiveness of pain treatment, and reduce the risks associated with long-term opioid therapy, including opioid use disorder, overdose, and death.

### ***F. Depomed Engaged in Off-Label Marketing Throughout the Class Period.***

64. Opioids, including NUCYNTA, are also subject to various federal laws and regulations governed by the FDA, which is responsible for protecting and promoting public health through the regulation and supervision of, among other things, prescription drugs. The FDCA gives authority to the FDA to oversee the safety of food, drugs, and cosmetics.

65. Under the FDCA, 21 U.S.C. §§301-97, and the Public Health Services Act ("PHSA"), 42 U.S.C. §262, et seq., drug manufacturers may not market or promote a drug for "off-label" use, or for a use the FDA has not approved. See 21 U.S.C. §331, §352; 42 U.S.C. §262(a)(1) and (b); 21 C.F.R. §601.12. A drug may not be marketed or sold in the United States unless the FDA has

approved the drug as safe and effective for its intended use and intended indication. The intended indications for use of the drug are provided in the drug's label which the FDA reviews and approves. *See* 21 U.S.C. §355-1(d)(1) and (2). Violation of the FDCA and PHSA are punishable by criminal and civil penalties including substantial fines. 21 U.S.C. §333.

66. Proving that a specific use or dosage is safe and effective for large numbers of patients requires lengthy clinical trials and is very expensive. On the other hand, drug companies derive immediate and substantial profits from off-label prescriptions. As a result, drug companies have a substantial short-term financial incentive to break the law by marketing and promoting their drugs for uses and dosages that are not proven to be medically safe and effective in treating large numbers of patients.

67. Drug companies that violate the FDCA prohibition against off-label marketing approval are also subject to criminal prosecution and, if convicted, face exclusion or "debarment" from Federal healthcare programs. Such federal debarment would result in catastrophic damage to Depomed and its shareholders because Medicaid and Medicare would no longer cover the costs of any Depomed drug and most patients would therefore find an alternative drug sold by a competitor or would forego treatment altogether.

68. The FDA-approved labels for both NUCYNTA IR and NUCYNTA ER describe the tapentadol molecule as "a substance with a high potential for abuse similar to other opioids including fentanyl, hydrocodone, hydromorphone, methadone, morphine, oxycodone, and oxymorphone." Nowhere on the FDA-approved label does it say or mention that NUCYNTA is safer, more tolerable, less abusive, or less addictive than other opioids. Despite this, NUCYNTA has a long history of its manufacturer claiming these off-label benefits in their sales pitches and marketing.

69. For example, Janssen promoted its branded opioids, including Duragesic, NUCYNTA, and NUCYNTA ER, through its sales representatives and a particularly active speakers program. Deceptive messages regarding low addiction risk and low prevalence of withdrawal symptoms were a foundation of this marketing campaign. Janssen also conveyed other misrepresentations, including that its opioids could safely be prescribed at higher doses and were safer than alternatives such as NSAIDs.

70. Janssen supplemented these efforts with its own unbranded website, as well as third-party publications and a Front Group website, to promote opioids for the treatment of chronic pain. These materials likewise made deceptive claims about addiction risk, safety at higher doses, and the safety of alternative treatments. They also claimed that opioid treatment would result in functional improvement, and further masked the risk of addiction by promoting the concept of pseudoaddiction.

71. Janssen sales representatives visited targeted physicians to deliver sales messages that were developed centrally and deployed identically across the country. These sales representatives were critical in transmitting Janssen's marketing strategies and talking points to individual prescribers. In 2011, at the peak of its effort to promote NUCYNTA ER, Janssen spent more than $90 million on detailing.

72. Janssen knew that there was no credible scientific evidence establishing that addiction rates were low among patients who used opioids to treat chronic pain. There is no evidence that NUCYNTA is any less addictive or prone to abuse than other opioids, or that the risk of addiction or abuse is low. Similarly, Janssen knew that there were severe symptoms associated with opioid withdrawal including, severe anxiety, nausea, vomiting, hallucinations, and delirium, but Janssen touted the ease with which patients could come off opioids.

73. These allegations were at the forefront of the City of Chicago Complaint. The City of Chicago Complaint was brought by Fiona A. Burke, Michael J. Dolesh and Mary Eileen Cuniff Wells of the Chicago Law Department in Chicago, Jason M. Bradford and Jeffrey D. Coleman of Jenner & Block in Chicago, Linda Singer and Joshua D. Glickman of Cohen, Milstein, Seller & Toll in Washington, D.C., and Michael A. Scodro of the Illinois Attorney General's Office in Chicago. The City of Chicago Complaint states that "between 2009 and 2012, NUCYNTA and NUCYNTA ER sales representatives repeatedly promoted these drugs as less addictive than other opioids. For example, Janssen sales representatives described NUCYNTA as 'not an opioid' to one Midwestern internist at least twice in 2010. Similarly, a sales representative told a Midwestern physician that NUCYNTA was 'nonopioid yet opioid like' in 2011." Further, the City of Chicago interviewed a number of sales representatives from Quintiles that promoted NUCYNTA off-label.

74. Sales "Representative E," who worked in Janssen's Midwest Region (the Regional Manager had offices in Naperville, Illinois), was instructed to push the envelope when selling NUCYNTA ER and stress that NUCYNTA ER didn't hit receptors like other opioids so it was less addictive and had fewer withdrawal issues. She also promoted NUCYNTA and NUCYNTA ER as a safer alternative to NSAIDs and, when discussing side effects related to NUCYNTA and NUCYNTA ER, she focused on nausea, itchy skin, and vomiting. She told physicians that they could prescribe higher doses of NUCYNTA ER because its mechanism works differently than other opioids.

75. Sales "Representative G," whose territory included the suburbs northwest of Chicago, recalled selling NUCYNTA and NUCYNTA ER. She promoted NUCYNTA and NUCYNTA ER as safe and effective for the long-term treatment of chronic pain and told physicians that drugs like Tylenol kill the liver and that NUCYNTA and NUCYNTA ER were cleaner by comparison and did not attack the organs.

76. Sales "Representative H," who also worked in Janssen's Midwest Region, recalls selling NUCYNTA and NUCYNTA ER. She recalls being trained to say that NUCYNTA and NUCYNTA ER did not offer the same euphoric feeling as other opioids. She also recalled referring prescribers to a YouTube video that asserted that NUCYNTA was more difficult to crush than other pills, making it less likely to be abused or diverted. Representative H believed that it was common for Janssen sales representatives to downplay the addictive nature of NUCYNTA and NUCYNTA ER.

77. The City of Chicago also interviewed a number of Prescribers who were visited by Janssen sales representatives marketing NUCYNTA. "Prescriber C," as referred to in the City of Chicago Complaint, stated that Janssen, routinely omitted any discussion about addiction and overdose death and frequently overstated the benefits of opioids. These representatives taught that opioids would increase his patients' ability to function and increase their quality of life. Janssen's sales representatives also falsely stated that NUCYNTA was not being abused.

78. "Prescriber D" stated that representatives from Janssen said their drugs were '"steady state," which he interpreted to mean that they were less addictive.

79. "Prescriber B," an anesthesiologist, sees opioid drug company representatives on a regular basis, and he has seen representatives from Janssen. These representatives pushed the message that "steady-state" drugs have less potential for abuse. Further, he relies on the representations made by drug company representatives because he does not have the time to conduct his own research.

80. "Prescriber AA" indicated that she was visited by sales representatives from Janssen. She was detailed by this sales representative once a month for 6 months to a year. This sales representative marketed NUCYNTA to Prescriber AA, but not as an opioid. The City of Chicago Complaint states that, instead, Prescriber AA was told that NUCYNTA was an alternative to opioid therapy and that it worked on an alternate receptor. This sales representative explained that NUCYNTA would be appropriate for chronic pain patients who were unable to continue opioid therapy due to excessive side effects. Further, the Janssen sales representative also told Prescriber AA that NUCYNTA didn't have a risk of addiction, unlike opioids, and that it would improve her patients' function.

81. Depomed purchased NUCYNTA from Janssen in April 2015 despite Janssen's on-going litigation with the City of Chicago for the improper off-label marketing of NUCYNTA. On June 10, 2016, Depomed filed a Form 8-K/A stating that "Janssen has been named in a number of lawsuits alleging claims related to opioid marketing practices." Additionally, as stated by Schoeneck, Depomed had "significant insight" into NUCYNTA marketing prior to purchasing NUCYNTA in April 2015. Further, Defendants knew that the FDA-approved label for NUCYNTA contained no information about NUCYNTA being safer, more tolerable, less addictive, or less abusive than alternative opioids, and knew they could not market NUCYNTA this way.

82. On June 23, 2015, Moretti stated that "[a]lthough not in the label there's a very low abuse profile and side effect rate." Additionally, Schoeneck stated on March 14, 2016, "The addiction profile is thought to be better. I can't make a claim around that because we don't actually have that in the label." In February 2017, Schoeneck also announced that Depomed was "initiating label enhancement studies, aimed at further differentiating NUCYNTA by highlighting its respiratory depression and abuse potential profile. These labeling studies will focus on the properties

of the tapentadol molecule, and its uniqueness in the pain marketplace." The purpose of this was to "be able to get it hopefully into the label." Further, Higgins on May 9, 2017 stated that Depomed was "looking to strengthen our label."

83. Despite knowing that Janssen was being sued for the off-label marketing of NUCYNTA and that it was illegal to promote NUCYNTA off-label, Defendants hired Quintiles, the same sales Janssen used to promote NUCYBTA, to promote NUCYNTA at Depomed. Further, Defendants, including Schoeneck, Moretti, and Higgins continued to promote NUCYNTA as a safer, more tolerable, less addictive, less abusive opioid that did not have the same euphoric effect on patients.

84. For example on a website ran by Depomed that is designed to market NUCYNTA, Depomed promotes NUCYNTA ER as more tolerable because of fewer "discontinuation rates due to treatment-emergent adverse events." Depomed goes on to set forth a number of treatment emergent adverse events and how they compare to one competitor, Oxycodone. The website also claims that NUCYNTA ER is safe because only 4.8% of NUCYNTA ER-treated patients experienced mild or moderate withdrawal. However, none of this appears on the FDA-approved label for NUCYNTA. Defendants encouraged their sales team to promote NUCYNTA off-label in the same manner. This is confirmed by former employees ("FE") of Depomed, detailed below.

85. FE1 worked as a former Specialty Sales Representative selling NUCYNTA at Depomed from October 2011 to March 2016. FE1 reported to David Sims, a former sales manager from Quintiles. According to FE1, Depomed appeared to change significantly in how it approached its sales practices and training following the acquisition of NUCYNTA. FE1 was trained on how to sell NUCYNTA by FE1's manager, David Sims, who formerly worked for Quintiles, the marketing firm used by Janssen. Sims trained FE1 by discussing the negative perception of opioids in general across the country, and by telling FE1 how to pushback against prescribers who cited concerns writing an opioid prescription.

86. FE1 indicated that Depomed's marketing push was "Think Differently." FE1 stated that the manager was very vocal about NUCYNTA being a "safer opioid." FE1 indicated that the Sims "would say that all the time" and that FE1 heard Sims call NUCYNTA a safer opioid to

physicians. FE1 would listen to Sims preach to physicians about NUCYNTA and its value to patients in terms of, among other things, improved safety relative to other opioids on the market. According to FE1, Sims "would just tell the doctors it was much safer, and for them to prescribe it for their patients, and it was better for their patients." FE1 stated he/she was aware Sims was speaking off-label about the drug and that it was not allowed by law. FE1 was also paired with a former Quintiles sales representative who actively told physicians that NUCYNTA was a safer opioid.

87. Similarly FE2, a former Senior Specialty Representative at Depomed from June 2012 to July 2017, who was responsible for promoting NUCYNTA, and also for helping prepare other new employees to sell the drug, stated that Depomed convinced its sales force that NUCYNTA was different. "A lot of things changed because we brought on a huge group of people, and, for instance, where the Training Department would do the training on its own, now I was part of the trainers where I was training a full classroom of people on my own," FE2 said. "It was very different in the practices, in that regard. They had so many brought on." FE2 stated "We were being convinced it was a safer opioid" that was "the overall consensus that was being told to us." FE2 stated that when the sales team complained about selling to neurologists, FE2's superiors would say that "this is a great opportunity to introduce them to the safer opioid." FE2 stated that the message that NUCYNTA was a safer opioid came from multiple people and "from different parts of the country."

88. FE3 was a Pain Sales Specialist at Depomed from November 2015 to August 2016 responsible for representing NUCYNTA. FE3 reported to her district manager Jessica Golino. FE3 was trained by Glenn Drummond who formerly represented Oxycontin for Purdue Pharma. FE3 said he/she had gone through sales training at several pharmaceutical companies prior to joining Depomed but that none of those was as intense as what she experienced with Drummond. "There was always negativity associated with selling any opioid, but we believed in the molecule," FE3 said. "You weren't going to get the euphoric effect. That was discussed, that you would not see that." FE3 stated that, "I heard Jim Schoeneck talk a lot. The perception of opioids? You're selling a molecule that's not supposed to cause euphoria. You're kind of talking out both sides of your mouth. I'm selling a painkiller, but not the same as (the ones) on the street." FE3 stated, "You have to think about the molecule. Doctors didn't want to give something to patients that would give that high."

89. When asked about whether the sales representatives talked about the lower abuse of NUCYNTA to doctors, FE3 stated, "If they have specific questions about abuse, we did talk abuse. We did talk about it. Yeah, we did." When asked where FE3 heard NUCYNTA was safer and less euphoric, FE3 stated that they were told during sales training that NUCYNTA did not provide the same euphoria as other street-level opioids. "It was discussed in training. That's what made this molecule as successful as it was. There was less abuse potential. Addicts weren't going to be stealing it because they wouldn't get the buzz." FE3 added the caveat, "It was never on the marketing materials. I can't point fingers at the trainers. It was just a well-known fact you're not going to get the euphoria." The fact that Depomed conspicuously omitted this training instruction from their printed training materials strongly suggests that Defendants knew that the instruction was inappropriate and improper, otherwise there would be no need to hide it in this manner. FE3 confirmed they were instructed that NUCYNTA presented less abuse potential because of its design. "Just the way it was manufactured," FE3 said. "If you tried to crush it, it was almost indestructible."

90. FE4 was a former Specialty Pain Sales Representative at Depomed, Inc. from late 2011 to late November/early December 2016. In addition to selling NUCYNTA, FE3 was responsible in assisting with sales training related to the new employees hired to promote NUCYNTA. FE3 indicated that "there may have been some perception" that NUCYNTA was a safer painkiller. FE3 stated, "I was a guest trainer. I worked intimately with Glen [Drummond] on multiple things. He was very serious about training, there's no doubt in my mind. He could be very challenging, I wouldn't go so far as to say difficult, and he had expectations for people going through training. The agenda was rigorous. It was long hours. Glen was very, very good. He was professional, and he expressed that there was a "gray area" when it comes to selling opioids.

91. While instructing Depomed's sales team to promote NUCYNTA off-label, Defendants made material misrepresentations to investors regarding Depomed's marketing strategy. Throughout the Class Period Depomed described its marketing strategy, however the description omitted material information concerning Depomed's off-label marketing strategy. In particular, absent from Defendants' statements was the fact that Depomed was marketing and promoting NUCYNTA as a safer, less addictive, less abusive opioid that did not contain the same euphoric

feeling as other opioids when it did not have FDA-approval to market NUCYNTA in this manner. Depomed also did not have any clinical study of its own to substantiate this claim but relied on clinical studies previously performed by Janssen.

92. Depomed's off-label marketing strategy allowed Defendants to continue promoting Depomed as a positive investment, one that had beaten (and would continue to beat) the generally declining opioid market. Indeed, Defendants raised their product revenue estimates based, in part, on their strong marketing strategy.

93. Defendants also misled investors in its quarterly and yearly filings. Although Defendants stated that "We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs" in Depomed's "risk factors" section, it did so in a misleading manner. Depomed had already been engaging in off-label marketing. Accordingly, Depomed's quarterly report should have described the risks associate with off-label marketing as having already materialized, and thus the potential exposure arising therefrom as a far more likely event. By discussing off-label marketing as something that "might" occur when in fact it "already" occurred, Defendants materially misled investors.

94. These risks ultimately came to bear and, through no fault of their own, Depomed's investors suffered significant losses.

## <u>SUBSTANTIVE ALLEGATIONS</u>

### *A. Defendants Misrepresented the Effect of the Opioid Crisis on Depomed and Depomed's Response*

95. Public sentiment towards opioid prescription and use deteriorated dramatically over the course of the Class Period. Companies in the opioid industry uniformly reported reduced sales due to worsening market conditions, except Depomed. Depomed, against all indications, reported increased sales and business development. Unbeknownst to investors, Depomed's operations were far less positive than represented. The headwinds within the opioid industry had been affecting, and would continue to affect, Depomed on a severe level. To the extent Depomed achieved positive earnings relative to its peers, it did so by engaging in an illicit off-label marketing scheme in which Depomed targeted primary care physicians in an effort to increase prescriptions and dosage.

96. Defendants' statements concealed these facts from investors. Instead of disclosing the true nature of Depomed's industry obstacles, Defendants created the false impression that business was carrying on as usual (if not improving). Whether and to what extent Depomed was engaging in off-label marketing in order to counter the negative effects of the opioid crisis was material to investors. Had investors known the truth about Depomed's operations, they would have been able to evaluate the exposure Depomed faced from engaging in illicit sales tactics and, in turn, consider these risks when deciding whether to invest in Depomed stock.

97. Investors did not begin to doubt the veracity of Defendants' statements until November 7, 2016, when Defendants lowered Depomed's top-line revenue estimate from $505 million to $465 million in part because of the worsening opioid market. Investors developed additional questions concerning Defendants' statements as Defendants began to admit that Depomed's business prospects were not as bright as initially represented. The Senate Investigation and the investigation by U.S. Department of Justice solidified investor concerns and, with each new revelation, Depomed's stock price declined further and further.

*July 29, 2015 – Earnings Call*

98. On July 29, 2015, Depomed held an earnings call to discuss Depomed's second-quarter fiscal year 2015 financial results. Schoeneck and Moretti attended the call and stated the following:

> **Jim Schoeneck** - Depomed, Inc. - President & CEO
> Continuity was a key to our second quarter success as well as we hired Quintiles, the same contract sales organization that had marketed NUCYNTA previously to continue selling on our behalf while we completed the recruitment for positions in our expanded sales force leading up to our re-launch of NUCYNTA in June. As impressive as NUCYNTA's second quarter numbers are, we believe we've just scratched the surface with this innovative product and that we have the potential to reach peak sales higher than we initially anticipated. Our new NUCYNTA positioning and expanded commercial re-launch efforts are now well underway.
>
> * * *
>
> I'd now like to spend a few minutes on each of these growth opportunities. First and foremost, we believe NUCYNTA has blockbuster potential and can achieve greater peak sales than we originally anticipated. There are four key elements to our NUCYNTA plan: one, significantly increased promotion, two, totally revamped product positioning and messaging, three, pricing and access strategies to maximize

the brand and this is new, four, proper dosing. Each has an impact on our sales ramp and the ultimate peak sales potential for NUCYNTA.

Now let me give you some more info on each one. First, promotion. ***The key component of our strategy is the strength of our sales and marketing force. We officially re-launched NUCYNTA in June with a significantly expanded sales force of 275 highly experienced and specialized pain and neurology reps. This sales force is over three times larger than the prior sales force and allows us to rapidly and effectively engage to more than 25,000 target prescribers as we raise the profile of NUCYNTA. Our sales force is fully deployed and energized targeting eight to 10 prescriber calls per day***.

And here's one new observations since our re-launch. There seems to be a group of physicians that have either prescribed NUCYNTA in the past or prescribe more NUCYNTA than they have recently. This latent demand may turn out to be an additional driver of NUCYNTA as Depomed re-engages these physicians.

Our medical and marketing activities have ramped up as well. During the month of July, over 300 medical support and speaker programs are being executed, including a national webcast that is expected to draw healthcare professionals from nearly every state. It's important to note that while we began distributing NUCYNTA at the beginning of April, our re-launch took place in mid June so the benefits from our commercial re-launch strategy should become evident later this year.

* * *

**August Moretti** - Depomed, Inc. - CFO & SVP
In light of our strong Q2 results, we are updating our guidance for 2015. Guidance for the year is based on actual results for the first six months of the year and our current budget for the second half of the year. Our budget is based on a large number of assumptions and there are significant uncertainties in estimating future product revenues. This is particularly true for our largest revenue products, NUCYNTA and NUCYNTA ER. For a more complete discussion of the relevant risks relating to our guidance, I will direct you to the Risk Factors section of our quarterly report on Form 10-Q that we expect to file later this week.

With that said, aggregate net product revenues for our six products for 2015 are expected to be $320 million to $340 million. This is an increase of $10 million on the bottom of the range and $5 million on the top. We expect total revenues to be approximately the same as we're not anticipating any milestone revenue in 2015.

99. The above statements (identified in bold) were materially misleading. Although the statements provided investors with a description of Depomed's marketing strategy, the description omitted material information concerning Defendants' off-label marketing strategy. In particular, absent from Defendants' above statements was the fact that Depomed was promoting NUCYNTA to primary care physicians as a safer, less addictive, less abusive opioid that did not contain the same euphoric feeling as other opioids. Depomed did not have FDA-approval to market NUCYNTA in

this manner. Depomed's off-label marketing strategy allowed Defendants to continue promoting Depomed as a positive investment, one that had beaten (and would continue to beat) the generally declining opioid market. Indeed, Defendants raised their product revenue estimates based, in part, on their strong marketing strategy.

100. Defendants' statements on July 29, 2015 prompted an immediate rise in the price of Depomed stock. From a closing price of $31.87 on July 29, 2015, Depomed's stock climbed to $32.25 the following day on July 30, 2015, on unusually heavy volume. The truth about Depomed's illegal off-label marketing practice would have altered the total mix of information available to investors. Defendants failed to disclose this information and, in doing so, allowed the statements they made to be materially misleading.

*August 3, 2015 – Form 10-Q*

101. On August 3, 2015, Depomed filed a Form 10-Q for the second quarter ending June 30, 2015. The Form 10-Q was certified and signed by Schoeneck and Moretti.

> ***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***
>
> Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

2Q15 at 52.

102. Defendants included the above statement in its quarterly report within a section titled "RISK FACTORS." Although the above statement discussed the risk of "incur[ring] significant

liability" in connection with off-label marketing, it did so in a misleading manner. Depomed, by this point in time, had already been deliberately engaging in off-label marketing. Accordingly, Depomed's quarterly report should have described the risks associate with off-label marketing as having already materialized, and thus the potential exposure arising therefrom as a far more likely event. By discussing off-label marketing as something that "might" occur when in fact it "already" occurred, Defendants materially misled investors.

*__November 9, 2015 – Earnings Call__*

103. On November 9, 2015, Depomed held an earnings call to discuss Depomed's third-quarter fiscal year 2015 financial results. Schoeneck and Moretti participated on the call and stated the following:

> **Jim Schoeneck** - Depomed, Inc. - President & CEO
> In line with this strong performance, today we announced we are raising guidance for our 2015 product sales to a range of $336 million to $348 million, which is more than triple our 2014 product sales, and raising our non-GAAP adjusted earnings to $58 million to $66 million, an increase of almost 40% over our prior guidance. Augie will provide a comprehensive look of our revised guidance in his remarks.
>
> Our relaunch of NUCYNTA is off to an exceptional start with growth accelerating ahead of our initial expectations. The third quarter was the first full quarter of NUCYNTA promotion by our expanded sales force, along with resumption of full marketing and medical support. Third-quarter net sales for NUCYNTA were $65 million, an increase of 15% compared to $57 million for the second-quarter 2015. We believe that our commercial strategy is already having a significant impact on unit demand and will serve as the platform for continued growth for many years. Total NUCYNTA ER prescriptions for the quarter were 80,000, up 8% compared to second-quarter 2015.
>
> * * *
>
> First, promotion. ***As you all know, we tripled the size of the NUCYNTA sales force effort, now promoting NUCYNTA with 277 sales reps. This experienced group is delivering about 10,000 sales calls per week, focusing on high prescribers in our product categories. Their hard work is already moving NUCYNTA scripts and market share. About four weeks ago we held sales meetings across the country, and I was able to meet with many of our people. They are focused and motivated. We are seeing new physician prescribers of NUCYNTA each week and we are seeing increased prescriptions from existing prescribers. I also believe that these meetings prepared our sales force to be even more effective in the fourth quarter as we continue the NUCYNTA relaunch.***
>
> * * *
>
> **August Moretti** - Depomed, Inc. - SVP & CFO

> Now to our guidance. In light of our strong Q3 results, we're updating our guidance for 2015. Guidance for the year is based on actual results for the first nine months of the year and our current budget for the remainder of the year. Our budget is based on a large number of assumptions and there are significant uncertainties in estimating future product revenues. This is particularly true for our largest revenue products, NUCYNTA and NUCYNTA ER. For a more complete discussion of the relevant risks relating to our guidance, I direct you to the Risk Factor section of our quarterly report on Form 10-Q that we will file with the SEC today.
>
> With that said, aggregate net product revenues for our six products for 2015 are expected to be $336 million to $348 million. This is an increase from our previous guidance of a range of $320 million to $340 million. We expect total revenues to be approximately the same, as we're not anticipating any milestone revenue in 2014. COGS for NUCYNTA and NUCYNTA ER will be approximately 25% for the remainder of 2015, reflecting the manufacturing costs and the royalties on net sales over to Grunenthal. COGS on our other products are expected to be approximately 10% of net sales. Operating expenses exclusive of amortization are expected to be $200 million to $210 million, an increase from our previous guidance of $195 million to $210 million.

104. The above statements (identified in bold) were materially misleading. Although describing Depomed's marketing and promotion practices, Defendants omitted that Depomed's strategy to increase prescriptions and sales revenue included off-label marketing. Depomed had been targeting (and would continue to target) primary care physicians by representing that NUCYNTA was a safer, less addictive, less abusive opioid that did not contain the same euphoric feeling as other opioids. Depomed did not have FDA-approval to market NUCYNTA in this manner and lacked credible, scientific support to make these claims. But for Depomed's off-label marketing scheme, the company would have been subject to the same negative headwinds that had been affecting the opioid industry in general.

<u>*November 9, 2015 – Form 10-Q*</u>

105. On November 9, 2015, Depomed filed a Form 10-Q for the second quarter ending June 30, 2015. The Form 10-Q was certified and signed by Schoeneck and Moretti

> ***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***
>
> Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA

> and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

3Q15 at 54.

106. Defendants included the above statement in its quarterly report within a section titled "RISK FACTORS." Defendants' description of the risks relating to off-label marketing were materially misleading. Depomed, by this point in time, had already deliberately engaged in off-label marketing and, as such, had already significantly increased the company's exposure to significant liability. By discussing off-label marketing as something that "might" occur when in fact it "already" occurred, Defendants materially misled investors.

*February 22, 2016 – Earnings Call*

107. On February 22, 2016, Depomed held an earnings call on February 22, 2016 to discuss Depomed's third-quarter fiscal year 2015 financial results. Schoeneck and Moretti participated on the call and stated the following:

> **Jim Schoeneck** - Depomed, Inc. - President and CEO
> I'm pleased to report that the NUCYNTA relaunch is exceeding our expectations. Fourth-quarter net sales for NUCYNTA were $68 million, up 55% over the approximately $44 million generated by Janssen in the fourth quarter of 2014. Fourth-quarter total NUCYNTA ER prescriptions reached an all-time high of about 87,000 and, during December, achieved an all-time weekly and monthly high, surpassing the October 2012 records established by Janssen.
>
> The cornerstone to our NUCYNTA growth strategy is the implementation of our four pillars of growth; promotion, positioning, patient access and proper dosing. ***We are already seeing the initial signs of success on the promotion front as the expanded reach of our sales force is gaining traction with high prescribers and influential thought leaders in the pain space***.

> This is evidenced by the increasing number of new prescribers, as well as increased prescriptions from existing prescribers. In addition, more physicians are prescribing both brands, both immediate release and long-acting NUCYNTA.
>
> In less than seven months, our sales and marketing team executed over 900 speaker programs educating over 10,000 healthcare professionals. Our sales force continues to target approximately 10,000 sales calls per week and is rolling out new marketing materials aimed at highlighting NUCYNTA's dual mechanism of action.
>
> Last month our 300-person-strong sales team gathered for our national sales meeting. They are committed, energized and unwavering in their desire to grow the portfolio. Their 2015 efforts translated into success with the recent all-time prescription highs. They also recognize that there is plenty of room for growth.
>
> The meeting gave us an opportunity to strengthen their successful play book with an enhanced set of tools, including new digital and printed marketing materials needed to help take them to the next level. We are also rolling out new customized managed care resources tailored for each position.
>
> Finally, we have added 24 additional voices to our NUCYNTA sales effort. Starting in February, our Lazanda sales team is now also selling NUCYNTA and NUCYNTA ER.
>
> * * *
>
> **August Moretti** - Depomed, Inc. - CFO & SVP
> For the fourth quarter, NUCYNTA sales were $68 million, an increase of 5% from the previous quarter. Prescriptions for the NUCYNTA franchise for the quarter were over 219,000. ER prescriptions were up 9% over Q3 and, as Jim mentioned, we have reversed the decline in IR prescriptions. The Q4 results further solidify NUCYNTA as Depomed's largest product franchise. That said, the rest of our products also delivered strong performances in the fourth quarter.

108. The above statements (identified in bold) were materially misleading. Defendants described Depomed's recent marketing achievements as successes, but at the same time did not disclose that these supposed successes were obtained in part through an illicit off-label marketing campaign. Depomed was actively targeting primary care physicians with marketing presentations that described NUCYNTA as a safer, less addictive, less abusive opioid that did not contain the same euphoric feeling as other opioids. Depomed did not have FDA-approval to market NUCYNTA in this manner. Depomed also did not have any independent scientific evidence to support these claims. Accordingly, the above misstatements were materially false and misleading.

*<u>February 26, 2016 – Form 10-K</u>*

109. On February 26, 2016, when Depomed filed an Annual Report on Form 10-K with the SEC, announcing Depomed's financial and operating results for the quarter and year ended

December 31, 2015 (the "2015 10-K"). Schoeneck and Moretti signed and certified the 2015 10-K. In the 2015 10-K, Depomed stated, in relevant part:

> **MARKETING AND SALES**
>
> We have developed capabilities in various aspects relating to the commercialization of our marketed products, including sales, marketing, manufacturing, quality assurance, wholesale distribution, managed market contracting, government price reporting, medical affairs, compliance, and regulatory. Members of our commercial organization are also engaged in the commercial and marketing assessments of other potential product candidates.
>
> Our sales organization includes approximately 300 full-time sales representatives. ***Our sales force primarily calls on pain specialists, neurologists and primary care physicians throughout most of the United States***. Our marketing organization is comprised of professionals who have developed a variety of marketing techniques and programs to promote our products, including promotional materials, speaker programs, industry publications, advertising and other media.

2015 10-K at 11.

110. The above statements (identified in bold) were materially misleading. Defendants described Depomed's recent marketing achievements as successes, but at the same time did not disclose that these supposed successes were obtained in part through an illicit off-label marketing campaign. Depomed was actively targeting primary care physicians with marketing presentations that described NUCYNTA as a safer, less addictive, less abusive opioid that did not contain the same euphoric feeling as other opioids. Depomed did not have FDA-approval to market NUCYNTA in this manner. Depomed also did not have any independent scientific evidence to support these claims. Defendants opted to discuss Depomed's marketing program while, at the same time, omitting that the company's marketing strategy relied in part on off-label promotion. Defendants' omission in this regard was materially misleading.

111. The 2015 10-K also included the same "risk warning" that appeared in Depomed's quarterly reports discussed above. In pertinent part, the 2015 10-K stated:

> ***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***

> Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

112. Defendants included the above statement in its quarterly report within a section titled "RISK FACTORS." Defendants' description of the risks relating to off-label marketing were materially misleading. Depomed, by this point in time, had already deliberately engaged in off-label marketing and, as such, had already significantly increased the company's exposure to significant liability. By discussing off-label marketing as something that "might" occur when in fact it "already" occurred, Defendants materially misled investors. Defendants conduct in this regard concealed from investors the true risks they faced as a result of investing in Depomed.

*May 5, 2016 – Earnings Call*

113. On May 5, 2016, Depomed held an Earnings Call to discuss Depomed's first-quarter fiscal year 2016 financial results. Schoeneck and Moretti participated on the call and stated the following:

> **Jim Schoeneck** - Depomed, Inc. - President & CEO
> We continue to be pleased with the Nucynta re-launch. The first quarter saw net sales of our Nucynta franchise of $69.4 million. In March, Nucynta ER prescriptions reached an all-time high of over 28,767, surpassing our previous record set last December and posted a 22.6% year-over-year increase in prescription volume. The prescription trends continued to accelerate. The most recent data for the week ending April 22 shows a prescription increase of 27.9% as compared to the same week last year.
>
> While our re-launch strategy is primarily focused on Nucynta ER, it is important to note that Nucynta IR has also shown favorable prescription trends. Immediately prior to our re-launch, Nucynta IR prescription volume was down 9% year-over-

> year. Since then, we have changed this trend with Nucynta IR prescriptions coming in above the prior-year levels for four of the past five months. Going forward, we believe that Nucynta IR prescriptions will grow as we target the appropriate specialists.
>
> We are continuing to see progress implementing our four pillars of Nucynta growth; promotion, positioning, patient access and proper dosing.
>
> ***On the promotion front, we are focused on growing Nucynta ER with pain specialists as well as our physician's assistant and nurse practitioners. These two groups write almost 75% of the prescriptions for Nucynta ER and the brand is growing faster in these specialties than the rest***.
>
> In fact, prior to our re-launch, Nucynta ER prescriptions from pain specialists were only growing 1% year-over-year. ***In March 2016, pain specialist preps were up 25% over the same month last year and our market share of the long-acting opioid prescriptions is now almost 3%***.
>
> Since one of the effects of the increased scrutiny on opioid prescribing maybe further concentration in the pain specialists' office, we believe that we are well positioned to continue to accelerate growth.
>
> * * *
>
> **August Moretti** - Depomed, Inc. - SVP & CFO
> With that said, total revenues for our six products for 2016 are expected to be in the range of $490 million to $520 million. SG&A expenses for the remainder of the year reflects the cost associated with marketing expenses for both Nucynta and Nucynta ER, as well as cost associated with the Nucynta litigation that we have assumed in connection with the acquisition. Non-GAAP SG&A expenses are expected to be in the range of $185 million to $195 million.

114. The above statements (identified in bold) were materially misleading. Absent from Defendants' discussion about Depomed's marketing was any mention of the fact that Depomed was engaging in an ongoing illicit, off-label marketing campaign. Depomed was actively targeting primary care physicians, among others, with presentations that portrayed NUCYNTA as a safer, less addictive, less abusive opioid that did not contain the same euphoric feeling as other opioids. Unbeknownst to investors, it was this off-label marketing campaign that enabled Depomed to avoid the negative business and market trends that were affecting its competitors within the opioid industry. Indeed, Defendants represented that NUCYNTA was uniquely positioned to combat the negative public sentiment against opioids. Schoeneck described NUCYNTA as having "***different properties than the other opioids, particularly when it comes to the kind of activity that the CDC and others are most concerned about***" and that "***there'll be relatively little impact on [Depomed]***

***compared to where some other companies may fall in at.*** " In reality, Depomed faced the same negative headwinds as its peers and was only avoiding the repercussions due to an ongoing illegal and improper off-label marketing campaign. Investors deserved to know the truth in this regard, as they would have considered the significant risks associated with off-label marketing when deciding to invest in Depomed.

*May 6, 2016 – Form 10-Q*

115. On May 6, 2016, Depomed filed a Form 10-Q for the first quarter ending March 31, 2016. The Form 10-Q was certified and signed by Schoeneck and Moretti

> ***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***
>
> Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

1Q2016 at 42.

116. Defendants included the above statement in its quarterly report within a section titled "RISK FACTORS." Defendants' description of the risks relating to off-label marketing were materially misleading. Depomed, by this point in time, had already deliberately engaged in off-label marketing and, as such, had already significantly increased the company's exposure to significant liability. By discussing off-label marketing as something that "might" occur when in fact it "already" occurred, Defendants materially misled investors. Defendants conduct in this regard concealed from investors the true risks they faced as a result of investing in Depomed.

*August 3, 2016 – Press Release & Earnings Call*

117. On August 3, 2016, Depomed issued a press release titled "Depomed Reports Second Quarter 2016 Financial Results." The press release was also filed with the SEC on the same day. The Press Release stated in pertinent part:

> NEWARK, CA. August 3, 2016 - Depomed, Inc. (Nasdaq: DEPO) today reported financial results and highlighted operational achievements for the quarter ended June 30, 2016.
>
> "The second quarter marked the 1-year anniversary of the mid-June relaunch of our flagship NUCYNTA franchise," said Jim Schoeneck, President and CEO of Depomed. "***During the first full year after our relaunch, we delivered $274 million of total NUCYNTA net sales, an increase of 59% over the final year of sales under the previous owner. NUCYNTA ER prescriptions continued to accelerate in June, up 26% over the prior year and achieving all-time high prescription volume and market share. And this is against a backdrop of challenging opioid market conditions that see declining prescriptions for the overall market and other leading brands. We are also encouraged by the positive NUCYNTA IR trends, with May and June showing a 2% prescription volume increase year-over-year, reversing the 10% decline seen before our re-launch.*** We believe that our flagship franchise is well-positioned for continued growth. The rest of our portfolio also performed well, delivering $45 million in combined revenues, with record quarterly revenues from both Gralise and Lazanda. Going forward we remain focused on growing our highly-differentiated portfolio and delivering value to all the groups we serve."

118. The above statement (identified in bold) was materially misleading. Defendants applauded Depomed's marketing efforts while, at the same time, omitting any mention of the fact that their marketing involved off-label tactics. Moreover, while Defendants claimed to have successfully avoided the "challenging opioid market conditions" that had negatively impacted their competitors, they did not attribute their supposed success to Depomed's illicit off-label marketing scheme.

119. Depomed also held an earnings call on August 3, 2016, to discuss Depomed's second-quarter fiscal year 2016 financial results. Schoeneck and Moretti were on the call and stated the following:

> **Jim Schoeneck** - Depomed, Inc. - President & CEO
> ***I believe that the growth of both NUCYNTA ER and IR is particularly impressive, especially given the backdrop of the opioid market. The overall market for opioids***

> ***is down 4% with leading brands declining more rapidly. We fully support the appropriate prescribing of opioids and we believe that tapentadol, the molecule in NUCYNTA, may be uniquely positioned to help pain patients and their physicians while also addressing concerns raised by community leaders and the media. As we mentioned before, we have focused on the growth of NUCYNTA IR with four pillars; promotion, positioning, patient access and proper dosing***.
>
> ***Let's look at what we've accomplished in the past year since our relaunch of NUCYNTA. On the promotion front we continue to perform well with pain specialists plus the nurse practitioners and PAs that work with them. Our market share with pain specialists now exceeds 3% of the long-acting opioid market and is almost that high with NPs and PAs. These groups together write about 75% of the NUCYNTA ER prescriptions. This is even more important when you consider that many primary care physicians are slowing their use of long-acting opioids and referring more and more patients to pain specialists where we are much more likely to capture the scripts for NUCYNTA ER.***
>
> *  *  *
>
> As I mentioned earlier, we fully support the appropriate prescribing of opioids including using the lowest effective dose for each patient. ***Even with these market headwinds that have affected both the overall market prescriptions and the dosing levels, we saw NUCYNTA ER and NUCYNTA prescriptions and sales trends continuing to accelerate***. We believe that the unique value proposition offered by NUCYNTA will continued to fuel growth for years to come.

120. The above statement (identified in bold) was materially misleading. Defendants, on one hand, portrayed Depomed as having successfully avoided the negative ramifications associated with the worsening opioid market while, on the other hand, omitting to tell investors that they were able to do this in part because they were engaging in off-label marketing. Defendants' statements prevented investors from obtaining the information they needed to accurately evaluate the risks associated with investing in Depomed. Had investors known the truth about Depomed's marketing conduct and how the company was able to outpace the market, they would have considered this information before investing in Depomed.

<u>*August 3, 2016 – Form 10-Q*</u>

121. On August 3, 2016, Depomed filed a Form 10-Q for the second quarter ending June 30, 2016. The Form 10-Q was certified and signed by Schoeneck and Moretti

> ***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***

> Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

2Q16 at 46.

122. Defendants included the above statement in its quarterly report within a section titled "RISK FACTORS." Defendants' description of the risks relating to off-label marketing were materially misleading. Depomed, by this point in time, had already deliberately engaged in off-label marketing and, as such, had already significantly increased the company's exposure to significant liability. Defendants portrayed the risk of exposure from off-label marketing as a mere potentiality when, in fact, Depomed was actively engaging in off-label marketing. Defendants conduct in this regard concealed from investors the true risks they faced as a result of investing in Depomed.

### ***B. The Truth Begins to Emerge as the Risks Concerning Depomed's Marketing Practices Begin to Materialize***

*<u>November 7, 2016 – Press Release & Earnings Call</u>*

123. On November 7, 2016, Depomed issued a press release titled "Depomed Reports Second Quarter 2016 Financial Results." The press release was also filed with the SEC on the same day. The Press Release stated in pertinent part:

> NEWARK, CA., November 7, 2016 — Depomed, Inc. (Nasdaq:DEPO) today reported financial results and highlighted operational achievements for the quarter ended September 30, 2016.

"Although our third quarter revenues increased by 5% over the previous year's quarter, they did not meet our expectations, as several factors, including a disconnect between prescription demand and wholesaler shipments, influenced net sales of the NUCYNTA franchise and Gralise. Prescriptions for NUCYNTA ER grew 4% over the second quarter, while shipments to wholesalers were down 1%. Prescriptions for NUCYNTA and Gralise were equal to the second quarter, however, shipments were down 6% and 12%, respectively," said Jim Schoeneck, President and CEO of Depomed. "In addition, we made adjustments to our reserve accounts, including managed care and PBM rebate submissions from prior quarters, which impacted our product net sales."

Continued Mr. Schoeneck, "For the rest of 2016 and beyond, we are fully committed to continuing the successful relaunch of our Nucynta franchise and building prescription demand for our products. For the third quarter, NUCYNTA ER reached all time high monthly market share and total prescriptions, with year-over-year prescription growth of approximately 20%. In addition, the rest of our portfolio achieved revenues of $45 million, an increase of 13% year-over-year. Finally, Depomed's recent NUCYNTA ANDA patent litigation win marked a major milestone for the company, giving us more than 9 years to continue to grow the NUCYNTA franchise, with exclusivity established until December 2025."

Business and Financial Highlights

- Third quarter 2016 revenues were $111 million, compared to $105 million for third quarter of 2015, an increase of 5%
- Quarterly net loss of ($12.9) million or ($0.21) per share
- Quarterly non-GAAP adjusted earnings of $20.9 million, or $0.28 per share
- Quarterly non-GAAP adjusted EBITDA of $35.4 million
- Favorable District Court ruling in the company's patent litigation against all three filers of Abbreviated New Drug Applications (ANDAs) of the NUCYNTA franchise with expected market exclusivity until December 2025
- Settlement agreement reached with Starboard Value LP including the addition of three independent directors, James P. Fogarty, Robert G. Savage and James L. Tyree, to Depomed's Board of Directors
- Introduction of a new aspartame-free formulation of CAMBIA® (diclofenac potassium for oral solution)

NUCYNTA Franchise Highlights

- Third quarter 2016 net sales of $65 million
- Net sales of $396 million since acquisition on April 2, 2015
- NUCYNTA ER reached record all-time monthly high prescription volume of over 30,000 reached in August, an increase of 20.4% over August 20151
- NUCYNTA ER reached record all-time monthly high market share of 6.85% of branded long acting opioids and 1.99% of total long acting opioids in September1

* * *

Updated 2016 Financial Outlook

Depomed is updating its 2016 financial guidance as follows:

| | Updated Guidance | Prior Guidance |
|---|---|---|
| Total Revenue | $455 to $465 million | $480 to $505 million |
| GAAP SG&A Expense | $204 to $208 million | Previously not given |
| GAAP R&D Expense | $33 to $36 million | Previously not given |
| Non-GAAP SG&A Expense | $183 to $187 million | $185 to $190 million |
| Non-GAAP R&D Expense | $32 to $35 million | $28 to $35 million |
| GAAP Net Loss | $43 to $49 million | Previously not given |
| Non-GAAP Adjusted Earnings | $79 to $85 million | $95 to $105 million |
| Non-GAAP Adjusted EBITDA | $152 to $160 million | $175 to $190 million |

124. On November 7, 2016, Depomed also held an earnings call to discuss Depomed's third-quarter fiscal year 2016 financial results. Schoeneck and Moretti were on the call and stated the following:

**Jim Schoeneck** - Depomed, Inc. - President and CEO
First, let me say that our quarterly results fell well short of our expectations. During the quarter, several factors influenced the net sales of NUCYNTA and Gralise. The shortfall is in three areas: a disconnect in the quarter between prescription, demand, and shipments; changes in product reserve accounts linked to rebate submissions for prior periods and additional units falling under existing contracts; and prescription demand growth for our key products that did not meet our forecast. I will address these areas, then Augie will speak to the financial implications in greater detail.

* * *

With that as background, let me now turn to the results from the quarter. Depomed posted third-quarter revenue of $111 million, an increase of 5% compared to $105 million for the third quarter last year. We had GAAP quarterly net loss of $13 million or $0.21 a share.

Our third-quarter non-GAAP adjusted earnings were $21 million or $0.28 a share, and our non-GAAP adjusted EBITDA was $35 million. Augie will review our GAAP to non-GAAP methodology later in the call.

In the third quarter, the NUCYNTA franchise generated net sales of $65 million and has produced $396 million of revenue since its acquisition in April of 2015. During the third quarter, NUCYNTA ER achieved approximately 20% year-over-year prescription volume growth as well as all-time record highs for both total and branded prescription market share.

In August, the brand reached an all-time monthly high of over 30,000 prescriptions, surpassing the previous monthly record set in June. Third-party data shows that we are increasing unique or new prescribers of NUCYNTA, with new prescribers up 10% for the first three quarters of 2016 versus the same period last year.

***We continue to see NUCYNTA IR prescription showing signs of growth, with August up 5% versus the prior year and September up 1%. You'll recall that the brand was declining 10% per year prior to our relaunch. Unique or new prescribers for IR are increasing 4% for the first nine months of 2016 versus the same period last year. We also see an increase in dual prescribers, meaning those that prescribe both NUCYNTA ER and IR.***

***All these are positive signs for the future, especially when you consider that the overall opioid market is down, with the long-acting market showing a 4% year-over-year decline and the short-acting opioid market down 6%. We believe that NUCYNTA offers differentiated properties that favorably position it despite these market pressures.***

* * *

Moving on to guidance, we are revising our 2016 financial guidance in light of our performance to date. Guidance for the year is based on actual results for the first nine months of the year and our current budget and expectations for the remainder of the year.

Our budget is based on a large number of assumptions, and there are significant uncertainties in estimating future product revenues. This is particularly true for our largest-revenue products, NUCYNTA and NUCYNTA ER. For a more complete discussion of the relevant risks related to our guidance, I'll direct you to the risk factors section of our quarterly report on Form 10-Q that we expect to file either later today or first thing tomorrow.

With that said, total revenues for our six products for 2016 are expected to be in the range of $455 million to $465 million. This is a reduction from our previous guidance of $480 million to $505 million. We are also reducing our non-GAAP SG&A expense guidance -- non-GAAP SG&A expenses, that is, GAAP expense minus stock compensation; purchase accounting; contingent consideration adjustments; and nonrecurring costs – are expected to be in the range of $183 million to $187 million, a reduction from our previous guidance of $185 million to $190 million. We are also providing GAAP SG&A expense of $204 million to $208 million.

* * *

**Ken Trbovich** - Janney Montgomery Scott - Analyst
I guess I'm trying to rationalize some of the commentary around the changing guidance, and I just want to make sure I fully understand it. If I understand that commentary, there was sort of three buckets.

First bucket was the change in the wholesaler inventories, which -- if we look at that as being a couple of days, we're talking about 83% of sales somewhere in the single digits, $3 million to $5 million, maybe. And if I understand the adjustments on the rebates, the number that was given was $2.3 million. So if we aggregate those, we are still well less than half of what I'm looking at as the shortfall in the quarter. And certainly maybe the expectations and the impacts going forward, those would be nonrecurring. So then it begs the question of whether or not the difference

is entirely a result of the change in prescription demand and your expectations around that.

I guess the reason for the question is that if I look at the guidance and the change in guidance, on the one hand it would suggest that there might not be much of a change in the fourth quarter in terms of the implications. On the other hand, we could see another $20 million change on the other end of -- on the guided range. So I'm trying to better understand how much of this is recurring versus nonrecurring.

**Jim Schoeneck** - Depomed, Inc. - President and CEO
I think we have -- as -- you've got a good handle, Ken. And Augie and Jack can comment more on the numbers per se.

But I think in terms of the one-time items that are there, in terms of the prescription demand piece, certainly the prescription demand -- while we are setting records on NUCYNTA IR, and while we have made a turn on NUCYNTA, we still in our plan had it moving farther than it has to date.

And that is one that I will be digging into significantly over the next few weeks here on what we can do to make sure that that is accelerating as we would expect. ***I think a piece of that is certainly the opioid market***. When we came into this last year, the opioid market was -- long-acting market was growing about 1% a year. Now it's declining 4%. It looks like it's stabilized at about that 4% year-over-year decline, at least for the last three months. We will see where it continues for the rest of the year.

I mentioned on our last call as well that we had some downtick in the milligrams per script. That has continued as well. It hasn't gone down much farther, but it has continued at that lower level. And that puts us in additional 4% or 5% of revenue loss, since this is basically a linear pricing. So as we have continued to see some of those things and not seen changes in those, it certainly does affect both the script numbers going forward and some of the realization per script, in addition to what some of Augie and Jack had mentioned in terms of the gross-to-net change.

125. The above statements signaled to investors that Depomed was susceptible to the negative market conditions affecting the opioid industry in general. In the press release and during the earnings call, Defendants disclosed that Depomed was lowering its estimate with respect to revenue and that this decision was in part due to the conditions in "the opioid market" generally. Depomed's disclosures on November 7, 2016 signaled to investors that Defendants' previous statements were misleading, and that perhaps risks existed with regard to Depomed's business that had not been properly disclosed. In response to Depomed's disclosures, the price of Depomed stock declined from $22.89 per share to $19.01 per share on November 8, 2016.

126. At the same time, Defendants also continued to mislead the public with respect to Depomed's marketing practices and ability to avoid the effects of negative sentiment towards the opioid industry. The above statements (identified in bold) misled investors by attributing their relative success to the company's marketing efforts, but omitted to disclose that these marketing efforts included illicit, off-label marketing presentations. Depomed encouraged its sales team to promote NUCYNTA as a safer, less addictive, less abusive opioid that did not contain the same euphoric feeling as other opioids, even though Depomed did not have FDA approval to market NUCYNTA in this regard.

*November 7, 2016 – Form 10-Q*

127. On November 7, 2016, Depomed filed a Form 10-Q for the third quarter ending September 30, 2016. The Form 10-Q was certified and signed by Schoeneck and Moretti

> ***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***
>
> Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

3Q16 at 47-48.

128. Defendants included the above statement in its quarterly report within a section titled "RISK FACTORS." Defendants' description of the risks relating to off-label marketing were materially misleading. Depomed, by this point in time, had already deliberately engaged in off-label marketing and, as such, had already significantly increased the company's exposure to significant

liability. By discussing off-label marketing as something that "might" occur when in fact it "already" occurred, Defendants materially misled investors. Defendants conduct in this regard concealed from investors the true risks they faced as a result of investing in Depomed.

*December 11, 2016 – Analyst Report*

129. On December 11, 2016, PiperJaffray, a well-respected firm that followed Depomed, issued an analyst report titled "Depomed Inc. (DEPO) Downgrading to Underweight; Trajectory of Underlying Business a Real Concern." The report stated in pertinent part:

> **CONCLUSION**
> We are downgrading Depomed to an Underweight from Neutral and lowering our PT to $14 from $17 based on a closer look at prescription (Rx) trends for the commercial portfolio that heightens our concern that management will not be able to drive significant growth from the business in 2017+. Further, ***it has become clear to us that management, based in part on its own commentary, does not really have a new strategy in place to wring significant further volume growth out of Nucynta ER in the face of more challenging market dynamics***. As such, we believe that further multiple contraction is warranted (i.e., current 2017 P/E of 19x our revised estimate in the context of visibility on a long-term EPS CAGR (2017+) in the high-single digits at best).

130. This report signaled to investors that Depomed was misleading investors as to the effect of the opioid market on Depomed. As a result of this partial revelation, Depomed's stock significantly sank from a close of $20.20 on December 9, 2016, the previous trading day, to a low of $17.74 per share of common stock on December 12, 2016. This resulted in a decrease of $2.46 per share, or 12% on unusually heavy volume.

*February 21, 2017 – Press Release & Earnings Call*

131. On February 21, 2017, Depomed issued a press release announcing its fourth quarter and full year 2016 financial results. The press release was also filed with the SEC, and states in relevant part:

> NEWARK, CA., February 21, 2017 — Depomed, Inc. (Nasdaq:DEPO) today reported financial results and highlighted operational achievements for the quarter and twelve months ended December 31, 2016 and provided 2017 guidance.
>
> "In 2016, we achieved key milestones strengthening our portfolio and de-leveraging our balance sheet. We ended the year with record annual and quarterly revenue and EBITDA. In addition, we posted all-time net sales highs for every one of our brands," said Jim Schoeneck, President and Chief Executive Officer of

Depomed. "Our full-year net revenue reached $456 million, representing a 33% increase over 2015, with quarterly revenue of $124 million, an 11% increase year over year. In addition, we have been successful in growing EBITDA from $7 million in 2014 to $111 million in 2015 and $156 million in 2016. This, along with the early pay down of $100 million of our debt, significantly improves our credit profile and positions us well to refinance. We also built future value into the business as legal victories provided us with 9 more years to grow our flagship NUCYNTA franchise and allowed us to advance our patent infringement case against Purdue."

Continued Mr. Schoeneck, "With the clarity on NUCYNTA's exclusivity until December 2025 and the insights gained since its relaunch, ***in February we began implementing a multi-faceted growth initiative to increase the appropriate use of NUCYNTA Extended Release and Immediate Release and to drive growth across the portfolio***. We continue to focus on opportunities to further differentiate our product portfolio, all with the goal of delivering value to our shareholders and to those we serve."

Business and Financial Highlights

- Record full year net product sales for 2016 were $455 million, an increase of 33% compared to $342 million for full year 2015
- Full year GAAP net loss of ($89) million or ($1.45) per share, which includes a non-cash tax reserve adjustment of ($43) million
- Full year non-GAAP adjusted earnings of $86 million, or $1.15 per share. We are modifying our method of calculating non-GAAP income taxes for non-GAAP adjusted earnings and non-GAAP adjusted earnings per share to align with the guidance under the Non-GAAP Financial Measures Compliance and Disclosure Interpretations issued by the SEC on May 17, 2016. The amounts above reflect the Company's prior methodology of calculating its non-GAAP income taxes for comparability to prior periods and to the Company's prior guidance for 2016. Please see the non-GAAP tax discussion below for further discussion of the new methodology.
- Full year non-GAAP adjusted EBITDA of $156 million
- Fourth quarter 2016 net product sales were a record $124 million, compared to $111 million for fourth quarter of 2015, an increase of 11%
- NUCYNTA franchise reported fourth quarter record net sales of $75 million
- Fourth quarter ending cash and marketable securities was $177 million, cash generated during the quarter was $40 million
- Quarterly GAAP net loss of ($44) million or ($0.72) per share, which includes a non-cash tax reserve adjustment of ($43) million
- Quarterly non-GAAP adjusted earnings of $37 million, or $0.48 per share under the Company's prior method of calculating its non-GAAP income tax expense.
- Quarterly non-GAAP adjusted EBITDA of $51 million
- U.S. District Court rules in favor of two key NUCYNTA patents, providing market exclusivity until December 2025
- U.S. Court of Appeals upheld patents asserted against Purdue Pharma

- Early payment of $100 million of secured debt in April 2016

NUCYNTA® Franchise Highlights

- Full year 2016 record net sales of $281 million
- Fourth quarter 2016 record net sales of $75 million
- Net sales of $471 million since acquisition on April 2, 2015
- NUCYNTA ER® reached record all-time quarterly prescription volume of over 90,000 in fourth quarter(1)
- NUCYNTA ER 2016 total prescriptions of over 344,000, an increase of 19% over 2015(1)
- NUCYNTA ER reached record all-time quarterly market share of 2.08% of total long acting opioids in December(1)
- NUCYNTA reached record all-time quarterly market share of 0.29% in fourth quarter(1)

Marking a continued commitment to unlock value from its portfolio, in February, the company launched the first of a series of initiatives aimed at driving NUCYNTA growth in 2017 which include:

- Salesforce Deployment: ***adds 75 reps to Pain sales force for a total of 257, an increase of 41%;*** Neuro and Oncology sales forces reduced by 70 positions to offset increase; ***new physician targeting emphasizes reimbursement coverage along with prescription volume***
- ***Primary Care Physician Expansion: new salesforce deployment targets more coverage of high decile primary care prescribers***
- NUCYNTA ER Diabetic Peripheral Neuropathy (DPN) Indication: highlights indication in category unique to NUCYNTA ER
- NUCYNTA Immediate Release Promotion: introduces a focused, stand-alone promotional campaign for the first time since relaunch
- NUCYNTA Label Expansion Studies: initiating studies aimed at strengthening NUCYNTA's respiratory depression and abuse profiles

132. On February 21, 2017, Depomed also held an earnings call to discuss Depomed's fourth-quarter and fiscal year 2016 financial results. Schoeneck and Moretti were on the call and stated the following:

**Jim Schoeneck** - Depomed, Inc. - President, CEO
2016 was a year of growth, challenges, and building value. In 2016 we set a full year record with net revenue of $456 million, up 33% over the prior year. In fact, each of our products achieved the highest revenue in their history in 2016, led by our NUCYNTA franchise. Our progress over the past three years has been dramatic, with net product revenue increasing from $114 million in 2014, to $342 million in 2015, and $455 million last year. Our cash flow and bottom line performance has been even more impressive, growing EBITDA from $7 million in 2014, to $111 million in 2015, and $156 million in 2016. ***And all of this was accomplished against three substantive headwinds, changes in the opioid market,***

> ***continuing pricing pressure from payors, and the challenges of growing a business and a team with regular headline distractions***.
>
> * * *
>
> Now I'll turn back to our commercial and financial performance for last year. ***Starting with NUCYNTA ER, in 2016 we achieved all-time record prescription volumes for the brand, and grew prescriptions 19% over the prior year. And that was against a challenging and changing backdrop in the opioid market.*** In 2015, the long-acting opioid market was stable compared to the prior year. After the release of the new CDC opioid guidelines in early 2016, the market moved steadily downward, with the long-acting opioid prescription market ending the year down 5% compared to 2015. We saw daily dosing levels drop as well. Both of these market trends were different than we had anticipated at the beginning of 2016. ***Even with these headwinds, we still saw significant growth in NUCYNTA ER.***

133. The above statements (identified in bold) were materially misleading. Defendants, on one hand, portrayed Depomed as having successfully avoided the negative ramifications associated with the worsening opioid market while, on the other hand, omitting to tell investors that they were able to do this in part because they were engaging in off-label marketing. Defendants' statements prevented investors from obtaining the information they needed to accurately evaluate the risks associated with investing in Depomed. Had investors known the truth about Depomed's marketing conduct and how the company was able to outpace the market, they would have considered this information before investing in Depomed.

*February 24, 2017 – Form 10-K*

134. On February 24, 2017, Depomed filed an Annual Report on Form 10-K with the SEC, announcing Depomed's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K"). Schoeneck and Moretti signed and certified the 2016 10-K. In the 2016 10-K, Depomed stated, in relevant part:

> **MARKETING AND SALES**
>
> We have developed capabilities in various aspects relating to the commercialization of our marketed products, including sales, marketing, manufacturing, quality assurance, wholesale distribution, managed market contracting, government price reporting, medical affairs, compliance, and regulatory. Members of our commercial organization are also engaged in the commercial and marketing assessments of other potential product candidates.
>
> Our sales organization includes approximately 300 full time sales representatives. ***Our sales force primarily calls on pain specialists, neurologists and primary care physicians throughout most of the United States.*** Our marketing organization is

> comprised of professionals who have developed a variety of marketing techniques and programs to promote our products, including promotional materials, speaker programs, industry publications, advertising and other media.

2016 10-K at 8.

135. The above statements (identified in bold) were materially misleading. Defendants described Depomed's recent marketing achievements as successes, but at the same time did not disclose that these supposed successes were obtained in part through an illicit off-label marketing campaign. Depomed was actively targeting primary care physicians with marketing presentations that described NUCYNTA as a safer, less addictive, less abusive opioid that did not contain the same euphoric feeling as other opioids. Depomed did not have FDA-approval to market NUCYNTA in this manner. Depomed also did not have any independent scientific evidence to support these claims. Defendants opted to discuss Depomed's marketing program while, at the same time, omitting that the company's marketing strategy relied in part on off-label promotion. Defendants' omission in this regard was materially misleading.

136. The 2016 10-K also included the same "risk warning" that appeared in Depomed's quarterly reports discussed above. In pertinent part, the 2016 10-K stated:

> ***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***
>
> Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. Such liabilities would harm our business, financial condition and results of operations as well as divert management's attention from our business operations and damage our reputation.

2016 10-K at 17-18.

137. Defendants included the above statement in its quarterly report within a section titled "RISK FACTORS." Defendants' description of the risks relating to off-label marketing were materially misleading. Depomed, by this point in time, had already deliberately engaged in off-label marketing and, as such, had already significantly increased the company's exposure to significant liability. By discussing off-label marketing as something that "might" occur when in fact it "already" occurred, Defendants materially misled investors. Defendants conduct in this regard concealed from investors the true risks they faced as a result of investing in Depomed.

*<u>March 28, 2017 – Letter from McCaskill</u>*

138. On March 28, 2017, U.S. Senator Claire McCaskill, the top-ranking Democrat on the Senate Homeland Security and Government Affairs Committee, announced that she was opening an investigation into the marketing and sales practices of the nation's top five manufacturers of prescription opioid products, including Depomed (the "Senate Investigation"). The press release stated the following, in relevant part:

> **BREAKING: Opioid Manufacturers are Subject of New McCaskill-Led, Wide-Ranging Investigation**
>
> **Tuesday, March 28, 2017**
>
> **WASHINGTON** – Opioid manufacturers will be the subject of a new, wide-ranging investigation being launched by U.S. Senator Claire McCaskill, the top-ranking Democrat on the Senate Homeland Security and Governmental Affairs Committee. McCaskill is requesting information from the manufacturers of the nation's top five prescription opioid products by 2015 sales, including sales and marketing materials, internal addiction studies, details on compliance with government settlements and donations to third party advocacy groups.
>
> The investigation will explore whether pharmaceutical manufacturers—at the head of the opioids pipeline—have contributed to opioid overutilization and overprescription as overdose deaths in the last fifteen years have approached nearly 200,000. According to the Centers for Disease Control and Prevention, deaths from opioids, including prescription opioids and heroin, reached over 30,000 in 2015 alone, and sales of prescription opioids have quadrupled since 1999.
>
> "I hear it everywhere I go—drug overdose deaths, the vast majority of them related to prescription opioids or heroin, are single-handedly destroying families and communities across Missouri and the country, and I refuse to just stand by and watch—we have an obligation to everyone devastated by this epidemic to find answers," McCaskill said. "All of this didn't happen overnight—it happened one

prescription and marketing program at a time. The vast majority of the employees, executives, sales representatives, scientists, and doctors involved with this industry are good people and responsible actors, but some are not. This investigation is about finding out whether the same practices that led to this epidemic still continue today, and if decisions are being made that harm the public health."

In letters to the heads of Purdue, Janssen/Johnson & Johnson, Insys, Mylan, and Depomed, McCaskill requested:

- Documents showing any internal estimates of the risk of misuse, abuse, addiction, overdose, diversion or death arising from the use of any opioid product or any estimates of these risks produced by third-party contractors or vendors.
- Any reports generated within the last five years summarizing or concerning compliance audits of sales and marketing policies.
- Marketing and business plans, including plans for direct-to-consumer and physician marketing, developed during the last five years.
- Quotas for sales representatives dedicated to opioid products concerning the recruitment of physicians for speakers programs during the last five years.
- Contributions to a variety of third party advocacy organizations.
- Any reports issued to government agencies during the last five years in accordance with corporate integrity agreements or other settlement agreements.

"This epidemic is the direct result of a calculated sales and marketing strategy major opioid manufacturers have allegedly pursued over the past 20 years to expand their market share and increase dependency on powerful—and often deadly—painkillers," McCaskill wrote. "To achieve this goal, manufactures have reportedly sought, among other techniques, to downplay the risk of addiction to their products and encourage physicians to prescribe opioids for all cases of pain and in high doses."

139. In connection with this announcement Senator McCaskill sent a letter to Schoeneck on March 28, 2017. The letter stated in pertinent part:

I am writing to request information from Depomed, as the manufacturer of one of the top five opioid products by 2015 sales, related to the sales, marketing, and educational strategies it has employed to promote opioid use. In the United States today, too many opioids are prescribed, too many are abused, and too many are purchased by the federal government. Medicare Part D spending on commonly abused opioids has increased 165% between 2006 and 2015, reaching a cost of $4. l billion, and almost 30% of Part D recipients received at least one commonly abused opioid in 2015. Financial waste is just one measure of the cost of our national opioid epidemic; in 2015, more than 15,000 Americans died from overdoses involving prescription opioids, and opioid-related hospitalizations and emergency room visits in Missouri, for example, doubled between 2005 and 2014.

This epidemic is the direct result of a calculated sales and marketing strategy major opioid manufacturers have allegedly pursued over the past 20 years to expand their market share and increase dependency on powerful-and often deadly-painkillers. To achieve this goal, manufactures have reportedly sought to downplay the risk of addiction to their products and encourage physicians to prescribe opioids for all cases of pain and in high doses. . . . An October 2016 complaint filed by the City of Chicago against Janssen, among other parties, similarly alleges that the company employed "'[ d]eceptive messages regarding low addiction risk and low prevalence of withdrawal symptoms" as a "foundation of [its] marketing campaign." At the same time, certain manufacturers allegedly premised their sales and marketing approach on the addictive qualities of opioids. Alec Burlakoff, former sales vice president for lnsys, which manufactures a fentanyl spray-Subsys that is 100 times more powerful than morphine, reportedly stated, for example: "If you can keep [patients] on [Subsys] for four months, they're hooked. Then they'll be on it for a year, maybe longer."

* * *

Other manufacturers have simply targeted physicians with abnormally high opioid prescribing histories.

* * *

Opioid manufacturers have also apparently attempted to influence prescribing behavior through the creation of continuing medical education (CME) to promote opioids for pain management. In a study by Georgetown University, Dr. Adriane Fugh-Berman found that industry-sponsored CME failed to mention opioid death altogether, compared to 26 mentions of the risk of death in non-industry sponsored presentations. Physicians viewing industry-created CME later noted their impression that opioids were underprescribed for chronic pain, and less frequently mentioned risks of addiction than their peers viewing non-industry CME. This practice appears to be widespread across the opioid manufacturing industry. The City of Chicago has alleged in a recent complaint, for example, that major opioid manufacturers, including Purdue and ***Janssen, have "sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating ... deceptive and biased messages***," including presentations that "***focus on opioids to the exclusion of alternative treatments, inflate the benefits of opioids, and frequently omit or downplay their risks and adverse effects***."

* * *

Manufacturers have also allegedly provided funding to advocacy groups like the American Geriatrics Society (AGS) and the American Academy of Pain Medicine (AAPM) to develop materials supportive of opioid use; Janssen, for example, allegedly partnered with AGS and AAPM to create a guide stating that "[rn]any studies show that opioids are *rarely* addictive when used properly for the management of chronic pain."

<u>*March 29, 2017 – Form 8-K*</u>

140. On March 29, 2017, Depomed filed a Form 8-K with the SEC titled "Depomed Announces Cooperation Agreement with Starboard Value LP Including CEO and Board Changes"

and concurrently filed a Form 8-K with the SEC attaching the press release. The press release stated in relevant part:

> **Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**
>
> *Resignation of James Schoeneck as Chief Executive Officer*
>
> On March 28, 2017, the Company announced the resignation of James Schoeneck as President and Chief Executive Officer of the Company and as a Director on the Board. The Company and Mr. Schoeneck entered into a Waiver and Release Agreement (the "Waiver and Release Agreement") in connection with Mr. Schoeneck's resignation. Mr. Schoeneck's resignation is not due to a disagreement with the Company on any matter relating to the Company's operations, policies or practices.
>
> Under the terms of the Waiver and Release Agreement, the Company has agreed to pay Mr. Schoeneck (i) $825,000, which is equal to 12 months of his current base salary, payable in equal installments in accordance with the Company's ordinary payroll practices, (ii) the full cost of the health insurance benefits provided to Mr. Schoeneck, his spouse and dependents, as applicable, pursuant to the terms of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") or other applicable law through the earlier of (a) the end of the 12 month period following the date of the Waiver and Release Agreement or (b) the date on which Mr. Schoeneck is no longer eligible for such COBRA or other benefits under applicable law and (iii) up to six months of documented, bona fide, outplacement services not to exceed $5,000 per month. Pursuant to the Waiver and Release Agreement Mr. Schoeneck has agreed to forfeit all of his outstanding stock options (whether vested or unvested) and unvested restricted stock units granted to him under the Company's equity compensation plans (as in effect from time to time). The Waiver and Release Agreement also includes a standard a non-disparagement covenant, confidentiality covenant, as well as a release of claims.
>
> * * *
>
> *Resignation of Samuel Saks and David Zenoff from the Board*
>
> On March 28, 2017, each of Dr. Samuel Saks, M.D and Mr. David Zenoff, D.B.A. resigned as directors on the Board, effective immediately. Neither Dr. Saks's nor Mr. Zenoff's resignation is due to a disagreement with the Company on any matter relating to the Company's operations, policies or practices.

141. A number of news outlets reported the Senate Investigation, including USA Today, the Washington Post, and The Hill. As the market received word of the Senate Investigation, investors began to further question Depomed's marketing practices and, in turn, the veracity of Defendants' previous statements. Depomed's stock price declined in response to news about the

Senate Investigation. Beginning on March 28, 2017, the price of Depomed's stock declined from its closing price of $14.90 per share on March 27, 2017, to $14.23 per share on March 28, 2017, to $13.79 on March 29, 2017.

142. Further, despite the fact that investors and analysts generally regarded Depomed's move to replace the CEO and several directors as a positive development, Depomed's stock priced continued to decline due to news about the Senate Investigation. Depomed's stock price declined from $12.82 on March 30, 2017 to $12.55 on March 31, 2017.

143. . Notwithstanding, Depomed's share price continued to decline due to news about the Senate Investigation.

*May 9, 2017 – Press Release & Earnings Call*

144. On May 9, 2017, Depomed issued a press release titled "Depomed Announces Second Quarter 2017 Financial Results" and concurrently filed a Form 8-K with the SEC attaching the press release. The press release stated in relevant part:

> NEWARK, California, May 9, 2017 - Depomed, Inc. (Nasdaq:DEPO) today reported financial results for the quarter ended March 31, 2017 and outlined a set of strategic initiatives aimed at positioning the Company for future growth.
>
> "I am excited to have joined Depomed and am confident in our future," said Arthur Higgins, President and Chief Executive Officer of Depomed. "We are currently facing a number of challenges in our business and they are reflected in our first quarter performance which fell well short of expectations. During my first month on the job, I have worked across the Company to diagnose our recent performance. The key drivers of our first quarter shortfall include: significant declines in the opioid market and a highly disruptive salesforce realignment which was implemented in February."
>
> Mr. Higgins continued: "Despite these challenges, Depomed has a valuable set of differentiated assets and, as a team, we are working rapidly to address the issues within our control. ***We are in the process of implementing a number of actions that are compatible with market realities and the promotional needs of our products***. These initiatives should have an impact in the coming quarters as we stabilize the business and look to exit the year well positioned to drive sustainable long-term growth and shareholder value."
>
> Business and Financial Highlights

- First quarter 2017 GAAP revenues were $90 million, impacted by a one-time $4.7 million Managed Care rebate charge. Non-GAAP revenues were $95 million excluding the charge
- First quarter ending cash and marketable securities was $195 million, an increase of $17 million during the quarter
- Quarterly GAAP net loss of ($27) million or ($0.43) per share
- Quarterly non-GAAP adjusted earnings of $4 million, or $0.07 per share
- Quarterly non-GAAP adjusted EBITDA of $25 million
- Early repayment of $100 million of secured debt in April 2017
- U.S. District Court upheld 5 of the 6 disputed claim terms of U.S. Patents in Depomed's patent infringement case against Purdue Pharma
- Appointment of Sharon D. Larkin, Senior Vice President of Human Resources and Administration

* * *

**Strategic Initiatives Aimed at Driving Sustainable Portfolio Growth**

The Company today is announcing a series of initiatives aimed at driving growth and increasing efficiencies in the business.

<u>Improved Salesforce Alignment</u>: the Company has implemented the following adjustments to its recent salesforce realignment. Importantly, the overall headcount of the salesforce will not be impacted.

> <u>Pain Team</u>: the Pain salesforce, which was recently increased from 190 to 258, will remain at 258 and continue to carry NUCYNTA ER and NUCYNTA IR as their primary focus. Gralise has been reassigned to the Neurology team where it will receive proper focus. ***Call plan targets will be optimized to ensure Pain Specialists are sufficiently covered given their increasing importance in this market.***
>
> <u>Neurology Team</u>: the Company will be re-investing in the Neurology franchise and salesforce. The Neurology salesforce numbering 40 will be increased to 60, reflecting allocation of Oncology headcount as outlined below. This group will carry Gralise and Cambia, which are promotionally sensitive products.
>
> <u>Elimination of Oncology Salesforce</u>***:*** due to the significant deterioration within the Fentanyl market, the Company will stop promoting Lazanda through its field force. The 20 Oncology headcount will be allocated to the Neurology salesforce to enhance the support of Gralise and Cambia.

<u>Streamlining of Corporate Functions</u>: today the Company is implementing a series of cost saving initiatives including an approximately 30 person reduction in force at the Company's headquarters, representing 20% of the home office staff. As a result, the Company intends to take a one-time charge of approximately $5 million in the second quarter of 2017.

Cebranopadol: in light of the changing opioid landscape, the Company is exploring ways to improve cebranopadol's differentiated profile and potential modifications to the development program prior to its entry into Phase 3 trials, which is now anticipated to begin in late 2018.

**2017 Financial Outlook**

Depomed is issuing new 2017 financial guidance:

| | 2017 Guidance |
|---|---|
| Total Revenue (GAAP) | $405-$425 million |
| Total Revenue (Non-GAAP) | $410-$430 million |
| Non-GAAP Adjusted EBITDA | $120-$130 million |
| Total Non-GAAP SG&A Expense | $187-$197 million |
| Total Non-GAAP R&D Expense | $22-$29 million |

This new revenue guidance includes an expectation that wholesaler inventories will be reduced during the year resulting in a reduction of revenue of approximately $7 to $8 million.

The Company is not providing GAAP net loss or GAAP expense guidance as the Company is not able to estimate its non-recurring expenses for 2017.

145. Also on May 9, 2017 Depomed held an earnings call to discuss Depomed's first-quarter fiscal year 2017 financial results. Higgins and Moretti were on the call and stated the following:

**Arthur Joseph Higgins** - Depomed, Inc. - CEO, President and Director
As you will have noted, the company's first quarter results fell well short of our expectations. While I've only been in the role for a little over a month, I am pleased to report that as a team, we've been able to quickly diagnose the issues behind this disappointing performance and more importantly, are acting decisively to address these issues. Our initiatives will have an impact in the coming quarters as we stabilize the business and look to exit the year well positioned to drive sustainable long-term growth and shareholder value.

Let me start with the reasons behind our recent performance, which are primarily two-fold: first, challenging and changing market conditions, especially in the pain market; and secondly, a highly disruptive sales force realignment that was implemented in early February, which negatively impacted our sales force execution across all of our products.

First, the market. As you're aware, in March 2016, the CDC announced guidelines for primary care physician prescribing of opioids. It is clear to us, though that these guidelines have resulted in a more significant decline in the opioid market than we projected, both in terms of fewer prescriptions and lower daily doses. Specifically, these pressures have resulted in year-over-year decreases of 9% in the long-acting opioid market and 8% in the short-acting market. Furthermore, in both of these

markets, primary care physicians are the fastest-declining prescriber base, with their long-acting prescriptions down 14% year-over-year and their short-acting down 10% year-over-year.

***It is important, however, to note that despite these significant market headwinds, we were able to grow NUCYNTA ER 1,200 basis points above the market and NUCYNTA IR 400 basis points. This is an illustration of how these products are valued in the market.*** Of course, we're not projecting that market conditions will improve in the short term. We remain confident that, over time, the pendulum will shift back to more appropriate focus on the vast majority of patients that are using opioid responsibly and rely on them for effective pain control. With differentiated products in NUCYNTA ER and IR, each with lengthy periods of exclusivity, as a company, we are uniquely positioned to benefit from this ultimate recovery.

Secondly, our sales force realignment. As you recall from the company's last earnings call, we implemented a new strategy to alter the configuration and detail in priorities in our pain, neurology and oncology field forces. This change was designed to primarily increase the support and growth of NUCYNTA IR in primary care, and we expect to have a spillover effect onto NUCYNTA ER. It was also assumed we could expand our pain sales force from 182 representatives to 258 by decreasing the field resources behind our non-NUCYNTA portfolio by approximately half, and that we could do this without impacting sales in these products. It has become readily apparent that the decision to significantly expand our reach with NUCYNTA IR into primary care physicians in the face of their increasing reluctance to prescribe opioids was misguided. We also found that the shifting of resources and focus away from our non-NUCYNTA portfolio was negatively impacting their performance to a significantly higher degree than we had expected.

Furthermore, the sales force alignment was highly disruptive, impacting every sales force, every sales representative and every product. As a result, 55% of our prescribing doctors where reassigned to a different sales representative during the first quarter. This severe disruption led us to not achieve the same level of historical performance across our product range.

Based on our first quarter results and a frank, comprehensive internal assessment, we have learned some hard but valuable lessons and are moving decisively to take corrective action. We are implementing the following initiatives that are in line with an evolving marketplace and aimed at optimizing the promotion of our products.

Let me review these initiatives in detail.

For the pain sales force that we increased from 182 to 258, we can adequately cover pain specialists. We will expand most selectively into the primary care physician's base, with an emphasis still on NUCYNTA ER. We are in the process of modifying our co-plan targets. These adjustments will result in an even deeper reach and frequency to the pain specialists. We are now seeing more and more patients refer to them by primary care physicians. At the same time, we will be much more

selective in our coverage of the primary care audience, focusing on those decision that act as de facto pain specialists within their communities.

* * *

**August J. Moretti** - Depomed, Inc. - CFO and SVP
As Arthur just outlined, the first quarter was disappointing. Total GAAP revenues for the quarter ended March 31, 2017 were $90 million. GAAP product revenues reflect a onetime charge of $4.7 million for a dispute with the PBM over rebates relating to NUCYNTA ER, NUCYNTA and Gralise. Excluding this onetime item, non-GAAP revenues were $95 million.

* * *

Now turning to updated 2017 guidance. Guidance for the year is based on our Q1 results and our current budget. Our budget is based on a large number of assumptions, and there are significant uncertainties in estimating future product revenues and operating expenses. For a more complete discussion of the relevant risks relating to our guidance, I'll direct you to the Risk Factors section of our Annual Report on Form 10-K that we filed in February and the Risk Factors section of our quarterly report on Form 10-Q that we expect to file either later today or first thing tomorrow.

With that said, total 2017 GAAP revenues are expected to be $405 million to $425 million, and non-GAAP revenues are expected to be $410 million to $430 million.

We expect total product revenues to be approximately the same, as we are not anticipating any milestone revenue or any significant royalty revenue in 2017.

We expect that the NUCYNTA franchise will represent approximately 64% to 66% of total net sales for the year.

* * *

**Unidentified Analyst**
This is actually [Brendan] on for Ken. So I was hoping to speak a little bit more about this pendulum of the opioid market. And the first question would be, do you see an opportunity to be more proactive around that? And perhaps, highlighting the differences in NUCYNTA because it's not a traditional opioid. Are there any plans to perhaps change your labeling around or add further data around respiratory data or the market equivalency?

**Arthur Joseph Higgins** - Depomed, Inc. - CEO, President and Director
Yes, look, I think, in every dimension, we want to be seen as leaders in this pain opioid space. So you are going to see us be more proactive. I think management in previous calls has mentioned that we are looking to strengthen our label. Again, that data is probably not going to be available until 2019. Again, very consistent with my view of stabilize this year, finish the year strong, grow in 2018 and break out in 2019. In addition, you will see us, [Brendan], take a more active voice in trying to shape opinion in this space. As leaders, I think we've got start to get behind initiatives that focus on responsible prescribing of opioids. And one of the challenges our field force is having, that's such a lot of negative press surrounding opioids, and we need to do our best to make people aware that the vast majority, and I mean, the vast majority of patients on opioids use them responsibly. And if you're going to choose an opioid, choose an opioid like tapentadol which has

characteristics that, I believe, make it a drug of choice when you have concerns about opioid use.

146. The statements in the press release and earnings call revealed to investors that Defendants' previous statements were misleading. While Defendants previously represented that Depomed had been able to largely avoid the negative impact of the worsening opioid market, that was not so. Indeed, Higgins admitted that Depomed's marketing efforts with regard to primary care physicians was "misguided" given the "increasing reluctance to prescribe opioids." However, despite making certain admissions concerning Depomed's susceptibility to overall negative market sentiments, Defendants continued to mislead investors. Defendants' statements during the earnings call (identified in bold) represented that Depomed's marketing practices had proven successful in spite of worsening market conditions, while at the same time omitting that these marketing practices involved off-label promoting that was exposing Depomed to significant liability risks.

*May 10, 2017 – Form 10-Q*

147. On May 10, 2017, after hours Depomed filed a Form 10-Q with the SEC announcing Depomed's financial and operating results for the first fiscal quarter ended March 30, 2017 which was signed and certified under the Sarbanes Oxley Act of 2002 by Higgins and Moretti. The Form 10-Q stated in relevant part:

> ***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***
>
> Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. Such liabilities would harm our business, financial condition and results of operations as well as divert management's attention from our business operations and damage our reputation.

1Q2017 at 51.

148. Defendants included the above statement in its quarterly report within a section titled "RISK FACTORS." Defendants' description of the risks relating to off-label marketing were materially misleading. Depomed, by this point in time, had already deliberately engaged in off-label marketing and, as such, had already significantly increased the company's exposure to significant liability. By discussing off-label marketing as something that "might" occur when in fact it "already" occurred, Defendants materially misled investors. Defendants conduct in this regard concealed from investors the true risks they faced as a result of investing in Depomed.

*July 13, 2017 – Press Release*

149. On July 13, 2017, Depomed issued a press release titled "Depomed Announces Intent to Effect a Debt Refinancing" and concurrently filed a Form 8-K with the SEC attaching the press release. The press release included preliminary results for the second quarter and reaffirmed guidance. The press release stated in relevant part:

> Preliminary Second Quarter 2017 Financial Results
>
> In connection with the proposed debt refinancing, Depomed today announced selected preliminary financial results for the quarter ended June 30, 2017 and reconfirmed its full year guidance.
>
> The Company currently expects net sales to be in the range of approximately $98 million to $103 million for the quarter ended June 30, 2017. The Company also expects non-GAAP Adjusted EBITDA for the second quarter to be in the range of approximately $23 million to $28 million. Cash and investments as of June 30, 2017 were approximately $117 million. Depomed currently expects to report its full second quarter 2017 financial results in early August.
>
> "Our second quarter performance marked an improvement over our first quarter and was consistent with our expectations," said Arthur Higgins, President and CEO of Depomed. "***We believe that in light of the quarter's performance we are on track to achieve our previously stated financial guidance for the full year***. Refinancing our debt is an important 2017 goal and we expect that we will be able to refinance on significantly more favorable terms given our solid net sales and EBITDA. Our intent is to close the refinancing during the quarter."

150. The above statements (identified in bold) were materially false. By July 13, 2017, the second quarter had already ended, meaning that Defendants knew how much revenue they needed to generate in order to meet their previously stated financial guidance. In just three weeks, Defendants would materially lower this guidance to $395 million to $410 million from $405 million

to $425 million, in part due to worsening market sentiment in the opioid industry. Defendants, however, already knew that Depomed had been negatively affected by worsening market conditions and that their previously-stated guidance was all but impossible. Defendants affirmed the guidance on July 13, 2017 in order to obtain refinancing terms, which Depomed identified as an "important 2017 goal."

151. By affirming this guidance, Defendants provided investors with a false impression of Depomed's operations and finances and further concealed the true effects of the worsening market conditions in the opioid industry. Investors relied upon Defendants' statements to their detriment.

*August 7, 2017 – Press Release & Earnings Call*

152. On August 7, 2017, Depomed issued a press release titled "Depomed Announces Second Quarter 2017 Financial Results" and concurrently filed a Form 8-K with the SEC attaching the press release. The press release stated in relevant part:

> NEWARK, California, August 7, 2017 - Depomed, Inc. (Nasdaq:DEPO) today reported financial results for the quarter ended June 30, 2017 and provided an update to the business.
>
> "Our second quarter product revenue was broadly in line with our expectations," said Arthur Higgins, President and CEO of Depomed. "We continue to operate in an environment that is challenging and rapidly evolving. The increasing public focus on opioids as well as opioid manufacturers, including by government agencies and other industry stakeholders, will continue to disrupt the opioid markets. ***While our flagship NUCYNTA franchise continues to outperform the long and short-acting markets, it is clearly not immune to these developments***. Despite these challenges we continue to see opportunities to develop a leadership position in the treatment of pain by working with all stakeholders to encourage the appropriate prescribing and use of opioids. As a company, we remain committed to serving the pain management needs of patients and their physicians."
>
> **Business and Financial Highlights**
>
> - Second quarter 2017 revenues were $100 million, broadly in line with our estimates
> - Second quarter ending cash and marketable securities was $117 million, an increase of $26 million during the quarter after prepayment of $100 million of secured debt and an associated $4 million prepayment fee
> - Quarterly GAAP net loss of ($27) million or ($0.43) per share
> - Quarterly non-GAAP adjusted earnings of $5 million, or $0.08 per share
> - Quarterly non-GAAP adjusted EBITDA of $28 million

- Instituted corporate governance updates to further align shareholder interests and corporate governance best practices
- Increasing Neurology salesforce effective September

* * *

Updated 2017 Financial Outlook

The Company is updating its 2017 financial guidance as a result of recent developments, including (a) increased pressure on short-acting and long-acting opioid markets by federal and state governments, managed care and other stakeholders, (b) July shipment and prescription demand trends, (c) increased legal expenses associated with responding to recent government inquiries and subpoenas directed to opioid manufacturers and (d) expenses associated with the increase in the neurology salesforce:

| | Updated Guidance | Prior Guidance |
|---|---|---|
| Total Revenue (GAAP) | $395 to $410 million | $405-$425 million |
| Total Revenue (Non-GAAP) | $400 to $415 million | $410-$430 million |
| Non-GAAP SG&A Expense | $195 to $201 million | $187-$197 million |
| Non-GAAP R&D Expense | $18 to $23 million | $22-$29 million |
| Non-GAAP Adjusted EBITDA | $107 to $117 million | $120-$130 million |

153. Despite reaffirming guidance less than one month prior, Depomed revised guidance by 10 million on the low end and 15 million on the high end, over 3.5% less.

154. The same day, Depomed held a conference call with analysts concerning Depomed's second quarter fiscal results. During the call, Defendants Higgins and Moretti each spoke about the opioid crisis' effect on Depomed. In relevant part, the Individual Defendants stated:

**Arthur Joseph Higgins - Depomed, Inc. - CEO, President & Director**

It is clear we are operating in a challenging and volatile environment. You only have to turn on the television or read the newspaper to understand that opioid addiction and the resulting overdoses and deaths are a national crisis. Recently, the new FDA Commissioner, Scott Gottlieb, called the opioid epidemic the biggest crisis facing the FDA. Janet Yellen, Chairman of the Federal Reserve, called the opioid epidemic a threat to the U.S. labor force.

And the Commission on Combating Drug Addiction and Opioid Abuse, led by Governor Chris Christie, urged the President Trump last week to declare it a national emergency. Also last week, the FDA announced plans to expand the existing long-acting REMS program to include immediate-release, short-acting opioids.

We are also seeing governmental stakeholders question the role of drugmakers, wholesalers and prescribers in the space. To that end, ***on July 28, we received a subpoena from the Department of Justice regarding our commercialization practices for our NUCYNTA products*** and Lazanda. Similar inquiries have been

made to other pharmaceutical companies in the opioid space, and we, as a company, look forward to cooperating with this request.

* * *

Not surprisingly and we feel, justifiably, this environment has significantly impacted the overall opioid market. In the second quarter, the long-acting and short-acting market showed a year-over-year decline of approximately 11% and 7%, respectively. Against this background, we were able to continue to grow our market share of our NUCYNTA franchise and deliver company-wide revenue of $100.4 million, which was broadly in line with our expectations. However, in the past several weeks, we have experienced some softness versus our forecast in weekly prescriptions and ex-factory shipments of both IR -- NUCYNTA IR and ER. This may reflect the events that we just outlined and does coincide with recent feedback from our pain sales force that ***the primary care segment is becoming more conservative in their rating of opioids and that pain specialists are facing tougher roadblocks in getting prescriptions through the reimbursement system***.

I had thought that given the expansion of our pain sales force earlier this year, we would see a clear separation of our performance versus the market by the year-end. And while I am not giving up on that goal, I think it's more realistic that this will not be fully apparent until sometime in 2018.

For the reasons I just described, and coupled with the associated costs required to respond to incoming legal inquiries as well as our very positive recent decision to accelerate our neurology field force build-out, we feel it's prudent to be more conservative with our full year outlook. Augie will give you more specifics on our financials for the quarter and revised guidance shortly.

* * *

Two of the more important moves we'll make in the coming quarters are: firstly, we are reducing the number of calls on targets -- or our call targets in our pain sales force by approximately 20%. ***The vast majority of that target reduction comes from primary care physicians, and it's becoming clear they will play a reduced role in pain management***. This move will allow our sales force to increase frequency and focus and resources to the pain specialists, who are playing an ever-increasing role in the treatment of these patients. To illustrate that point, pain specialists and their physicians, assistants and nurses currently account for approximately 70% of our NUCYNTA franchise. By focusing on the pain specialists, we will protect our base business, and by increasing our frequency and resources to the pain specialists, we will be in a position to efficiently grow the business over time.

* * *

**August J. Moretti - Depomed, Inc. - CFO & Senior VP**

I want to discuss government inquiries for a moment. Recently, Depomed and other pharmaceutical companies received subpoenas ***relating to opioid sales and marketing practices from the Office of the Attorney General of Maryland and, as you heard from Arthur, the United States Department of Justice***. We are currently cooperating with the state of Maryland and the DOJ in their respective investigations. In addition, Depomed and other pharmaceutical companies earlier received a request for information from Senator McCaskill, the ranking minority member of the United States Senate Committee on Homeland Security and Governmental Affairs, ***relating***

> ***to the company's promotion of opioid products***. The company has voluntarily furnished information responsive to such requests. As a result of the activity required to respond to these requests, we will be incurring legal expenses in support of our responses, which are reflected in our updated guidance.
>
> So turning now to guidance. We're updating our 2017 financial guidance as a result of recent developments, including an increased pressure on short-acting and long-acting opioid markets by federal and state governments, managed care and other stakeholders; July shipment and prescription demand trends; increased legal expenses associated with responding to recent government inquiries and subpoenas; and expenses associated with the increase in the neurology sales force that Arthur mentioned.
>
> * * *
>
> With that said, total revenues for our 6 products for 2017 are expected to be in the range of $395 million to $410 million. This is a reduction from our previous guidance of $405 million to $425 million. Non-GAAP SG&A expenses, that is GAAP minus stock compensation, purchase accounting contingent consideration adjustments and nonrecurring costs, are expected to be in the range of $195 million to $201 million. This is an increase from our previous guidance of $187 million to $197 million and reflects the costs associated with responding to the government inquiries and the increase in the neurology sales force. Non-GAAP R&D expenses are expected to be $18 million to $23 million. This is a decrease from our previous guidance of $22 million to $29 million. Non-GAAP adjusted EBITDA is expected to be in the range of $107 million to $117 million.

155. Further, in response to an analyst's question about the opioid market, Higgins stated the following:

> **Ashley Ryu** - RBC Capital Markets, LLC, Research Division - Senior Associate
> This is Ashley Ryu on for Randall. I just want to start with NUCYNTA. So in light of the continued pressures in the opioid space, how much visibility do you feel that you have? It sounds like the market has worsened relative to your initial expectations last quarter. And how do you feel comfortable that this updated outlook kind of captures the right level?
>
> **Arthur Joseph Higgins** - Depomed, Inc. - CEO, President & Director
> Ashley, I think that's a very good question. And I think, again, in my opening remarks, we said we wanted to be more conservative and cautious. This is a highly volatile environment. It's moving rapidly, and we're doing our best to stay on top of it. So what we have presented today is our best outlook based on the information we have available. We believe it's right, but I caveat that by saying this is a very challenging and volatile marketplace.

156. This information further revealed to the market the impact of the opioid crisis on Depomed. Despite Depomed's illegal and improper promotion of NUCYNTA, Depomed was not immune to the opioid epidemic. Further, as a result of Depomed's illegal and improper off-label

promotion and marketing of NUCYNTA, Depomed was under investigation from the Office of the Attorney General of Maryland and the United States Department of Justice. Defendants' marketing practices had, all along, subjected Depomed to extreme liability risks. These investigations (along with the Senate Investigation) represented the materialization of these risks. But for Defendants' material misrepresentations and omissions, investors would have been able to appreciate the risks associated with Depomed's marketing practices and considered them when deciding to invest in Depomed.

*<u>August 7, 2017 – Form 10-Q</u>*

157. On August 7, 2017, after hours Depomed filed a Form 10-Q with the SEC announcing Depomed's financial and operating results for the second fiscal quarter ended June 30, 2017 which was signed and certified under the Sarbanes Oxley Act of 2002 by Higgins and Moretti. The Form 10-Q included never before seen warnings and disclosures. The Form 10-Q stated in relevant part:

> ***Opioid-Related Request and Subpoenas***
>
> The Company and a number of other pharmaceutical companies recently received a request for information from the ranking minority member of the United States Senate Committee on Homeland Security and Governmental Affairs related to the promotion of opioids. The Company has voluntarily furnished information responsive to such request.
>
> The Company and a number of other pharmaceutical companies recently received subpoenas related to opioid sales and marketing from the Office of the Attorney General of Maryland and the United States Department of Justice. The Company is currently cooperating with the State of Maryland and the Department of Justice in their respective investigations.

2Q2017 at 23, 44.

> While we expect NUCYNTA franchise product sales to increase in the second half of 2017 over first half of 2017, ***prescriptions in the opioid market have declined in recent quarters as a result of, among other things, regulatory actions, government investigations and heightened public attention on opioid abuse, and we expect prescriptions in the opioid market to continue to decline at least in the short term***.

2Q2017 at 32.

> ***Changes in laws and regulations applicable to and investigations of, the pharmaceutical industry, including the opioid market, may adversely affect our business, financial condition and results of operations.***

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. The Centers for Disease Control (CDC) recently issued national, non-binding guidelines on the prescribing of opioids, providing recommended considerations for primary care providers when prescribing opioids, including specific considerations and cautionary information about opioid dosage increases and morphine milligram equivalents (MME). Certain third-party payers are, or are considering, adopting these CDC guidelines. In July 2017, the Pharmaceutical Care Management Association, a trade association representing pharmacy benefit managers, wrote a letter to the commissioner of FDA in which it expressed support for, among other things, the CDC guidelines and a seven-day limit on the supply of opioids for acute pain. In addition, states, including the Commonwealth of Massachusetts and the States of New York, Ohio and New Jersey, have either recently enacted or have pending legislation or regulations designed to among other things, limit the duration and quantity of initial prescriptions of immediate release form of opiates and mandate the use by prescribers of prescription drug databases. Also, at the state and local level, a number of states and major cities have brought separate lawsuits against various pharmaceutical companies marketing and selling opioid pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. In addition, the attorneys general from several states have announced the launch of a joint investigation into the marketing and sales practices of drug companies that market opioid pain medications. These and other similar initiatives and actions, whether taken by governmental authorities or other industry stakeholders, may result in the reduced prescribing and use of opioids, including NUCYNTA and NUCYNTA ER, which could adversely affect our business, financial condition and results of operations.

At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, the U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. Further, the FDA is requiring "black-box" warnings on immediate release opioids highlighting the risk of misuse, abuse, addiction, overdose and death. In addition, during the 2016 presidential campaign, President Trump called for the DEA to restrict the amount of opioids that can be manufactured in the U.S. In March 2017, President Trump announced the creation of a commission to make recommendations to the president regarding new laws and policies to combat opioid addiction and abuse. In August 2017, the commission issued a preliminary report calling on President Trump to officially declare the crisis of opioid abuse a national emergency. These and other changes, and potential changes in laws, regulations and industry practices including those that have the effect of reducing the overall

market for opioids or reducing the prescribing of opioids, could adversely affect our business, financial condition and results of operations.

***Heightened attention on the problems associated with the abuse of opioids could adversely affect our business, financial condition and results of operations.***

In recent years, there has been increased public attention on the problem of opioid abuse. The ability of drug abusers to discover previously unknown ways to abuse and misuse opioid products; public inquiries and investigations into prescription drug abuse; litigation and heightened regulatory activity regarding the sales, marketing, distribution or storage of opioid products, among other things, could cause additional unfavorable publicity regarding the use and misuse of opioids, which could have a material adverse effect on our products and our reputation. Such negative publicity could reduce the potential size of the market for our products and product candidate and decrease the revenues we are able to generate from their sale. Additionally, such increased scrutiny of opioids generally, whether focused on our products or otherwise, could have the effect of negatively impacting our relationships with healthcare providers and other members of the healthcare community, reducing the overall market for opioids or reducing the prescribing and use of our products.

***Governmental investigations and inquiries as well as regulatory actions with respect to the commercialization and use of opioids could adversely affect our business, financial condition and results of operations.***

As a result of the greater public awareness of the problem of opioid abuse, there has been increased scrutiny of, and investigation into, the commercial practices of opioid manufacturers generally by federal, state and local regulatory and governmental agencies. For example, we were named as a defendant in a case brought by the City of Chicago against a number of pharmaceutical companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. This case against the Company was dismissed. We recently received a letter from Senator Claire McCaskill, the Ranking Member on the United States Senate Committee on Homeland Security and Governmental Affairs, requesting certain information from the Company regarding its commercialization of opioid products. We have voluntarily furnished information responsive to Sen. McCaskill's requests. We recently received an Administrative Subpoena from the Office of the Attorney General of Maryland seeking documents and information regarding the sales and marketing of opioid products. We are currently cooperating with the State of Maryland in its investigation. We recently received a subpoena from the United States Department of Justice (DOJ) seeking documents and information regarding the sales and marketing of opioid products. We are currently cooperating with the DOJ in its investigation.

These and other governmental investigations or inquiries in which we may become involved may result in claims being brought against the Company by governmental agencies or private parties. It is not possible at this time to predict the outcome of any governmental investigations or inquiries of the Company or any lawsuits or

regulatory responses that may result from such investigations or inquiries or otherwise. However, the initiation of any investigation, inquiry or lawsuit relating to the Company, or any assertion, claim or finding of wrongdoing by the Company, could:

- adversely affect our business, financial condition and results of operations;
- result in reputational harm and reduced market acceptance and demand for our products;
- harm our ability to market our products;
- cause us to incur significant costs and expenses; and
- cause our senior management to be distracted from execution of our business strategy.

Furthermore, governmental regulators could take measures that could have a negative effect on the Company's business. For example, Endo Pharmaceuticals, Inc. recently voluntarily withdrew, at the FDA's request, OPANA® ER from the market due to the FDA's view that the risks associated with the use of the product outweighed the potential benefits. Any negative regulatory request or action taken by a regulatory agency, including the FDA, with respect to NUCYNTA or NUCYNTA ER would adversely affect our business, results of operations and financial condition.

2Q2017 at 48-49.

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA ER, NUCYNTA, Gralise, CAMBIA, Zipsor and Lazanda, as well as marketing activities related to any other products that we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such

> statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.
>
> ***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***
>
> Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. Such liabilities would harm our business, financial condition and results of operations as well as divert management's attention from our business operations and damage our reputation.

2Q2017 at 51.

158. Depomed's quarterly report further confirmed to investors that Depomed was susceptible to the worsening market conditions in the opioid industry. Moreover, it confirmed that Depomed's marketing practices were not as successful or legitimate as Defendants had previously represented. In connection with Depomed's illegal and improper off-label promotion and marketing of NUCYNTA, Depomed was under investigation from the Office of the Attorney General of Maryland and the United States Department of Justice. For the first time, Depomed's quarterly report included disclosures that detailed the risks it faced in connection with worsening market conditions as well as its efforts to avoid the negative effects from the market conditions, *i.e.*, Depomed's off-label marketing.

159. PiperJaffray issued an analyst report on August 7, 2017 titled "Another Downwards Guidance Revision; Hard to Envision Multiple Recovery." The PiperJaffray report stated in pertinent part that Depomed "cut its 2017 revenue and EBITDA guidance ranges once again, driven in part by continued headwinds facing the NUCYNTA franchise and also higher spend." It continued "Management conceded that the opioid crisis has clearly had an impact on the NUCYNTA franchise

even though the products have hardly been among the worst offenders when it comes to diversion, misuse and abuse."

160. Janney issued an analyst report on August 8, 2017 titled "Another disappointment, downgrading DEPO to Neutral, lowering FV to $8." The Janney report stated in pertinent part:

> Just weeks ago, DEPO pre-released 2Q17 results (in-line with our estimates) and reaffirmed its full year guidance. The quarter came in generally as expected, but DEPO surprised by lowering its full-year guidance for revenues by $10-$15mln and raising its expense guidance (low-end raised by $4 mln). After struggling for months to stem the negative prescription trends across its product portfolio, ***the revised guidance seems to be an admission the challenges facing its business are far greater to overcome than fixing the sales force realignment implemented by the prior CEO***. The new CEO's hope for demonstrating separation for negative industry trends for opioids by year-end has been replaced by the possibility it happens sometime next year. On lower estimates, we downgrade to NEUTRAL and lower our fair value estimate from $18 to $8.

161. Depomed's August 7, 2017 disclosures, including the press release, earnings call, and quarterly report, prompted a stark response from investors. In response to the news, Depomed's share price declined from $9.23 per share of common stock to $6.15 share per share of common stock on August 8, 2017, a decline of $3.09, or 33.42%.

### *C. Post Class Period Events*

162. Due to the worsening headwinds within the opioid market, Depomed ultimately sold Lazanda to Slán Medicinal Holdings on November 7, 2017, and entered into a commercialization agreement with Collegium Pharmaceutical, Inc., for the NUCYNTA brand on December 4, 2017. Investors and analysts alike were generally relieved that Depomed was abandoning the opioid drugs. Depomed's stock price increased following these announcements.

### *D. Scienter Allegations*

163. As alleged herein, Defendants acted with fraudulent intent and/or deliberate recklessness when making the above misrepresentations and material omissions. As explained in detail below, Defendants knew that they could not promote NUCYNTA as a safer, less addictive, less abusive opioid that did not have the same euphoric feeling on patients because these properties were not on its FDA-approved label. Despite this knowledge, Defendants trained their sales representatives to use off-label marketing tactics to sell NUCYNTA. Defendants also knew about

the allegations against Janssen in the City of Chicago Complaint related to the illegal and improper marketing of NUCYNTA. However, Defendants used the same sales team as Janssen to promote NUCYNTA, knowing that Janssen was being sued for, among other things, improperly marketing NUCYNTA. Defendants had done significant research into NUCYNTA before acquiring the drug from Janssen, closely monitored the opioid market, and were intimately familiar with Depomed's sales team training and strategy. Defendants also had motive to defraud investors. Accordingly, Defendants acted with scienter when they portrayed Depomed as having successfully avoided the negative ramifications associated with the worsening opioid market while, on the other hand, omitting to tell investors that they were able to do this in part because they were engaging in off-label marketing.

164. The critical nature of NUCYNTA and the scrutiny surrounding off-label marketing of Schedule II drugs strongly supports the conclusion that, at the very least, Depomed acted with scienter under the corporate scienter doctrine.

***<u>Defendants Knew NUCYNTA Was Being Promoted Off-Label</u>***

165. The FDA-approved labels for both NUCYNTA IR and NUCYNTA ER describe the tapentadol molecule as "a substance with a high potential for abuse similar to other opioids including fentanyl, hydrocodone, hydromorphone, methadone, morphine, oxycodone, and oxymorphone." Nowhere on the FDA-approved label does it say or mention that NUCYNTA is safer, more tolerable, less abusive, or less addictive than other opioids. Despite this, NUCYNTA has a long history of its manufacturer claiming these off-label benefits in their sales pitches and marketing.

166. For example, Janssen promoted its branded opioids, including Duragesic, NUCYNTA, and NUCYNTA ER, through its sales representatives and a particularly active speakers program. Deceptive messages regarding low addiction risk and low prevalence of withdrawal symptoms were a foundation of this marketing campaign. Janssen also conveyed other misrepresentations, including that its opioids could safely be prescribed at higher doses and were safer than alternatives such as NSAIDs.

167. Janssen supplemented these efforts with its own unbranded website, as well as third-party publications and a Front Group website, to promote opioids for the treatment of chronic pain.

These materials likewise made deceptive claims about addiction risk, safety at higher doses, and the safety of alternative treatments. They also claimed that opioid treatment would result in functional improvement, and further masked the risk of addiction by promoting the concept of pseudoaddiction.

168. Janssen sales representatives visited targeted physicians to deliver sales messages that were developed centrally and deployed identically across the country. These sales representatives were critical in transmitting Janssen's marketing strategies and talking points to individual prescribers. In 2011, at the peak of its effort to promote NUCYNTA ER, Janssen spent more than $90 million on detailing.

169. Janssen knew that there was no credible scientific evidence establishing that addiction rates were low among patients who used opioids to treat chronic pain. There is no evidence that NUCYNTA is any less addictive or prone to abuse than other opioids, or that the risk of addiction or abuse is low. Similarly, Janssen knew that there were severe symptoms associated with opioid withdrawal including, severe anxiety, nausea, vomiting, hallucinations, and delirium, but Janssen touted the ease with which patients could come off opioids.

170. These allegations were at the forefront of the City of Chicago Complaint. The City of Chicago Complaint states that "between 2009 and 2012, NUCYNTA and NUCYNTA ER sales representatives repeatedly promoted these drugs as less addictive than other opioids. For example, Janssen sales representatives described NUCYNTA as 'not an opioid' to one Midwestern internist at least twice in 2010. Similarly, a sales representative told a Midwestern physician that NUCYNTA was 'nonopioid yet opioid like' in 2011."

171. Further, the City of Chicago interviewed a number of sales representatives from Quintiles that promoted NUCYNTA off-label. These sales representatives admit that they were instructed to push the envelope when selling NUCYNTA ER and stress that NUCYNTA ER didn't hit receptors like other opioids so it was less addictive and had fewer withdrawal issues, as well as promote NUCYNTA and NUCYNTA ER as a safer alternative to NSAIDs. Quintiles sales representatives were also trained to say that NUCYNTA and NUCYNTA ER did not offer the same euphoric feeling as other opioids.

172. Depomed purchased NUCYNTA from Janssen in April 2015 despite knowing of Janssen's on-going litigation with the City of Chicago for the improper off-label marketing of NUCYNTA. On June 10, 2016, Depomed filed a Form 8-K/A stating that "Janssen has been named in a number of lawsuits alleging claims related to opioid marketing practices." Additionally, Depomed and the Defendants had "significant insight" into NUCYNTA marketing prior to purchasing NUCYNTA in April 2015. On July 12, 2016, Schoeneck stated, "When we bought the molecule from J&J, we thought that there were some things that we could do better in terms of the marketing and selling of the molecule. Now, I know that may sound like a big task for a small company, but we had significant insight into this and did significant market research prior to actually putting in our final bid on the drug." Therefore, Schoeneck and Defendants knew about these claims prior to the purchase of NUCYNTA.

173. Further, on November 9, 2015, Depomed filed a Form 10-Q for the second quarter ending June 30, 2015. The Form 10-Q was certified and signed by Schoeneck and Moretti and stated the following:

> **City of Chicago v. Purdue Pharma L.P. et al.**
>
> On August 26, 2015, the City of Chicago (City*) **named the Company as a defendant*** in a Second Amended Complaint (SAC) filed in City of Chicago v. Purdue Pharma L.P. et al., a federal case filed in the United States District Court, Northern District of Illinois (following removal from Cook County Circuit Court) in June 2014 against a number of pharmaceutical companies marketing and selling opioid pain medications and that was dismissed in May 2015 with leave to amend by the Court. ***The original complaint in the action named as a defendant Janssen Pharma and its related companies.*** Janssen, at the time the original complaint was filed, marketed and sold NUCYNTA® and NUCYNTA® ER, the U.S. rights to which were sold to the Company in a transaction that closed in April 2015. The SAC references the transaction between Company and Janssen and alleges that the Company has been listed in the SAC as a defendant in order to ensure the City can obtain complete relief. ***The essential factual allegations of the SAC concern purported misleading and otherwise improper promotion of opioid drugs to physician prescribers and consumers*** that occurred prior to the Company's acquisition of the U.S. rights to NUCYNTA® and NUCYNTA® ER. The Court has set November 20, 2015 as the date for filing motions to dismiss the SAC. Discovery is currently stayed, and no trial date has been set.

3Q15 at 26 (emphasis added).

174. The City of Chicago's second amended complaint states in pertinent part:

> Janssen promoted its branded opioids, including Duragesic, Nucynta, and Nucynta ER, through its sales representatives and a particularly active speakers program. ***Deceptive messages regarding low addiction risk and low prevalence of withdrawal symptoms were a foundation of this marketing campaign***. Janssen also conveyed other mispresentations [sic] as described in Section V.D, including that ***its opioids could safely be prescribed at higher doses and were safer than alternatives such as NSAIDs***.
>
> Janssen supplemented these efforts with its own unbranded website, as well as third-party publications and a Front Group website, to promote opioids for the treatment of chronic pain. ***These materials likewise made deceptive claims about addiction risk, safety at higher doses, and the safety of alternative treatments***. They also claimed that opioid treatment would result in functional improvement, and further masked the risk of addiction by promoting the concept of pseudoaddiction.
>
> * * *
>
> Janssen joined the other Defendants in propagating deceptive branded marketing that falsely minimized the risks and overstated the benefits associated with the long-term use of opioids to treat chronic pain. Like the other Defendants, Janssen sales representatives visited targeted physicians to ***deliver sales messages that were developed centrally and deployed identically across the country***. These sales representatives were critical in transmitting Janssen's marketing strategies and talking points to individual prescribers. In 2011, at the peak of its effort to promote Nucynta ER, Janssen spent more than $90 million on detailing.
>
> Janssen's designs to increase sales through deceptive marketing are apparent on the face of its marketing plans. For example, although Janssen knew that there was no credible scientific evidence establishing that addiction rates were low among patients who used opioids to treat chronic pain, [REDACTED] ***there is no evidence that Nucynta is any less addictive or prone to abuse than other opioids, or that the risk of addiction or abuse is low.*** Similarly, Janssen knew that there were severe symptoms associated with opioid withdrawal including, severe anxiety, nausea, vomiting, hallucinations, and delirium, but Janssen touted the ease with which patients could come off opioids.

175. During the Class Period, Defendants, including Schoeneck, Moretti, and Higgins, knew that was on NUCYNTA's FDA-approved label and, equally important, what was not.

176. For example, on a conference call on June 23, 2015, Moretti stated that "***[a]lthough not in the label*** there's a very low abuse profile and side effect rate." Defendants repeated these statements throughout the Class Period.

177. On March 14, 2016, Depomed made a presentation at the ROTH Conference. Schoeneck and Moretti participated in the presentation on behalf of Depomed. In response to a question by ROTH analyst Scott Henry, Schoeneck stated the following:

**Scott Henry** - ROTH Capital Partners - Analyst
Okay, that is helpful. Are there any questions in the audience? Let's continue just a little bit more on NUCYNTA. There's been a lot of talk against opioids.

I don't want to distract your CMO, but ***I think the perception is that perhaps yours may be a little less addictive***. Do you think some of that macro trend could favor NUCYNTA? And is that, can that be part of the marketing message in growing that product?

**Jim Schoeneck** - Depomed, Inc. - President and CEO
***I think it's certainly part of the medical rationale on the product.*** I think the marketing messaging getting into the label in terms of the differentiation, ***much tougher standard with the agents***, with the FDA to do that.

But if you look at tapentadol with the two mechanisms of action, with the norepinephrine mechanism in addition to the mu mechanism***, you do are getting of [sic] lower level of hits against the mu receptor and with that we see lower levels on respiratory depression***.

***The addiction profile is thought to be better. I can't make a claim around that because we don't actually have that in the label***. We are doing some things to be able to flesh out some of the different categories of abuse protection, if you want to call it that, with the FDA. But still in some discussions.

178. The above statements show Schoeneck's knowledge of NUCYNTA's label and that Depomed could not promote NUCYNTA as a safer, more tolerable, less addictive and less abusive opioid because it was not on the FDA-approved label. In fact, in February 2017, Schoeneck also announced that Depomed was "initiating label enhancement studies, aimed at further differentiating NUCYNTA by highlighting its respiratory depression and abuse potential profile. These labeling studies will focus on the properties of the tapentadol molecule, and its uniqueness in the pain marketplace." The purpose of this was to "be able to get it hopefully into the label." This shows that Schoeneck was attempting to get this information onto the label so they would no longer be in violation of the FDA rules.

179. Further, Higgins on May 9, 2017 stated that Depomed was "looking to strengthen our label." In February 2017, Schoeneck also announced that Depomed was "initiating label enhancement studies, aimed at further differentiating NUCYNTA by highlighting its respiratory depression and abuse potential profile. These labeling studies will focus on the properties of the

tapentadol molecule, and its uniqueness in the pain marketplace." The purpose of this was to "be able to get it hopefully into the label."

180. Knowing that it was illegal to promote NUCYNTA off-label, Defendants, including Schoeneck, Moretti, and Higgins continued to promote NUCYNTA as a safer, more tolerable, less addictive, less abusive opioid that did not have the same euphoric effect on patients.

181. First, Depomed hired many of the same representatives from Quintiles whose sales practices regarding NUCYNTA were the subject of the City of Chicago Complaint. These illicit sales methods continued under Depomed.

182. For example on a website, https://www.nucynta.com/hcp/er/safety-and-tolerability, ran by Depomed that is designed to market NUCYNTA, Depomed promotes NUCYNTA ER as more tolerable because of fewer "discontinuation rates due to treatment-emergent adverse events." Depomed goes on to set forth a number of treatment emergent adverse events and how they compare to one competitor, Oxycodone. The website also claims that NUCYNTA ER is safe because only 4.8% of NUCYNTA ER-treated patients experienced mild or moderate withdrawal. However, none of this appears on the FDA-approved label for NUCYNTA. Defendants encouraged their sales team to promote NUCYNTA off-label in the same manner.

183. Additionally, on March 23, 2016, Depomed held their Analyst and Investor Day Conference. Depomed filed with the SEC slides to accompany the presentation that depicted NUCYNTA as a safer opioid as shown below:




184. On June 21, 2016, Depomed made a presentation at the JMP Securities Life Sciences Conference. Schoeneck and Moretti participated in the presentation on behalf of Depomed. In response to JMP analyst Jason Butler's question about opioid abuse, Schoeneck promoted NUCYNTA as a safer opioid. Schoeneck stated in pertinent part:

> I think some physicians look at this drug and see it as one from the data that you don't see as much of the issues that they are looking for – or looking out for, which is ***you've got lower rates of abuse, lower rates of hospitalization*** and these are out of some of the database that the FDA uses, [RADAR] is an inflection. You see lower incidences of it.
>
> And the street price of the drug is barely above the retail price of the drug, where something like OxyContin is about $1 a milligram, we're at about $0.06 a milligram. So not particularly popular on the Street either. And some of that has to do with the fact that if you look at just the drug in the two mechanisms of action, people don't tend to get -- ***they don't get the euphoria that they get with the classic opioids.***

> You're not hitting the mu receptor nearly as hard because you're also hitting this other system. ***And with that you don't see the euphoria.*** And that's really what people want is they want that -- they like that good feeling and they want more of it. They start to tolerate to it, take higher and higher doses and that's where the category gets really dangerous.

185. Similarly, on an August 3, 2016 earnings call, Schoeneck states that "***the product is viewed as having low abuse potential*** and no evidence of the dose creeps seen with other opioids. . . ."

186. On March 13, 2017, Moretti made a presentation at the ROTH Conference. In response to a request from ROTH analyst Scott Henry to "talk about NUCYNTA in the concept of perhaps there are better and worse opioids with regard to addiction," Moretti stated in pertinent part:

> **August Moretti** - Depomed, Inc. - SVP and CFO
> Right. With all the appropriate caveats, my long-term view is that this is the best molecule in the category. As a dual mechanism of action, it does bind to the new opioid receptor, but at a binding strength that's 1/15th that of morphine. So as a result, ***the patient doesn't get the kind of euphoria that you get with other drugs in the category***.
>
> The second mechanism of action, norepinephrine reuptake inhibition, synergizes with the new opioid agonist and ***provides effective pain relief without the euphoria to the patient***. And as a result, you wind up with less likeability, ***less potential for abuse***. And I think that the physicians feel that way about the drug; ***however, those claims are not in the label.***
>
> * * *
>
> Our view is that our abuse deterrents comes from the molecule itself, in that ***the molecule provides less euphoria; and, as a result, is less abusable***. It's equal pain relief but ***less threat of abuse and addiction***. But that's different from a physical barrier, or what have you -- a [hardened] pill that might support an abuse-deterrent claim for a particular route of administration.

187. At another conference one week later on March 21, 2017, Moretti again stated, "***But in the absence of the same level of euphoria and likability that other drugs in the class have***[.] So that ultimately we think that [NUCYNTA] could emerge as the opioid of choice."

188. Depomed was openly promoting NUCYNTA as a safer, less addictive, less abusive opioid without the euphoria that occurred in other opioids. These points were not approved by the FDA and did not appear on NUCYNTA's label. This supports the conclusion that, unbeknownst to investors, Defendants were also instructing their sales team to promote NUCYNTA off-label in order

to increase sales. This is evident based upon information obtained from former employees ("FE") of Depomed, detailed below.

189. FE1 worked as a former Specialty Sales Representative selling NUCYNTA at Depomed from October 2011 to March 2016. FE1 reported to David Sims, a former sales manager from Quintiles. According to FE1, Depomed appeared to change significantly in how it approached its sales practices and training following the acquisition of NUCYNTA. FE1 was trained on how to sell NUCYNTA by FE1's manager, David Sims, who formerly worked for Quintiles, the marketing firm used by Janssen. Sims trained FE1 by discussing the negative perception of opioids in general across the country, and by telling FE1 how to pushback against prescribers who cited concerns writing an opioid prescription.

190. FE1 indicated that Depomed's marketing push was "Think Differently." FE1 stated that the manager was very vocal about NUCYNTA being a "safer opioid." FE1 indicated that the Sims "would say that all the time" and that FE1 heard Sims call NUCYNTA a safer opioid to physicians. FE1 would listen to Sims preach to physicians about NUCYNTA and its value to patients in terms of, among other things, improved safety relative to other opioids on the market. According to FE1, Sims "would just tell the doctors it was much safer, and for them to prescribe it for their patients, and it was better for their patients." FE1 stated he/she was aware Sims was speaking off-label about the drug and that it was not allowed by law. FE1 was also paired with a former Quintiles sales representative who actively told physicians that NUCYNTA was a safer opioid.

191. Similarly FE2, a former Senior Specialty Representative at Depomed from June 2012 to July 2017, who was responsible for promoting NUCYNTA, and also for helping prepare other new employees to sell the drug, stated that Depomed convinced its sales force that NUCYNTA was different. "A lot of things changed because we brought on a huge group of people, and, for instance, where the Training Department would do the training on its own, now I was part of the trainers where I was training a full classroom of people on my own," FE2 said. "It was very different in the practices, in that regard. They had so many brought on." FE2 stated "We were being convinced it was a safer opioid" that was "the overall consensus that was being told to us." FE2 stated that when the sales team complained about selling to neurologists, FE2's superiors would say that "this is a

great opportunity to introduce them to the safer opioid." FE2 stated that the message that NUCYNTA was a safer opioid came from multiple people and "from different parts of the country."

192. FE3 was a Pain Sales Specialist at Depomed from November 2015 to August 2016 responsible for representing NUCYNTA. FE3 reported to her district manager Jessica Golino. FE3 was trained by Glenn Drummond who formerly represented Oxycontin for Purdue Pharma. FE3 said he/she had gone through sales training at several pharmaceutical companies prior to joining Depomed but that none of those was as intense as what she experienced with Drummond. "There was always negativity associated with selling any opioid, but we believed in the molecule," FE3 said. "You weren't going to get the euphoric effect. That was discussed, that you would not see that." FE3 stated that, "I heard Jim Schoeneck talk a lot. The perception of opioids? You're selling a molecule that's not supposed to cause euphoria. You're kind of talking out both sides of your mouth. I'm selling a painkiller, but not the same as (the ones) on the street." FE3 stated, "You have to think about the molecule. Doctors didn't want to give something to patients that would give that high." When asked about whether the sales representatives talked about the lower abuse of NUCYNTA to doctors, FE3 stated, "If they have specific questions about abuse, we did talk abuse. We did talk about it. Yeah, we did."

193. When asked where FE3 heard NUCYNTA was safer and less euphoric, FE3 stated that they were told during sales training that NUCYNTA did not provide the same euphoria as other street-level opioids. "It was discussed in training. That's what made this molecule as successful as it was. There was less abuse potential. Addicts weren't going to be stealing it because they wouldn't get the buzz." FE3 added the caveat, "It was never on the marketing materials. I can't point fingers at the trainers. It was just a well-known fact you're not going to get the euphoria." The fact that Depomed conspicuously omitted this training instruction from their printed training materials strongly suggests that Defendants knew that the instruction was inappropriate and improper, otherwise there would be no need to hide it in this manner. FE3 confirmed they were instructed that NUCYNTA presented less abuse potential because of its design. "Just the way it was manufactured," FE3 said. "If you tried to crush it, it was almost indestructible."

194. FE4 was a former Specialty Pain Sales Representative at Depomed, Inc. from late 2011 to late November/early December 2016. In addition to selling NUCYNTA, FE3 was responsible in assisting with sales training related to the new employees hired to promote NUCYNTA. FE3 indicated that "there may have been some perception" that NUCYNTA was a safer painkiller. FE3 stated, "I was a guest trainer. I worked intimately with Glen [Drummond] on multiple things. He was very serious about training, there's no doubt in my mind. He could be very challenging, I wouldn't go so far as to say difficult, and he had expectations for people going through training. The agenda was rigorous. It was long hours. Glen was very, very good. He was professional, and he expressed that there was a "gray area" when it comes to selling opioids.

195. These statements by the former employees show that Depomed's policy to train sales representatives to promote NUCYNTA off-label, as a safer and less addictive opioid that did not cause the same euphoric feeling as other drugs. Defendants knew Depomed's sales representatives were promoting NUCYNTA off-label as evidenced by their public statements, and their close work with the sales team. Defendants consistently held sales conference calls and events where the sales representatives would be present and discuss the off-label benefits of NUCYNTA.

196. Further evidence that Defendants knew of the off-label marketing is the fact that on November 7, 2016, Schoeneck stated that with Scott Shivley's resignation "the sales, marketing, and managed care functions previously reporting to Scott will now report directly to me . . . ." With Shively's resignation, Schoeneck became further involved with sales and marketing. Depomed's off-label marketing practices were front and center, and Schoeneck perpetuated the illicit marketing scheme.

197. Additionally, Defendants knew that NUCYNTA was being illegally marketed because of their vast experience in the pharmaceutical industry. For example, until Schoeneck joined Depomed, he was CEO of BrainCells, Inc. ("BrainCells"), a privately-held biopharmaceutical company. Prior to joining BrainCells, he served as CEO of ActivX BioSciences, Inc., a development stage biotechnology company. Schoeneck also served as President and Chief Executive Officer of Prometheus Laboratories Inc. ("Prometheus") for three years. Prior to joining Prometheus, Schoeneck spent three years at Centocor, Inc. ("Centocor"), where he led the development of

Centocor's commercial capabilities. His group launched Remicade®, which has become one of the world's largest pharmaceutical products. Earlier in his career, he spent 13 years at Rhone-Poulenc Rorer, Inc. (now Sanofi S.A.) serving in various sales and marketing positions of increasing responsibility. According to the 2016 Proxy, the Board considered "Mr. Schoeneck's experience and expertise within the following areas relevant to Depomed and its business in concluding that he should serve on the Board: Corporate Strategy; Corporate Management; Commercial Strategy; Pharmaceutical Product Launch; Strategic Transactions; and Corporate Leadership."

198. From 2010 until his appointment at Depomed, Higgins served as a Senior Advisor to Blackstone Healthcare Partners, the healthcare team of The Blackstone Group, where he focused on product-based healthcare acquisitions. Prior to 2010, Higgins held various high-ranking positions in several different pharmaceutical companies, including joining Bayer HealthCare AG in 2004, where he served as Chair of the Board Management of Bayer HealthCare AG, a developer and manufacturer of human and animal health care products, and Chairman of the Bayer HealthCare Executive Committee. From 2001 to 2004, Higgins served as Chairman, President and CEO of Enzon Pharmaceuticals. Prior to joining Enzon, Higgins spent 14 years at Abbott Laboratories. He also has served as a past Board member of the Pharmaceutical Research Manufacturers of America (PhRMA), of the Council of the International Federation of Pharmaceutical Manufacturers and Association (IFPMA), and President of the European Federation of Pharmaceutical Industries and Associations (EFPIA).

199. From 2004 to December 2011, Mr. Moretti served as Chief Financial Officer and Senior Vice President of Alexza Pharmaceuticals, Inc., a publicly-held pharmaceutical company. From 2001 to 2004, Mr. Moretti served as Chief Financial Officer of Alavita, Inc. (formerly Surromed, Inc.). Prior to Alavita, Mr. Moretti was a partner of Heller Ehrman LLP, an international law firm. Mr. Moretti holds a B.A. from Princeton University and a J.D. from Harvard Law School.

200. Defendants are highly intelligent individuals and experienced in the pharmaceuticals industry. Therefore, they knew that it was illegal to promote NUCYNTA off-label but encouraged their sales representatives to market it as safer and less addictive anyway.

*Defendants Hired Sales Representatives from Quintiles Knowing They Engaged In Off-Label Marketing*

201. Knowing that Janssen was being sued for the off-label marketing of NUCYNTA and that it was illegal to promote NUCYNTA off-label, Defendants hired the same sales team as Janssen to promote NUCYNTA at Depomed. Defendants also hired these sales representatives to train the new Depomed sales representatives knowing that they had engaged in the off-label marketing of NUCYNTA.

202. On July 29, 2015, Schoeneck stated, "Continuity was a key to our second quarter success as well as we hired Quintiles, the same contract sales organization that had marketed NUCYNTA previously to continue selling on our behalf while we completed the recruitment for positions in our expanded sales force leading up to our re-launch of NUCYNTA in June." Additionally, on November 9, 2015, in response to a question about the ability of Depomed's salesforce, Schoeneck responded, "We certainly think we vetted well when we brought people in. There was a group that actually had been selling NUCYNTA before with quintiles that we brought onboard. So on that group we actually had direct experience in seeing what they were able to accomplish under the contract with J&J."

203. Not only did Depomed and Defendants hire Quintiles to sell NUCYNTA, but as stated by FE3, Defendants also had the former Quintiles sales representative participate in the training of the newly hired Depomed salesforce. Given Defendants knowledge of Quintiles off-label marketing and the significant insight done into the marketing of NUCYNTA, Defendants knew that their own sales representatives were marketing NUCYNTA off-label.

204. Accordingly, Defendants acted with scienter because they had actual knowledge that Depomed's sales force was marketing NUCYNTA off-label but portrayed the risk of exposure from off-label marketing as a mere potentiality when, in fact, Depomed was actively engaging in off-label marketing.

***Defendants Benefitted Financially From the Fraud***

205. In addition to having actual knowledge of the misrepresentations as described above, Defendants were also financially motivated to mislead investors. Defendants' bonuses were based on corporate objectives set forth by Depomed's Compensation Committee. These included "net

product sales target of $525 million," EPS of $1.50, and "positive cash flow target of $126 million." These directly incentivized Defendants to engage in off-label marketing to increase their already lucrative compensation and cash bonuses.

206. According to the 2017 Proxy, for Fiscal 2016, Schoeneck earned $6,167,070 in total compensation from Depomed, consisting of $787,500 in salary, $2,362,290 in stock awards, $2,308,415 in option awards, $694,000 in cash bonuses and $14,865 in other compensation. Additionally, in connection with his resignation from Depomed, on March 28, 2017, Schoeneck and Depomed entered into a Waiver and Release Agreement whereby Depomed agreed to pay Schoeneck: (i) $825,000, which is equal to 12-months of his then-current base salary, payable in equal installments in accordance with Depomed's ordinary payroll practices, (ii) the full cost of the health insurance benefits provided to Mr. Schoeneck, his spouse and dependents, as applicable, pursuant to the terms of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") or other applicable law through the earlier of (a) the end of the 12 month period following the date of the Waiver and Release Agreement or (b) the date on which Mr. Schoeneck is no longer eligible for such COBRA or other benefits under applicable law and (iii) up to six months of documented, bona fide, outplacement services not to exceed $5,000 per month.

207. According to the 2017 Proxy, upon joining Depomed, it entered into a letter agreement with Higgins whereby he would receive an annual base salary of $800,000, an annual target cash bonus of 100% of his base salary, stock options that vest over a four-year-period with a value of $1.75 million and reimbursement of reasonable out-of-pocket relocation expenses. Further, on March 31, 2017, Depomed granted Higgins 139,442 restricted stock units that would vest annually in four equal tranches, with the first 25% vesting on December 1, 2017, and 315,884 stock options that vest 12.5% on September 28, 2017 and in 42 equal installments thereafter.

208. Depomed paid Moretti total compensation of $1,805,459 in 2016 and $1,490,539 in 2015.

209. Further, while in possession of material, nonpublic information concerning Depomed's true business health, defendant Moretti also sold 30,000 shares of his stock for $572,797.49 in proceeds.

210. By engaging in the fraud alleged herein, the Individual Defendants benefitted themselves financially in a personal and specific manner.

***Resignation of Employees***

211. Adding to the theory of scienter is the resignation of multiple high level employees that occurred in close proximity to the revelations of fraud. On March 28, 2017, the same exact day that the senate announced investigation into Depomed, Schoeneck resigned. Further, between November 2016 and June 2017, Shively (Depomed's Senior Vice-President and Chief Commercial Officer), Schoeneck (Depomed's President and Chief Executive Officer and a Director), and Rao (Depomed's Senior Vice President and Chief Medical Officer) all resigned and were rewarded lucrative severance packages by the Board, in direct violation of Depomed's Management Continuity Agreements entered into with each of the foregoing defendants, which provides severance payments for only certain voluntary/involuntary terminations, including a change in control, but does not provide any severance whatsoever where the employee voluntarily resigns, as was the case here.

212. Depomed's decision to fire these former directors and employees further implicates Defendants as having acted with scienter.

213. Depomed terminated employment with them in response to the conduct alleged herein. The nature and timing of Depomed's decision to terminate Schoeneck evidences this fact, as explained below:

- Depomed terminated Schoeneck the same day it received the letter from Senator McCaskill. The timeliness of Schoeneck's termination suggests that it was directly related to how Schoeneck promoted NUCYNTA and the misleading statements made during the Class Period;
- Schoeneck was responsible for the majority of the fraudulent statements alleged herein. The fact that Depomed terminated Schoeneck shows that wrongdoing occurred at Depomed, and that Schoeneck was responsible for the wrongdoing in some material way; and

- The current report did not contain any of the typical salutary words often found in corporate statements announcing high-level resignations, which suggests strongly that Schoeneck's departure from Depomed was involuntary and for cause.

214. Depomed's decision to terminate Schoeneck's employment shows that wrongdoing occurred in connection with Depomed's misrepresentations regarding the opioid market's effect on Depomed and Depomed's involvement in off-label marketing, which further supports the inference that Defendants acted with scienter.

***<u>Corporate Scienter</u>***

215. Depomed's public statements about the safety of NUCYNTA, off-label marking, and the opioid crisis were critical to its reputation and overall operations. Given the dramatic allegations of falsity contained herein, a strong inference exists that Depomed's corporate officials knew of the falsity of the statements at the time of publication. Specifically, the knowledge of Depomed's former CEO Schoeneck, CEO Higgins, and CFO Moretti (among other members of senior management) concerning Depomed's engagement in off-label marking and the effect of the opioid crisis on Depomed's finances, is imputed to Depomed. Depomed acted with scienter under the corporate scienter doctrine

***E. Loss Causation And Economic Loss***

216. Defendants' materially misleading statements and omissions during the Class Period resulted in Plaintiffs and other members of the Class purchasing Depomed's shares at artificially inflated prices, and thereby directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiffs and other members of the Class.

217. As alleged herein:

a. the market for Depomed's stock was open, well-developed and efficient at all relevant times;

b. Defendants' above-detailed materially misleading statements and/or material omissions had the effect of creating in the market an unrealistically positive assessment of Depomed and its prospects, thus causing Depomed's shares to be

overvalued and the market price of Depomed's shares to be artificially inflated during the Class Period;

c. Defendants created an unrealistically positive assessment of Depomed and its prospects by, in part, concealing risks associated with exposure arising from Depomed's off-label marketing practices;

d. Plaintiffs and other members of the Class purchased or otherwise acquired Depomed stock relying upon the integrity of the market price for Depomed shares and market information relating to Depomed;

e. The risks associated with exposure arising from Depomed's off-label marketing practices began to materialize and, in turn, investors began to discover that Defendants' public statements were materially misleading; and

f. Upon discovery of Defendants' materially misleading statements and/or material omissions, Depomed's share price suffered severe devaluation.

218. Disclosures and/or events on the following dates resulted in damages:

a. November 7, 2016 – On November 7, 2016, Depomed lowered its revenue guidance to $455 million to $465 million from $480 million to $505 million. Depomed attributed its decision to lower guidance, in part, to worsening conditions within the opioid market. Prior to that point, Defendants consistently stated that their NUCYNTA marketing strategy had proven (and would continue to prove) successful, even in the face of worsening market conditions. Depomed's decision to lower its revenue estimate signaled to investors that, contrary to their prior statements, the negative sentiment towards opioids in general was affecting Depomed. On November 8, 2016, the price of Depomed stock declined from $22.89 per share to $19.01 per share;

b. December 11, 2016 – On December 11, 2016, PiperJaffray downgraded Depomed to "underweight" citing the "trajectory of [Depomed's] business" as a "real concern." PiperJaffray also lowered its price target for Depomed stock from $17 per share to $14 per share. Significantly, PiperJaffray stated that "it has

become clear to us that management, based in part on its own commentary, does not really have a new strategy in place to wring significant further volume growth out of NUCYNTA ER in the face of more challenging market dynamics." PiperJaffray's report provided investors with cause for concern, drawing suspicion around the veracity of Defendants' prior statements about Depomed's ability to weather negative market conditions (notwithstanding Defendants' assurances to the contrary). On December 12, 2016, the price of Depomed stock declined from $20.20 per share to $18.13 per share;

c. March 28, 2017 – On March 28, 2017, Senator McCaskill announced an investigation into the marketing and sales practices of the nation's top five manufacturers of prescription opioid products, including Depomed. The investigation further signaled to investors that Depomed's marketing practices were not as successful or legitimate as Defendants' previously represented. Beginning on March 28, 2017 and continuing over the course of the week, the price of Depomed's stock declined from its closing price of $14.90 per share on March 27, 2017, to $14.23 per share on March 28, $13.79 on March 29, $12.82 on March 30, and $12.55 on March 31;

d. May 17, 2017 – On May 17, 2017, Roth Capital Partners released a report on Depomed stating that the firm was reducing its price target on Depomed stock. Roth Capital lowered the price target "based largely on a deteriorating macro environment for opioid pain treatments." Roth Capital's conclusions contradicted Defendants' statements, which gave investors further cause for concern about the accuracy of Defendants' statements prior to that point in time. On May 18, 2017, the price of Depomed stock declined from $10.82 per share to $10.20 per share; and

e. August 7, 2017 – On August 7, 2017, Defendants revealed that, in addition to Senator McCaskill's investigation, the U.S. Department of Justice and the Office of the Attorney General for the State of Maryland had subpoenaed Depomed in

connection with Depomed's opioid marketing practices. In addition, Depomed revealed that it was lowering its revenue estimates to $395 million to $410 million from $405 million to $425 million. Moreover, for the first time, Depomed substantially revised "risk warning" language within its quarterly reports (Form 10-Q) to discuss worsening market conditions resulting from regulatory actions, government investigations, and heightened public attention on opioid abuse. These disclosures signaled to investors that, contrary to Defendants' prior statements, Depomed faced significant exposure from risks arising from the Depomed's opioid marketing practices and worsening market conditions. On August 8, 2017, the price of Depomed stock declined from $9.23 per share to $6.15 per share.

219. Defendants withheld material information concerning Depomed's marketing practices and, in turn, the sales results the company was generating in spite of the worsening opioid market conditions. This information included the fact that Depomed was engaging in off-label marketing. Defendants' misleading statements and omissions concealed this information from the public and precluded investors from knowing that they were subjecting themselves to significant risks when investing in Depomed, *i.e.*, risks associated with liability exposure arising from off-label marketing.

***F. Presumption Of Reliance; Fraud-On-The-Market***

220. At all relevant times, the market for Depomed's common stock was an efficient market for the following reasons, among others:

(a) Depomed common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

(b) During the Class Period, Depomed common stock was actively traded, demonstrating a strong presumption of an efficient market;

(c) As a regulated issuer, Depomed filed with the SEC periodic public reports during the Class Period;

(d) Depomed regularly communicated with public investors via established market

communication mechanisms;

(e) Depomed was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about Depomed was rapidly reflected in and incorporated into Depomed's stock price during the Class Period.

221. As a result of the foregoing, the market for Depomed's common stock promptly digested current information regarding Depomed from all publicly available sources and reflected such information in Depomed's stock price. Under these circumstances, all purchasers of Depomed common stock during the Class Period suffered similar injury through their purchase of Depomed's common stock at artificially inflated prices, and a presumption of reliance applies.

222. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered how the opioid epidemic was impacting Depomed and Depomed's decision to engage in off-label marketing when deciding whether to purchase and/or sell stock in Depomed.

### ***G. No Safe Harbor; Inapplicability Of Bespeaks Caution Doctrine***

223. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

224. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

225. Defendants are also liable for any false or misleading "forward-looking statements"

pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Depomed who knew that the "forward-looking statement" was false. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

**CLASS ACTION ALLEGATIONS**

226. Plaintiffs bring this action on behalf of all individuals and entities who purchased acquired Depomed common stock on the public market during the Class Period, and were damaged, excluding Depomed, the Individual Defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

227. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of Depomed's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Depomed or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 6, 2017, Depomed had 63,013,451 outstanding shares of common stock. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

228. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

229. Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

230. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b) whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements concerning the opioid market's effect on Depomed and Depomed's involvement in off-label marketing;

(c) whether the price of Depomed common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

(d) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

231. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **COUNT I**

### ***Violation of Section 10(b) and Rule 10b-5 Against All Defendants***

232. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

233. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Depomed common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

234. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Depomed's common stock in an effort to maintain artificially high market prices for Depomed's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

235. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the opioid market's effect on Depomed and Depomed's involvement in off-label marketing and thus the business and future prospects of Depomed as specified herein.

236. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Depomed's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the opioid market's effect on Depomed and Depomed's involvement in off-label marketing and Depomed's business and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Depomed's common stock during the Class Period.

237. Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at Depomed during the Class Period and members of Depomed's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of Depomed, was privy to and participated in the creation, development and reporting of Depomed's SEC filings and public statements concerning the opioid market's effect on

Depomed and Depomed's involvement in off-label marketing; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of Depomed's management team, internal reports and other data and information about the opioid market's effect on Depomed and Depomed's involvement in off-label marketing, at all relevant times; and (4) each Individual Defendant was aware of Depomed's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

238. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the opioid market's effect on Depomed and Depomed's involvement in off-label marketing and thus Depomed's business and future prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' misrepresentations concerning the opioid market's effect on Depomed and Depomed's involvement in off-label marketing throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

239. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Depomed's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Depomed's publicly-traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired

Depomed's common stock during the Class Period at artificially high prices and were or will be damaged thereby.

240. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the opioid market's effect on Depomed and Depomed's involvement in off-label marketing, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Depomed common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

241. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

242. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of Depomed's common stock during the Class Period.

243. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of common stock giving rise to the cause of action.

**COUNT II**

***The Individual Defendants Violated Section 20(a) of the Exchange Act***

244. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

245. The Individual Defendants acted as controlling persons of Depomed within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Depomed's operations and/or intimate knowledge of the false information filed by Depomed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Depomed, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to

copies of Depomed's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

246. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Depomed and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

247. As set forth above, Depomed and the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

248. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Depomed's common stock during the Class Period.

249. This action was filed within two years of discovery of the fraud and within five years of each Plaintiffs' purchases of common stock giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a) Determining that this action is a proper class action, certifying Plaintiffs as class representative under Federal Rule of Civil Procedure 23 and Plaintiffs' counsel as class counsel;

(b) Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d) Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demands a jury trial.

Dated: February 6, 2018

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam C. McCall*
Adam C. McCall (SBN 302130)
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294
Email: amccall@zlk.com

Adam M. Apton (SBN 316506)
Rosemary M. Rivas (SBN 209147)
Quentin A. Roberts (SBN 306687)
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294
Email: aapton@zlk.com
Email: rrivas@zlk.com
Email: qroberts@zlk.com

-and-

Nicholas I. Porritt
**LEVI & KORSINSKY, LLP**
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
(*admitted pro hac vice*)

*Attorneys for Lead Plaintiffs and the Class*