UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INCHEN HUANG, et al.,

Plaintiffs,

v.

ARTHUR JOSEPH HIGGINS, et al.,

Defendants.

Case No. 17-cv-04830-JST

**ORDER GRANTING MOTION TO DISMISS**

Re: ECF No. 92

Before the Court is a motion to dismiss Plaintiffs' second amended complaint filed by Defendant Assertio Therapeutics, Inc. and Defendants Arthur Joseph Higgins, James A. Schoeneck, and August J. Moretti (collectively, the "Individual Defendants"). ECF No. 92. The Court will grant the motion.

## I. BACKGROUND

This is a putative securities fraud class action brought on behalf of all persons who purchased Depomed, Inc.[1] common stock between July 29, 2015 and August 7, 2017 (the "Class Period"), against Depomed and certain current and former Depomed officers and directors. Second Amended Complaint ("SAC") ¶ 1, ECF No. 87. In its March 18, 2019 order granting Defendants' motion to dismiss Plaintiffs' first amended complaint ("FAC"), the Court extensively summarized the facts and allegations underlying this case. ECF No. 83. In sum, Plaintiffs allege that, during the Class Period, Defendants made material misrepresentations and omissions regarding Depomed's sales, concealing the fact that Depomed was engaged in an illegal off-label

[1] Depomed has since changed its name to Assertio Therapeutics, Inc. *See* ECF No. 72. The Court uses Depomed throughout this order because the second amended complaint and the parties' subsequent briefing refer to Assertio as Depomed.

United States District Court
Northern District of California

marketing campaign for NUCYNTA, a line of opioid drugs that drove the majority of Depomed's revenues. *Id.* at 2-3.

The Court incorporates its prior summary of the procedural history of this case, *see* ECF No. 87 at 3-4, adding only that Plaintiffs filed their SAC on May 2, 2019, asserting the same causes of action as their FAC: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5; and (2) a violation of Section 20(a) of the Exchange Act. SAC ¶¶ 696-713. Defendants moved to dismiss the SAC on June 17, 2019. ECF No. 92. Plaintiffs filed an opposition on August 1, 2019, ECF No. 94, and Defendants filed a reply on August 30, 2019, ECF No. 96. The Court held a hearing on the motion on December 18, 2019. ECF No. 104.

## II. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

## III. LEGAL STANDARD

### A. The Dual Pleading Requirements

Section 10(b) of the Securities Exchange Act of 1934 prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security. To establish a violation of Section 10(b), a plaintiff must plead: (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

On a motion to dismiss, the Court accepts the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, while a plaintiff generally need only plead "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), "[s]ecurities fraud class actions must meet



United States District Court
Northern District of California

United States District Court
Northern District of California

the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')," *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).

Under the PSLRA and Rule 9(b), a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission, and "a party must state with particularity the circumstances constituting fraud or mistake." 15 U.S.C. § 78u-4(b)(2)(A); Fed. R. Civ. P. 9(b); *see also Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605. "In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), *abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

**B. Falsity and Materiality**

The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). For statements to be actionable under the PSLRA, they must be both false or misleading and material. A statement or omission is misleading under the PSLRA and Section 10(b) of the Exchange Act "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotation marks and citation omitted).

A false or misleading statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). To plead materiality, a complaint's allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the

materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable." *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017) (citation omitted). "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010) (internal quotation marks and citations omitted).

**C. Scienter**

The required state of mind under the PSLRA is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n.12 (1976). In order to adequately establish scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). In evaluating whether a complaint satisfies the "strong inference" requirement, courts must undertake a two-step inquiry by first considering "whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and "if no individual allegation is sufficient, . . . conduct[ing] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017) (citation omitted).

In the Ninth Circuit, scienter is a "mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (quoting

*Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). "Deliberate recklessness is an *extreme* departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (alteration and emphasis in original) (quoting *City of Dearborn Heights*, 856 F.3d at 619). Stated differently, deliberate recklessness requires that an actor "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [the actor] could have done so without extraordinary effort." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (citation omitted). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).

**D. Loss Causation**

Loss causation, "i.e., a causal connection between the material misrepresentation and the loss" experienced by the plaintiff, is a necessary element of pleading a securities fraud claim under Section 10(b) of the Exchange Act. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The plaintiff "must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some other intervening event." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). In other words, plaintiffs alleging that they suffered a loss because they resold shares at a lower price must show that the price reflects "the earlier misrepresentation" rather than "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharm.*, 544 U.S. at 343. The Ninth Circuit has held that, as with other elements of a securities fraud claim, plaintiffs must plead loss causation with the particularity required by Federal Rule of Civil Procedure 9(b). *See Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605.

"The burden of pleading loss causation is typically satisfied by allegations that the

United States District Court
Northern District of California

defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd*, 811 F.3d at 1209 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2406 (2014)); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013) ("Typically, 'to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.'") (quoting *McCage v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d. Cir. 2007)). However, "[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Nuveen*, 730 F.3d at 1120. "The fundamental inquiry before the Court remains whether there is 'a causal connection between the material misrepresentation and the loss.'" *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1046 (N.D. Cal. 2016) (quoting *Dura Pharm.*, 544 U.S. at 342).

## IV. DISCUSSION

As laid out in their FAC and SAC, Plaintiffs' theory is that Defendants made statements about Depomed's sales that were materially false or misleading because they did not disclose that the growth in sales was due in part to an illicit off-label marketing campaign for NUCYNTA. ECF No. 83 at 8. Plaintiffs also allege that Defendants filed statements with the SEC that were materially misleading because they disclosed the general risk of liability from off-label marketing but not the alleged fact that Depomed was engaged in such marketing. *Id.* at 17. These theories both rely on Plaintiffs' allegation that Defendants conducted a widespread off-label marketing campaign. In its order granting Defendants' motion to dismiss Plaintiffs' FAC, the Court held that Plaintiffs had not alleged facts sufficient to support an inference that Defendants had engaged in such a campaign. *Id.* at 15-17. This failure undermined both of Plaintiffs' theories as to falsity and materiality. *Id.* at 15-18.

The Court also held that Plaintiffs had failed to plead facts raising a sufficiently strong inference of scienter because they had alleged only "isolated instances of [off-label marketing], rather than widespread deception . . . ." *Id.* at 25 (quoting *Or. Pub. Emps. Ret. Fund*, 774 F.3d at

608). Lastly, the Court held that Plaintiffs had failed to adequately allege loss causation on either a materialization of risk or investigation announcement theory. *Id.* at 25-31. Because Plaintiffs had not sufficiently stated a Section 10(b) claim, the Court held that their Section 20(a) claim also failed. *Id.* at 31.

Plaintiffs' SAC adds 120 pages of new allegations. The Court adopts its prior analysis of the allegations made in the FAC and considers whether the new allegations cure the defects described in its prior order.

**A. Falsity and Materiality**

As in their FAC, Plaintiffs allege two categories of false or misleading statements: (1) public statements "about NUCYNTA's revenue and sales operations [that concealed] the company's illicit off-label marketing of NUCYNTA," ECF No. 94 at 17; and (2) the risk factors section of Depomed's SEC filings, in which Defendants warned of "risks arising from *potential* 'off-label' marketing [while concealing] that 'off-label' marketing was *already* occurring," *id.* at 21. The falsity of both categories of statements again depends on whether Defendants engaged in a widespread off-label marketing campaign.

Plaintiffs also allege what they characterize as a new category of statement about the impact of CDC guidelines on Depomed's business. *See id.* at 21.

**1. Extent of Off-Label Marketing**

Plaintiffs make four new types of off-label marketing allegations: (1) Depomed Former Employees ("FEs") and Individual Defendants made off-label statements about dosage, *see* SAC at 42; (2) the FEs and Individual Defendants improperly relied on a study comparing NUCYNTA to other opioids, *see id.* at 45; (3) Depomed paid speakers to promote NUCYNTA off-label, *see id.* at 57; and (4) miscellaneous other off-label statements.

Plaintiffs allege statements by six new FEs (FEs 5-10) to substantiate many of their claims, in addition to the FE statements offered in the FAC (FEs 1-4). The Court assesses these statements under the standard it noted in its prior order: First, confidential witness statements must be "described with sufficient particularity to establish their reliability and personal



United States District Court
Northern District of California

knowledge."[2] *Zucco Partners*, 552 F.3d at 995. Second, the FEs' statements must "themselves be indicative of" the elements in question: here, falsity and materiality. *Id.*

**a. Statements About Dosage**

Plaintiffs allege Defendants engaged in off-label marketing by "instructing [their] sales representatives to tell physicians that they could prescribe NUCYNTA at higher doses than what was permitted on the drug's FDA-approved label." ECF No. 94 at 11; SAC ¶¶ 145, 149-51. According to Plaintiffs, "'proper dosing' was one of [Depomed's] 'four pillars' to NUCYNTA's growth." SAC ¶¶ 146, 320. Plaintiffs rely on statements by two new FEs to support these allegations.

FE5 alleges that at a sales team meeting "he believed was in Dallas," Depomed regional directors told sales representatives to push "higher starting doses" of NUCYNTA than were approved on the label. *Id.* ¶ 150. FE5 alleges that Chris Cooper, his regional director, told him about recommending the increased dosage of NUCYNTA ER – from 50 mg to 100 mg twice a day – at a breakout session, and that "[h]e thinks the other District Managers communicated to their teams the same message." *Id.* ¶¶ 150-52. FE5 estimates that "this directive was issued around when NUCYNTA was launched by Depomed or just a little while after the launch." *Id.* ¶ 152. "FE5 believes that whatever the District Managers conveyed about recommending an increase in the NUCYNTA ER dosage was based on a directive that had been conveyed to them from 'upper management.'" *Id.*

FE7 "confirmed" FE5's statements regarding instructions to increase the recommended dosage of NUCYNTA ER from 50 mg to 100 mg. *Id.* ¶ 155. FE7 alleges that dosage increase recommendations began in January 2017 but "had been happening before then as well." *Id.*

Defendants cite NUCYNTA ER's label, which, at the time the allegedly false statements

---

[2] As in its prior order, the Court finds that Plaintiffs have described the new FEs with sufficient particularity by providing "each witness's job description and responsibilities." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017). Because each new FE was a sales representative or specialist for Depomed during at least part of the Class Period, *see* SAC ¶¶ 124, 130, 136, 149, 153, 296, these descriptions "support the probability that a person in the position occupied by the source would possess the information alleged," *In re Quality Sys.*, 865 F.3d at 1145 (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)).



United States District Court Northern District of California

were made, "recommended initiating treatment at 50 milligrams twice daily for patients taking NUCYNTA ER as *a first opioid or for patients who were not opioid tolerant*."[3] ECF No. 92 at 13 (emphasis in original); ECF No. 92-2 at 4-5. Defendants note that the label "did not state a recommended starting dose *for all other patients*" and suggest that recommending a 100 mg starting dose for opioid tolerant patients would not have been off-label. ECF No. 92 at 13 (emphasis in original).[4] The SAC does not distinguish dosing practices for different types of patients, and in their opposition, Plaintiffs do not directly respond to this point, instead characterizing it as a "factual argument" that should be resolved in their favor on a motion to dismiss. ECF No. 94 at 15.

The Court agrees that, viewing the facts in the light most favorable to Plaintiffs, the SAC alleges that sales representatives were instructed to make off-label statements regarding dosing. While FE5 and FE7 do not allege that they were told to recommend 100 mg doses for patients who were not opioid tolerant or for whom NUCYNTA was their first opioid, FE5 does allege that he was told to "push NUCYNTA at higher starting doses than was approved on the label," that "this was definitely 'off-label' in regards to the recommended dosage," and that he thought at the time that it was "illegal." SAC ¶¶ 150-51. It is reasonable to infer from these statements that FE5 is alleging that sales representatives were told to recommend 100 mg doses for patients for whom such doses were not approved. *See Navarro*, 250 F.3d at 732 (on motion to dismiss, courts accept material facts alleged in complaint, together with reasonable inferences to be drawn from those facts, as true).

Defendants also argue that the statements by FE5 and FE7 are too vague to satisfy the

---

[3] Defendants urge the Court to incorporate NUCYNTA ER's label by reference. ECF No. 92 at 13 n.2. Plaintiffs do not object to this request. Under the doctrine of incorporation-by-reference, a court may consider documents not attached to the complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Since Plaintiffs' SAC hinges on allegations of off-label marketing, the Court holds that the contents of NUCYNTA ER's label are incorporated into the SAC.

[4] Defendants further note that in December 2016, NUCYNTA ER's label eliminated this distinction. ECF No. 92 at 13 n.3. Defendants claim this change is irrelevant because Plaintiffs do not allege any statements made after December 2016 that are false or misleading due to dosing practices. *Id*. Plaintiffs do not contest this in their opposition. ECF No. 94. The Court therefore finds this change immaterial to its analysis.



United States District Court
Northern District of California

PSLRA and that they do not assert personal knowledge that off-label recommendations of higher starting doses actually took place. ECF No. 92 at 14-15. Defendants' particularity argument fails. Like the confidential witnesses in *In re Gilead Sciences Securities Litigation*, FE5 alleges that "specific instructions were given to sales and marketing personnel to utilize off-label information to push sales of" the drug in question. No. C03-4999-MJJ, 2005 WL 181885, at *8-9 (N.D. Cal. Jan. 26, 2005). Like those witnesses, FE5 identifies the particular meeting at which he received these instructions, including its location, general time frame, and the specific manager who allegedly gave the instructions. *Id.* However, as in *Gilead*, FE5 and FE7 do not allege that the instructed activity "actually took place." *Id.* The *Gilead* court concluded that off-label marketing occurred only because the confidential witness allegations were corroborated by FDA letters specifically citing instances of off-label marketing by the company's sales representatives. *Id.* Plaintiffs' SAC provides no such corroborating evidence about the dosage instructions.

So, while Plaintiffs have sufficiently alleged that sales representatives were instructed to make off-label statements regarding dosage, their allegations fail to establish that this kind of off-label marketing actually took place, much less that it was part of a widespread campaign of off-label marketing. *See* ECF No. 83 at 12. Therefore, Plaintiffs fail to make a strong showing of off-label marketing on the basis of improper dosage statements.

**b. Use of Study**

Plaintiffs also allege that Defendants promoted NUCYNTA off-label by relying on a study comparing NUCYNTA ER to a competitor opioid. ECF No. 94 at 10. Plaintiffs cite the section of NUCYNTA ER's label that reads: "Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice." SAC ¶ 159; ECF No. 92-2 at 12. Plaintiffs allege that Depomed ignored this prohibition by publishing on its website "a study directly comparing rates of NUCYNTA ER to Oxycodone CR."[5] SAC ¶ 160; *see* ECF No. 87-3. The study looked at subjects experiencing

[5] Plaintiffs incorporate this portion of Depomed's website into their complaint. *See* SAC ¶ 160; ECF No. 87-3. Defendants do not object.



United States District Court
Northern District of California

"severe chronic low back pain" and compared their adverse reactions when treated with NUCYNTA ER, oxycodone CR, or a placebo. ECF No. 87-3 at 2. It included oxycodone "for analgesic assay sensitivity and not as a head-to-head comparator." *Id.*

Plaintiffs include in the SAC three charts from the study that appeared on Defendants' website. SAC ¶¶ 160, 162, 175. The first chart lists the incidence of adverse effects in subjects treated with NUCYNTA, a placebo, and oxycodone. *Id.* ¶ 160. The second chart shows the percentage of NUCYNTA-treated patients who experienced withdrawal after abrupt discontinuation of treatment. *Id.* ¶ 162. The third chart shows rates of discontinuation due to adverse effects in patients treated with NUCYNTA, a placebo, and oxycodone. *Id.* ¶ 175. The top of the first and third charts indicates that "[o]xycodone CR was included in the study as an active control to confirm the sensitivity of the pain models." *Id.*

Plaintiffs allege that on March 23, 2016, Depomed's Chief Commercial Officer ("COO") told analysts and investors that NUCYNTA had a "well-documented and a solid tolerability and safety profile. And a very important thing that we've been able to communicate is that if the product is discontinued, 95% of these patients will not experience withdrawal, and that's a far better statistic than all other long-acting opioids have, and that infers a lot of good things about the product to physicians." SAC ¶ 163.

Plaintiffs additionally allege that Depomed instructed sales representatives and physician speakers to use the study to support off-label claims that NUCYNTA was safer and less addictive than other opioids. *Id.* ¶¶ 164-65; ECF No. 94 at 10. FE5 identifies the study as a "Comprehensive Visual Aid" ("CVA") that Depomed distributed to sales reps for marketing purposes. *Id.* ¶¶ 165-67. FE5 alleges that instead of "tell[ing] the story" of the drug by emphasizing things like NUCYNTA's efficacy and side-effects, "sales representatives would [use the study to] represent to the prescribers that 'what we really show here is 90% of patients having no withdrawal.'" *Id.* ¶ 169. FE5 recounts an instance "where he used this study and got 'called out' by a doctor," who argued that it "did not validate a low addictive risk for NUCYNTA ER



United States District Court
Northern District of California

given Oxycodone's well-known addictiveness." *Id.* ¶ 166.

FE7 also identifies this study as "one of the main forms of off-label marketing." *Id.* ¶ 170. FE8 alleges that he "vaguely remembers" a study suggesting that "the percentage of users experiencing withdrawal was supposed to be lower with NUCYNTA than it had been with other opioids, like OxyContin." *Id.* ¶ 171. FE8 "indicated that during sales calls he would talk about the study and what the study said, but if he were asked if the study meant something one way or another, his stock answer was that 'the data is what it is' and that the questioner needed to draw his or her own conclusions." *Id.* ¶ 172. "FE8 would say whatever the withdrawal rate was per the study and if someone questioned him whether NUCYNTA was safer, he would answer that he could not speak to that." *Id.* ¶ 173. FE9 states "he was not totally sure at this point what exactly had been problematic about the study," but "as best he could recall . . . the two drugs were being compared to one another [and] the study had not completely compared them 'at every measure and point.'" *Id.* ¶ 174.

Defendants point out that NUCYNTA ER's label discussed this particular study, which "was one of the pivotal studies underlying the FDA's approval" of the drug. ECF No. 92 at 16; *see* ECF No. 92-2 at 12-14 (summarizing study's findings of adverse reactions in patients treated with NUCYNTA ER versus a placebo); *id.* at 28-29 (summarizing this study and four others demonstrating drug's efficacy, comparing NUCYNTA to placebo). Defendants argue that "accurate presentation of the data from a study . . . *cannot* constitute off-label marketing." ECF No. 92 at 16. Defendants cite a June 2018 FDA guidance for this proposition, though they do not move for judicial notice of this document. *Id.* While Plaintiffs do not object to consideration of this guidance, they argue that it does not support Depomed's argument because it was published after the Class Period ended.[6] ECF No. 94 at 15. In their reply, Defendants cite a January 2017 draft FDA guidance making the same points as the 2018 one. ECF No. 96 at 7 n.1; ECF No. 96-2. While Defendants have not moved for judicial notice of this document either, the Court *sua sponte*

[6] Plaintiffs argue that the June 2018 guidance was published "at least two years after the Class Period," ECF No. 94 at 15, but the Court notes that it in fact was published less than one year after the Class Period ended in August 2017.

takes judicial notice of both the 2018 guidance and the 2017 draft guidance. *See* Fed. R. Evid. 201(c)(1); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("[A] court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment[,]" as long as the matters are not "subject to reasonable dispute"); *Wilson v. Frito-Lay N. Am., Inc.*, 260 F. Supp. 3d 1202, 1207 (N.D. Cal. 2017) ("Courts routinely take judicial notice of similar FDA guidance documents, many of which also appear on the FDA's public website.").

These guidance documents provide "examples of the kinds of information that could be consistent with the FDA-required labeling for a product," including:

> Information based on a comparison of the safety or efficacy of a medical product for its approved/cleared indication to another medical product approved/cleared for the same indication (e.g., a firm's communication provides information from a head-to-head study indicating that its drug that is approved to treat high blood pressure in adults has superior efficacy to another drug that is also approved to treat high blood pressure in adults)

ECF No. 96-2 at 8. Defendants argue that they accurately described the results of the disputed study on their website and in their marketing materials, which "disclosed precisely what role Oxycodone played in the study." ECF No. 96 at 7. Plaintiffs fixate on the fact that the study was not "head-to-head," ECF No. 94 at 15, but this is neither here nor there – all the materials Plaintiffs cite accurately describe the role of oxycodone in the study. Additionally, the FDA guidance mentions a "head-to-head study" as an *example* of the type of information that, presuming it is accurate, may be relayed in marketing materials. ECF No. 96-2 at 8-9 (prohibiting "false or misleading" representations). The fact that this particular study was not head-to-head does not mean that Defendants were not permitted to describe its results in marketing their drug.

Neither do Plaintiffs' allegations support an inference that Defendants relied on the study in violation of NUCYNTA's label. Where the label language Plaintiffs cite prohibits direct comparison of "adverse reaction rates observed in the clinical trials of a drug . . . to rates in the clinical trials of another drug," SAC ¶ 159, the data at issue here was gathered in *the same study*, ECF No. 92 at 17. Plaintiffs have thus failed to allege that Defendants' written materials relied on the study in an off-label manner. However, because NUCYNTA's label did not approve the drug

as safer or less addictive than other opioids, *see* ECF No. 92-2 at 1, relying on the study to demonstrate that NUCYNTA was safer or less addictive than oxycodone would have been off-label marketing.

Defendants argue that FE5's story about citing the study to a doctor and getting "called out" does not show that Depomed relied on the study to compare NUCYNTA to other opioids because "FE5 does not allege that he told this doctor, or any doctor, that NUCYNTA was safer" and because "the study itself does not characterize the results as showing NUCYNTA was safer." ECF No. 92 at 10. Read in context, however, FE5's statement clearly alleges that he used the study to compare NUCYNTA to oxycodone when discussing the drug with the doctor. SAC ¶ 166. FE5 characterizes the study as showing "NUCYNTA ER as being less prone to abuse by patients" and recalls that the doctor pushed back on this assertion by noting how addictive oxycodone is. *Id.* It is reasonable to infer from this exchange that FE5 had compared the addictiveness of NUCYNTA ER and oxycodone to the doctor, thereby engaging in off-label marketing. *See Navarro*, 250 F.3d at 732.

While Plaintiffs have sufficiently alleged that at least one Depomed salesperson marketed NUCYNTA off-label, the SAC does not support the inference that this practice was systematic and widespread. FE7's allegation that the study was "one of the main forms of off-label marketing," *id.* ¶ 170, is too conclusory to meet the PSLRA's particularity requirement. *See Iqbal*, 556 U.S. at 678; *In re Cutera Sec. Litig.*, 610 F.3d at 1108. While FE9 confirms the existence of the study, he makes no allegations as to how it was used in marketing NUCYNTA. *Id.* ¶ 174. And FE8 in fact emphasizes that he was careful *not* to tell prescribers that the study showed that NUCYNTA was safer than other opioids. *Id.* at 18-19.

Plaintiffs have alleged that sales representatives were instructed to invite prescribers to infer that NUCYNTA was safer than other opioids, and that at least one sales representative made this claim explicitly while marketing the drug to a prescriber. Plaintiffs admit that the study was primarily used to imply that NUCYNTA was a safer opioid, alleging that "[t]his study was Depomed's way to show physicians that NUCYNTA was safer and less abusive than other opioids, *without directly stating so*." SAC ¶ 177 (emphasis added). The statement by Depomed's

COO additionally supports an inference that off-label statements were made to investors, but not that systematic off-label marketing was occurring on the ground.

Plaintiffs rely on *In re Syncor International Corp. Securities Litigation*, 239 F. App'x 318 (9th Cir. 2007) to argue that they have alleged sufficient facts to "suggest that [the off-label marketing scheme was] in fact a significant reason for [NUCYNTA's] growth."[7] ECF No. 94 at 10. In that case, the Ninth Circuit relied on statements by a company's executives to infer that the company had engaged in illegal activity. *Syncor*, 239 F. App'x at 320 ("When corporate officers credit an illegal payment scheme for raising revenues, a reasonable inference is that the scheme *did* raise revenues."). The executives in *Syncor*, however, had "used terms such as 'bribe' and 'buying off doctors' . . . ." *Id.* at 321. While the Ninth Circuit's memorandum disposition does not analyze other facts supporting an inference that illegal activity was occurring, the statement Plaintiffs cite by Depomed's COO comes nowhere near such a specific admission that the company's sales team was marketing the drug off label.

Plaintiffs also compare the study to the "sales aid" used in *In re Amgen Inc. Securities Litigation*, 544 F. Supp. 2d 1009 (C.D. Cal. 2008). ECF No. 94 at 12. In that case, a description of a specific "sales aid" with a list of questions related to off-label promotion contributed to an inference of off-label marketing. *Amgen*, 544 F. Supp. 2d at 1033. Here, Plaintiffs have presented a study specifically referenced in NUCYNTA's label. Plaintiffs do not allege that Depomed inaccurately relayed the results of this study. Instead, they allege that sales representatives were instructed to, and in at least one instance did, refer to the study when making a claim about NUCYNTA that was not approved on its label. Whereas the *Amgen* sales aid provided written instructions for how to market the drug off label, the study here is innocent on its own. Any inference of off-label marketing hinges on how sales representatives used this study when speaking with prescribers, and Plaintiffs have not alleged more than one instance of actual off-label marketing based on the study.

Accordingly, these new allegations support at most a weak inference of a widespread off-

---

[7] Pursuant to Ninth Circuit Rule 36-3, the Court considers this unpublished disposition as persuasive authority.



United States District Court
Northern District of California

label marketing campaign.

**c. Paid Speaker Program**

The SAC also alleges that Depomed engaged in off-label marketing via a "kickback scheme" in which it "hired speakers to promote its drugs and trained them to make the very same misrepresentations made by its sales representatives." SAC ¶¶ 5, 204. Plaintiffs allege that Depomed paid these physician speakers "with the understanding that, in exchange, the physicians would preferentially prescribe or indicate the use of NUCYNTA to treat patients." *Id.* ¶ 206. Plaintiffs claim that "[t]he criteria used to determine which physicians to offer speaker positions depended primarily upon the volume of NUCYNTA prescriptions written" rather than their "academic or clinical accomplishments." *Id.* ¶¶ 211-12. The SAC alleges that this program "incentivized physicians to prescribe NUCYNTA off-label, as well as promote NUCYNTA off-label during speaker arrangements." *Id.* ¶ 219.

FE6 alleges that three particular district managers told him "that a criterion for a physician who wanted to become a speaker was to tell them that they had to write prescriptions of Depomed products. FE6 was told to ask the physicians how they could expect to be speakers of NUCYNTA if they had not used the products." *Id.* ¶ 214. "For instance, FE6 would say something like, 'I know you want to be a speaker, here's what you need to do.'" *Id.* FE6 further alleges that speakers were paid approximately $1,000-$1,500 per presentation. *Id.* ¶ 215. "FE6 explained that in order for a physician to be considered as a speaker, a 'ballpark' estimate of what would be an acceptable number of prescriptions for the physician to write was perhaps 60 a week . . . ." *Id.* FE6 alleges that "his speakers used the official slide-deck and package insert data provided by Depomed," which Plaintiffs allege was off-label because it incorporated the study discussed above.[8] *Id.* ¶ 218. FE7 describes a particular speaking engagement that Plaintiffs argue shows that "Depomed paid physicians to get in their good graces and to incentivize them to write

[8] Plaintiffs allege here that this study was "not approved by the FDA." SAC ¶ 218. Because NUCYNTA's label explicitly references this study, and because Plaintiffs do not make this argument when discussing the study directly, the Court assumes they mean to allege that the FDA had not approved marketing of the drug based on this study.



United States District Court
Northern District of California

NUCYNTA prescriptions." *Id.* ¶¶ 216-17.

Nearly all of these allegations, however, are that Defendants paid physician speakers to *write more prescriptions* of NUCYNTA, not to market or promote it off-label. The only such allegation, about use of the official slide-deck and package insert, fails for the same reason Plaintiffs' allegations about the broader use of the study do. And even if allegations that NUCYNTA was prescribed for off-label purposes could somehow support Plaintiffs' falsity argument, the SAC merely implies that such activity was occurring. Plaintiffs allege no instance in which a doctor prescribed NUCYNTA for an off-label purpose.

Accordingly, these allegations do not support an inference of widespread off-label marketing.

#### d. Other Alleged Off-Label Activity

Plaintiffs make various other allegations of off-label activity. First, multiple FE's allege that their supervisors told them to tell prescribers that NUCYNTA was safer than other opioids because it had "no street value," i.e., it was less susceptible to abuse. FE6 alleges that, during regional breakout sessions at sales meetings, "upper management" told sales representatives that they "could say that NUCYNTA 'can't be abused because there was no street value,'" in contrast to oxycodone. SAC ¶ 125. Specifically, FE6 alleges that district managers Jessica Golino and John Hardiman made these representations to him and other sales reps, though he does not give specific information about the sales meeting(s) at which these representations were made. *Id.* ¶ 126. FE6 further alleges that Golino "strongly implied and reinforced" that NUCYNTA did not have street value when she accompanied FE6 on provider visits, suggesting afterwards that he "us[e] 'that verbiage.'" *Id.* ¶ 127. He also states that Golino and Hardiman wanted sales representatives "to be proactive in making these representations (that NUCYNTA gave 'less of a high' and was not as addictive to [sic] Oxycodone) to prescribers, as opposed to only making these representations in response to questions posed by the prescribers." *Id.* ¶ 129.

FE8 echoes these claims, stating that the street value of pain medications was discussed during sales personnel meetings, but that this information was supposed to be "for your information only" and "he could not say 'who did or who did not' engage in off-label

practices." *Id.* ¶ 132. FE9 states that sales representatives were supposed to tell prescribers that "NUCYNTA has 'less than 1% euphoria'" for all indications despite the fact this statistic "was only supported by a study involving lower back pain." *Id.* ¶ 137. Plaintiffs further allege that sales representatives faced negative evaluations for declining to make such representations. *Id.* ¶¶ 199-200.

FE9 is the only FE to allege a particular instance in which NUCYNTA's street value was discussed with a prescriber. During a sales lunch attended by himself, Kristen Knight (who was then a regional account manager), and a potential prescriber, Knight allegedly "told the prescriber that 'NUCYNTA had no street value and was not really a Schedule II drug.'" *Id.* ¶ 138. While FE9 does not give a date or location for this meeting, the Court finds that FE9 has sufficiently established personal knowledge by identifying a particular meeting he attended, the time of day the meeting occurred, the identity of at least one additional participant, and the contents of a statement by that participant. *See Zucco Partners*, 552 F.3d at 996 (holding personal knowledge of confidential witnesses insufficient where allegations were based on double or triple hearsay and lacked detail).

Defendants argue that the SAC does not allege whether this statement took place during the Class Period. ECF No. 92 at 10. Plaintiffs respond that the lunch must have taken place within the Class Period because "Depomed only start[ed] promoting NUCYNTA in mid-June 2015 and FE9 left Depomed in September 2016." ECF No. 94 at 16. Even if the lunch had taken place in the one to two months before the Class Period began on July 29, 2015, Plaintiffs assert, the allegations would still be relevant because "the misrepresentations include whether Depomed was found to have ever promoted NUCYNTA off-label." *Id.* However, the Court need not reach the question whether the allegation would still be relevant even if the meeting occurred before the Class Period began because this single allegation of off-label marketing does not raise an inference that the practice was systematic. As with their dosage and study-related allegations, Plaintiffs' allegations related to the "street value" of NUCYNTA mostly concern alleged instructions given by sales managers to their reports, and at least one of these allegations actually undercuts the idea that such practices were widespread. *See id.* ¶ 132 (FE8 recalling that "street value" discussion



United States District Court
Northern District of California

"was supposed to be 'for your information' only" and that "he had been 'smart enough' to know better than to make such representations").

Plaintiffs next allege that Depomed improperly "represented that NUCYNTA was safer by indicating that NUCYNTA . . . did not have the same addictive properties as other opioids because NUCYNTA has 'dual mechanisms of action.'" *Id.* ¶ 107; *see also id.* ¶ 311. However, they make no specific allegations of anyone making this claim to a prescriber. Plaintiffs also allege that "Depomed told its sales team that taking NUCYNTA IR and ER together was safe," despite the fact that NUCYNTA ER's label instructs patients to "discontinue all other [opioid products]." *Id.* ¶ 156. To that end, FE9 stated that a particular district manager instructed sales representatives to "say that many doctors were using NUCYNTA ER and NUCYNTA IR together." *Id.* ¶ 157. Again, however, Plaintiffs' allegations are limited to instructions to sales representatives; they cite no instance in which a representative relayed this claim to a prescriber.

Plaintiffs also allege that "[a]t least thirty-eight opioid lawsuits have been filed against Depomed between March 2018 and December 2018" and that "[m]any of these allegations show that Depomed engaged in off-label marketing and directly contributed to the opioid crisis." SAC ¶ 256; *see also id.* ¶ 257 (listing lawsuits). According to Plaintiffs, these lawsuits "allege that Depomed engaged in an intentional and deceptive marketing campaign to promote the use of prescription opioids, including NUCYNTA." *Id.* ¶ 258. While complaints in other cases "may come into the mix of the materials considered by the court on a motion to dismiss" a securities class action complaint, *In re Connectics Corp. Sec. Litig.*, 542 F. Supp. 2d. 996, 1005 (N.D. Cal. 2008) (citing *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1080, 1083 (N.D. Cal. 2001)), Plaintiffs' summaries of these complaints are not particular enough to assess whether the complaints do in fact corroborate Plaintiffs' allegations. The *In re Cylink* court found that allegations in an SEC complaint combined with allegations by the plaintiffs to create an inference of scienter where plaintiffs' complaint had referred to particular transactions and allegations from the SEC complaint. 178 F. Supp. 2d at 1082-1084. Here, the SAC makes only general references to the contents of the 38 complaints. *See* SAC ¶ 259 (complaints allege that Depomed used six "deceptive marketing" tactics); *id.* ¶ 260 (complaints "allege that Depomed made these materially

false representations directly to doctors and patients through advertising campaigns and 'detailers' (sales representatives who directly targeted doctors)"); *id.* ¶ 261 (complaints "allege that Depomed marketed their products indirectly to avoid FDA scrutiny and regulation"). The Court cannot retrieve the 38 complaints listed in the SAC and comb through them for potentially relevant material. *Cf. Californians for Renewable Energy v. California Pub. Utilities Comm'n*, 922 F.3d 929, 935-36 (9th Cir. 2019) (on summary judgment, it is not the court's "task . . . to scour the record in search of a genuine issue of triable fact" (quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)). Without more specific citations and comparisons to these complaints, the Court cannot evaluate whether they do in fact corroborate Plaintiffs' own allegations.

Lastly, Plaintiffs cite a report resulting from an investigation by the Senate Homeland Security and Governmental Affairs Committee into Depomed and various other opioid manufacturers. *See* ECF No. 94 at 13. This report, however, was about third-party advocacy of opioid policy. Plaintiffs' claim that the report's conclusion that "Depomed paid over $1 million dollars to promote opioid use to third parties suggests that they also encouraged the off-label marketing scheme," *id.*, is conclusory.[9]

"Taken collectively," *In re Quality Sys.*, 865 F.3d at 1145 (citation omitted), Plaintiffs have again failed to allege a widespread campaign of off-label marketing. The most generous reading of the SAC alleges that Defendants instructed sales representatives, sometimes implicitly and sometimes explicitly, to pitch NUCYNTA as a safer, less addictive drug than other opioids. But the SAC alleges just two new instances of actual off-label marketing. *See* ECF No. 83 at 12 (finding that FAC alleged just one instance of off-label marketing). Without corroborating evidence in the form of the FDA letters in *Gilead*, 2005 WL 181885, at *8-9, the sales aids in *Amgen*, 544 F. Supp. 2d at 1033, or the FDA and U.S. Attorney's investigations in *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 233-37 (1st Cir. 2015), these one-off

[9] As for Plaintiffs' allegations regarding Depomed's retention of Quintiles, the sales team used by NUCYNTA's prior manufacturer, the Court again finds it unreasonable "to infer that in the face of [ongoing litigation over Janssen's sales tactics], [Depomed] continued the same disputed off-label marketing, absent the pleading of specific facts related to [Depomed's] practices." ECF No. 83 at 10.



United States District Court
Northern District of California

United States District Court
Northern District of California

allegations do not support an inference of the sort of widespread practices necessary to support Plaintiffs' theory of falsity. *See* ECF No. 83 at 13-14.

**1. Statements Regarding NUCYNTA Sales**

As with the FAC, Plaintiffs' failure to plead a widespread off-label marketing campaign dooms their claim that Defendants' statements about Depomed's sales were materially false or misleading because they omitted the fact that growth in sales was due in part to an illicit off-label marketing campaign for NUCYNTA. The Court incorporates the analysis from its prior order in holding that this category of statements was not materially misleading. *See* ECF No. 83 at 15-17.

Plaintiffs cite cases that establish that public statements that omit key facts can be materially misleading. ECF No. 94 at 18 (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1010 (9th Cir. 2018); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016)). This gets them no closer, however, to establishing the key facts they allege Defendants omitted. Likewise unavailing is Plaintiffs' attempt to assuage the Court's concerns about the "'long chain of inferences' necessary to make the failure to discuss off-label marketing material." ECF No. 83 at 15 (quoting *Abiomed*, 778 F.3d at 242). Plaintiffs point to the FDA letters in *Abiomed* to bolster their argument that Defendants "actively concealed" their off-label marketing campaign, ECF No. 94 at 19, while glossing over the fact that in *Abiomed*, those letters were one of the reasons the court found that the plaintiffs had sufficiently alleged widespread off-label marketing, 778 F.3d at 243. Because Plaintiffs have still not alleged that underlying fact, they have progressed no further along the chain of inferences necessary to establish falsity and materiality.

**2. Risk Statements**

Plaintiffs' claim that Defendants' statements in SEC filings were materially false or misleading because they disclosed the general risk of liability from off-label marketing without indicating that Depomed was engaged in that activity fails for the same reason. Because Plaintiffs have still not adequately pleaded a widespread off-label marketing scheme, they have not sufficiently alleged that Depomed materially misstated the likelihood or extent of regulatory risks. The Court incorporates the analysis from its prior order and holds that this category of statement

was also not materially misleading. *See* ECF No. 83 at 17-18.

### 3. Statements Regarding CDC Guidelines and Opioid Headwinds

Plaintiffs allege what they characterize as a new, "separate" category of materially false or misleading statement related to guidelines that the Centers for Disease Control and Prevention ("CDC") issued in March, 2016 restricting primary care physicians' ability to prescribe opioids. ECF No. 94 at 21. Defendants argue that this theory is in fact a sub-category of statements about NUCYNTA sales and that it is thus "intertwined with the off-label marketing allegations" and fails for the same reason as the other allegedly false statements.[10] ECF No. 96 at 11.

Plaintiffs' theory seems to be that, because Depomed specifically targeted primary care physicians, the CDC guidelines caused Depomed's sales to drop. ECF No. 94 at 21-22. Plaintiffs allege that, despite this reality, Depomed falsely indicated that it was not at risk for declining sales. *Id.* Plaintiffs claim that Depomed's assertions were false because, on November 7, 2016, Individual Defendant Schoeneck admitted that NUCYNTA sales were lagging and that "a piece of that is certainly the opioid market." *Id.* at 23; SAC ¶ 393. Plaintiffs cite similar statements by other Individual Defendants and on Depomed's Second Quarter 2017 Form 10-Q admitting a downtick in NUCYNTA sales as a result of the CDC guidelines and other "headwinds" in the opioid market. ECF No. 94 at 23; SAC ¶¶ 409, 420, 433. Plaintiffs also offer statements from FEs to show that employees knew the negative opioid headwinds, and specifically the CDC guidelines, were cutting into NUCYNTA sales even as Depomed indicated it was positioned for growth. SAC ¶¶ 265-304.

In support of this theory, Plaintiffs cite two different kinds of statement: (1) statements alleging that Depomed was uniquely immune from the negative effect the CDC guidelines were

---

[10] Plaintiffs argue that Defendants "have waived their right to raise any arguments on this point" because they "[did] not even attempt to address these false and misleading statements in their brief." ECF No. 94 at 22. However, Defendants' motion to dismiss engages directly with Plaintiffs' theory that Defendants' statements about NUCYNTA sales and Depomed's ability to weather negative headwinds in the opioid market were materially false or misleading because they failed to disclose the existence of an off-label marketing campaign. *See, e.g.*, ECF No. 92 at 9. Because the Court holds that Plaintiffs' arguments regarding the CDC guidelines reflect this theory, it rejects their argument that Defendants waived their right to respond to Plaintiffs' arguments on this point.

having on opioid prescriptions, *see, e.g.*, SAC ¶¶ 266, 366, and (2) broader allegations that "NUCYNTA was uniquely positioned to combat the negative public sentiment against opioids," *id.* ¶ 264; *see also, e.g.*, *id.* ¶¶ 384-85. The Court has already held that the second category of statement is dependent upon sufficient allegations of widespread off-label marketing. ECF No. 83 at 15. Because the SAC does not make such allegations, Plaintiffs fail to allege that this category of statement was materially false or misleading.

Plaintiffs seem to argue, however, that the first category of statement – those specific to Depomed's ability to weather the effects of the CDC guidelines – does not rest on allegations of off-label marketing. *See* ECF No. 94 at 21; SAC ¶ 266 (statements were materially false because "[i]n reality, the opioid headwinds were heavily affecting NUCYNTA prescriptions because NUCYNTA was a Schedule II opioid subject to the same laws and regulations as other opioids"); *id.* ¶ 366 (statement was false because "in reality, Depomed was just as susceptible to the opioid scrutiny as other Schedule II drugs"). As in their FAC, Plaintiffs do not allege that Defendants conveyed factually inaccurate information about the status of NUCYNTA sales. *See* ECF No. 83 at 15. Rather, their claims are premised on an omissions theory, i.e., that Defendants should have disclosed the risks inherent to their off-label marketing of NUCYNTA. *See id.*; *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("To be actionable under the securities laws, an omission must . . . affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.").

Plaintiffs present no alternative theory as to why Defendants' statements regarding their ability to weather the impact of the CDC guidelines were materially false or misleading. In fact, Plaintiffs' opposition brief appears to confirm that this theory is in fact identical to their broader theory regarding Defendants' statements about their ability to combat negative public sentiment against opioids. *See* ECF No. 94 at 24 (arguing that the statements about the CDC guidelines were materially false because, at the time they were made, "the CDC guidelines and market headwinds were already having a direct impact on Defendants' *off-label marketing scheme*"). The Court thus agrees with Defendants that this category of statement was not materially false or misleading because it too hinges on adequate allegations of off-label marketing. For this reason, the Court

need not reach Defendants' argument that the challenged statements are inactionable as examples of corporate puffery. *See* ECF No. 96 at 12-13; *see Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017) ("In the Ninth Circuit, vague, generalized assertions of corporate optimism or statements of mere puffing are not actionable material misrepresentations under federal securities laws because no reasonable investor would rely on such statements.") (citation and quotation marks omitted).

**B. Scienter**

Plaintiffs premise their scienter arguments on the existence of a "systematic, widespread off-label marketing campaign for NUCYNTA," arguing that it "it necessarily follows that Depomed (and, for that matter, its senior officers) 'either knew of, or [were] willfully blind to, [Depomed's] own off-label marketing.'" ECF No. 94 at 25 (citing ECF No. 83 at 21). Because Plaintiffs have failed to adequately plead that such a campaign existed, their scienter arguments "necessarily" fail. *Id.* Even if Plaintiffs had sufficiently pleaded such a campaign, however, their SAC would still fail to raise a strong inference of scienter.

Plaintiffs allege both individual and collective scienter. *See id.*; *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (In the Ninth Circuit, it is "possible to raise the inference of scienter without doing so for a specific individual," such as where "a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication.") (quoting *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008)). Plaintiffs argue that Depomed, if not the Individual Defendants, "acted with actual awareness or deliberate recklessness." *See* ECF No. 94 at 25. They also rely on the core operations doctrine to argue that "it would be 'absurd' to suggest an absence of knowledge" given the significance of "the alleged wrongdoing relative to [Depomed's] overall operations." *Id.* Lastly, they make new allegations regarding Depomed's and the Individual Defendants' motives.

The Court addresses collective and individual scienter separately before considering all of the relevant allegations holistically. *See Curry*, 875 F.3d at 1226.



United States District Court
Northern District of California

**1. Collective Scienter**

Defendants cite four categories of new allegation to support an inference of scienter: (1) statements from the new FEs alleging "a company-wide policy of off-label marketing"; (2) "additional details of how Depomed personally trained the sales representatives and speakers to promote NUCYNTA off-label"; (3) "allegations that Depomed fostered a culture of doing anything – including the marketing of NUCYNTA off-label – to increase the growth of NUCYNTA"; and (4) "allegations of payments to prescribers through speaking engagements." ECF No. 94 at 25.

Because the Court has found that the new FE statements do not allege a company-wide policy of off-label marketing, the first category does not support an inference of scienter. The Court considers the other allegations through the lens of collective scienter, which allows an inference of scienter where "a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1063 (quoting *Glazer Capital Mgmt.*, 549 F.3d at 743). As discussed above, Plaintiffs' allegations of falsity depend on their allegations of off-label marketing. Because these allegations fail, the SAC does not raise an inference of collective scienter.

**2. Individual Scienter**

Plaintiffs do not allege that the Individual Defendants acted with actual knowledge. ECF No. 94 at 25. Instead, they invoke the core operations doctrine, under which "[a]llegations regarding management's role may help satisfy the PSLRA scienter requirement . . . where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights*, 856 F.3d at 616. Because Plaintiffs do no more to support this point than reiterate their allegations of systematic off-label marketing, however, this argument does not add to the scienter analysis. ECF No. 94 at 25.

Plaintiffs devote most of their scienter argument to new allegations of motive. Since the Court has rejected Plaintiffs' collective scienter argument, it considers only Plaintiffs' motive

United States District Court
Northern District of California

allegations specific to Individual Defendants. Plaintiffs allege that Defendants "Schoeneck, Higgins, and Moretti were under pressure from activist investors to increase NUCYNTA revenues at any cost" and that "[t]his pressure threatened the Individual Defendants' positions with the company and gave rise to a serious fear that they would lose their jobs, which some ultimately did." *Id.* at 26 (citing SAC ¶¶ 644, 648). Plaintiffs cite letters sent by Starboard Value LP, an activist investor, to Depomed leadership and shareholders expressing concerns with that leadership and outlining a plan to replace Depomed's board. SAC ¶¶ 645-57. While the threat of termination can contribute to an inference of scienter, *see, e.g., Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 15-7658 (MAS) (LHG), 2017 WL 1658822, at *8, *11 (D.N.J. Apr. 28, 2017), Plaintiffs cite no case in which this factor was sufficient to support a finding of scienter on its own.

Plaintiffs attempt to bolster their motive argument by citing a February 12, 2018 report resulting from a Senate investigation of the opioid industry. ECF No. 94 at 25-26. This report found that opioid manufacturers, "including Depomed, provided millions of dollars to groups that echoed and amplified messages favorable to increased opioid use"; "issued guidelines and policies minimizing the risk of opioid addi[c]tion and promoting opioids for chronic pain"; "lobbied to change laws directed at curbing opioid use, and argued against accountability for physicians and industry executives responsible for over prescription and misbranding"; and "strongly criticized the 2016 guidelines from the CDC that recommended limits on opioid prescriptions for chronic pain." SAC ¶ 440. Plaintiffs do not allege that the report made any claims about off-label marketing. Based on the authority they cite, their theory seems to be that this report demonstrates a general willingness to engage in "scheme[s] to increase company profits," which should support an inference of scienter. ECF No. 94 at 26 (citing cases in which the "lucrative nature" of schemes at issue contributed to inference of scienter). Given that the "scheme" at the heart of the SAC – off-label marketing – does not appear to be a subject of the report, these cases do not support including the report in the holistic scienter analysis.

The Court thus holds that the 2018 Senate report is not relevant to the scienter analysis and that pressure from investors contributes at most a weak inference of individual scienter.

**3. Holistic Review**

In its prior order, the Court held that several other allegations raised weak inferences of scienter. ECF No. 83 at 19 (unclear statement by FE3 regarding Schoeneck); *id.* at 21-22 (Individual Defendants' compensation tied to corporate objectives and stock options). In its holistic analysis, the Court also considered allegations that did not contribute to an inference of scienter on their own. *Id.* at 24 ("boilerplate allegations of Moretti's and Higgins's general awareness of the day-to-day workings of the company's business") (internal quotation marks and citation omitted); *id.* at 25 (fact that Shoeneck resigned on same day Senate investigation was announced). Since the SAC repeats these allegations, *see* ECF No. 94 at 27 n.6, the Court will again consider them in its holistic analysis.

The only new factor the Court considers is the alleged pressure on Individual Defendants from activist investors. This combination is not sufficient "to create a strong inference of intentional conduct or deliberate recklessness." *Curry*, 875 F.3d at 1226 (citation omitted). The Court again finds that these allegations do not overcome the competing inference that the Individual Defendants were unaware that in some instances NUCYNTA sales representatives crossed the line into promoting off-label uses, therefore rendering Defendants' statements regarding NUCYNTA sales and regulatory risk materially misleading.

**C. Loss Causation**

Plaintiffs' loss causation argument also hinges on sufficiently pleaded off-label marketing. *See* ECF No. 94 at 28 (arguing that "corrective disclosures . . . related to Depomed's off-label marketing campaign" revealed "the concealed facts . . . that Depomed was engaging in an illicit off-label marketing campaign"). Because Plaintiffs have not made these underlying allegations, their loss causation theory is untenable. Rather than re-address this theory, the Court incorporates the loss causation analysis from its prior order. *See* ECF No. 83 at 25-31. It will briefly address Plaintiffs' new allegations, however, which do not alter this analysis.

First, Plaintiffs have added two statements regarding the effect of the CDC guidelines on NUCYNTA prescriptions. SAC ¶ 668 (attributing a decline in "the average daily dosage" of NUCYNTA to "the reinforcement of the start low, go slow mantra in the CDC guidelines"); *id.*

United States District Court
Northern District of California

¶ 670 ("these guidelines have resulted in a more significant decline in the opioid market than we projected, both in terms of fewer prescriptions and lower daily doses"). Plaintiffs have not, however, added any new allegations to "connect the risks of the alleged off-label marketing to a subsequent stagnation or decrease in off-label prescriptions underlying the negative financial news released on Plaintiffs' loss causation dates," as the Court instructed in its prior order. ECF No. 83 at 27-28. They have not pleaded additional facts as to "the scale of off-label marketing of NUCYNTA, its off-label prescriptions, or the curtailment of those prescriptions." *Id.* at 28. Accordingly, these new statements do not change the Court's analysis as to Defendants' lowered revenue projections.

Second, Plaintiffs cite the February 12, 2018 Senate report on misfeasance in the opioid industry. SAC ¶¶ 667-68. This report, however, was issued six months after the class period ended and thus cannot logically constitute a "'corrective disclosure[]' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd*, 811 F.3d at 1209 (quoting *Halliburton*, 134 S. Ct. at 2406). Plaintiffs argue that it supports their loss causation theory because it shows "that the risks arising from Depomed's off-label marketing campaign continued to materialize as time progressed." ECF No. 94 at 29 n.8. This allegation, however, lacks the particularity required by the PSLRA and Rule 9(b). *See Or. Pub. Emps. Ret. Fund*, 774 F.3d at 608. As the Court noted in holding that the announcement of the Senate investigation did not support loss causation, the investigation focused on the opioid industry as a whole, rather than Depomed in particular.[11] ECF No. 83 at 30. Neither does it appear to make any findings as to off-label marketing. As in *Oregon Public Employees Retirement Fund*, where the Ninth Circuit held that a "report focused on the for-profit education industry as a whole" did not allege a causal

[11] *Evanston Police Pension Fund v. McKesson Corp.*, No. 19-cv-06525, 2019 WL 5587311 (N.D. Cal. Oct. 30, 2019), which Plaintiffs cite in a sur-reply, ECF No. 108, and Depomed responds to, ECF No. 109, does not change the Court's calculus as to the announcement of the investigation. *Evanston* followed *Lloyd*, 811 F.3d at 1210, in holding that disappointing financial results, combined with the announcement of government price-fixing investigations, sufficed to allege loss causation. *Id.* at *14. Nothing about this application alters the Court's own application of *Lloyd* to Plaintiffs' allegations in the FAC. *See* ECF No. 83 at 29-30. As the SAC does not materially add to these allegations for the purpose of loss causation, this analysis remains the same.

United States District Court
Northern District of California

connection between the defendant's misrepresentations and investor losses, *id.*, the Senate report here does not support a connection between Depomed's marketing activities and an economic loss by Plaintiffs.

Lastly, Plaintiffs cite the lawsuits filed against Depomed in 2018. SAC ¶¶ 679-682. As these suits were also filed after the class period ended, Plaintiffs appear to rely on them as corroboration of the widespread off-label marketing that they allege was responsible for their losses. *See* ECF No. 94 at 29 n.8. This argument blurs into Plaintiffs' theory of falsity, which the Court has rejected.

Because Plaintiffs' new allegations do not connect the causal deficiencies the Court identified in its prior order, they have again failed to plead loss causation. Accordingly, the Court dismisses Plaintiffs' Section 10(b) and Rule 10b-5 claim.

### D. Section 20(a) Control Person Liability

Section 20(a) of the Exchange Act, which forms the basis of Plaintiffs' second cause of action, extends liability to persons who directly or indirectly control a violation of the securities laws. 15 U.S.C. § 78t(a). Under Section 20(a), "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator." *City of Dearborn Heights*, 856 F.3d at 623 (quoting *Zucco Partners*, 552 F.3d at 990).

A claim under Section 20(a) can survive only if the underlying predicate Exchange Act violation also survives. *See City of Dearborn Heights*, 856 F.3d at 623. Because the Court dismisses Plaintiffs' Section 10(b) claim, Plaintiffs' second cause of action must also be dismissed.

## V. LEAVE TO AMEND

The Court previously dismissed Plaintiffs' FAC without prejudice and permitted them to amend their complaint to address the deficiencies the Court identified. ECF No. 83 at 31. The fact that Plaintiffs "failed to correct these deficiencies in [their] Second Amended Complaint is a strong indication that the plaintiffs have no additional facts to plead." *Zucco Partners*, 552 F.3d at

1007 (citation and internal quotation marks omitted). "A district court's discretion to deny leave to amend is particularly broad where the plaintiff has previously amended." *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (citation and internal quotation marks omitted). The Court concludes that further leave to amend would be futile and therefore dismisses Plaintiffs' SAC without leave to amend.

**CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion to dismiss without leave to amend.

**IT IS SO ORDERED.**

Dated: March 11, 2020

JON S. TIGAR
United States District Judge

United States District Court
Northern District of California